UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re

GREENER CLEANERS, LTD                    Chapter 11
                                         Case No. 08-14239


                        Debtor
_____

### DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE CONCERNING THE CHAPTER 11 PLAN OF REORGANIZATION FOR GREENER CLEANERS LTD.


Dated:  October 14, 2009


DRIBUSCH LAW FIRM
Attorneys for Debtor and Debtor in Possession
The Patroon Building
Five Clinton Square
Albany, New York  12207
Telephone No.:  (518) 436-1662

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ............................................................................................................... 1
    A.  Right to Vote .............................................................................................................. 4
    B.  Debtors Assets ........................................................................................................... 6

II. SUMMARY OF THE DEBTORS' CHAPTER 11 PLAN ................................................ 6
    A.  Overview of the Plan ................................................................................................. 6
    B.  Administrative Claims ............................................................................................... 7
    C.  Classification of Claims and Interests ...................................................................... 8
    D.  Treatment of Classes under the Plan ........................................................................ 8

III. ACCEPTANCE OR REJECTION OF THE PLAN ........................................................ 9
    A.  Impaired Classes Entitled to Vote ............................................................................ 9
    B.  Acceptance by an Impaired Class of Claims ............................................................ 9
    C.  Presumed Acceptance of Plan by Unimpaired Classes ............................................ 9
    D.  Deemed Non-Acceptance of Plan ............................................................................. 9

IV. MEANS FOR IMPLEMENTATION OF THE PLAN ................................................... 10

V.  CONDITIONS PRECEDENT ........................................................................................ 10

VI. DISTRIBUTIONS UNDER THE PLAN ....................................................................... 11

VII. EXECUTORY CONTRACTS ....................................................................................... 13
    A.  Assumption or Rejection of Executory Contracts and Unexpired Leases. ........... 13

VIII. EFFECTS OF PLAN UPON CONFIRMATION ........................................................ 14

IX. CORPORATE EXISTENCE AFTER CONFIRMATION ............................................ 16

X.  MISCELLANEOUS PROVISIONS .............................................................................. 16

XI. LIQUIDATION ANALYSIS ......................................................................................... 19

XII. REQUIRED VOTES .................................................................................................... 20

XIII. CONFIRMATION OF THE PLAN ............................................................................ 21
    A.  Feasibility ................................................................................................................ 21
    B.  "Cram Down" Provisions ....................................................................................... 21

XIV. CONCLUSION ............................................................................................................ 22
Exhibit A  -  Chapter 11 Plan of Liquidation
Exhibit B  -  Schedule of Administrative Expense Claims
Exhibit C  -  Schedule of Priority Claims (Class 2)
Exhibit D  -  Schedule of General Unsecured Claims (Class 3)
Exhibit E  -  Proposed Perth Asset Purchase Agreement
Exhibit F  -  R.R. Streets & Co. Solvair Warranty Claim
Exhibit G  -  R.R. Streets & Co. Solvair Warranty Agreement Redline

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

## I.   INTRODUCTION[1/]

The Chapter 11 Joint Plan Reorganization for Greener Cleaners Ltd. dated September 2009 ("Plan") provides for an absolute priority distribution to holders of Claims against Greener Cleaners, Ltd. (the "Debtor").

Debtors submit this Disclosure Statement, dated September 2009 ("Disclosure Statement"), pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. ("Bankruptcy Code") to all Creditors[2] of the Debtors and other parties in interest in connection with the solicitation of acceptances or rejections of the Plan.

On December 22, 2008 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

### Company Background

Greener Cleaners, Ltd. is a long term operator in the Albany and Schenectady dry cleaning and coin operated cleaning market.   The business was acquired in 1982 by Benson Seidman (38%), Herb Siegal (38%), and Donald Hoffman (24%) in 1982.   Herb Siegal transferred his shares to David Siegal in 1994.  Donald Hoffman left the business in 1994 and his shares were redeemed by the Debtor.   Benson Seidman's direct participation in the business ended around 2003 when he retired.   Benson Seidman passed away in August 6, 2009.  The Benson Seidman Trust now owns Benson Seidman's ownership interest in Greener Cleaners.  Gaye Reinhold and Mitchell Seidman are the Trustees of the Benson Seidman Trust.  John Reinhold, Benson's son-in-law has been a strategic advisor to the Debtor since August 2008.

The Debtor operated Perchlorate-based (PERC) Dry Cleaning equipment in various locations until 1997.  The Debtor centralized all processing at its current central Plant in 1997.

### Events Leading to Bankruptcy

---

[1/]        All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Chapter 11 Plan of Reorganization for Greener Cleaners, Ltd. attached as Exhibit A ("Plan").

[2]        Capitalized terms not expressly defined herein have the meaning ascribed to them in the Plan annexed hereto as Exhibit A.

The Debtor had PERC and asbestos problems from previous owners/locations, acquired businesses and post-acquisition operations which resulted in over $500,000 in DEC penalties, legal and remediation costs.

The above problems and general decline of the Dry Cleaning industry were exacerbated by management issues which resulted in negative cash flow beginning in fiscal years 2004/2005 and which ultimately led to the Debtor's Chapter 11 filing in December 2008.  Mangement issues, included, *inter alia*, (i) reactive, rather than proactive, response to DEC issues; (ii) failure to reduce costs in correlation with declining sales; (iii) signing of long-term leases for stores not supported by a business case, assuring that the affected stores would never contribute positive cash flow; and (iv) operational and financial control weaknesses.

Management issues included, without limitation: (a) in CY2007 there was no functional accounting system and the $500,000.00 loss in 2007 was not quantified until September 2008; (b) extreme deferred maintenance and minimal reinvestment in vital equipment; (c) declining quality and timeliness led to increased customer dissatisfaction; (d) decision to pioneer  R.R. Streets & Co.'s new Solvair Cleaning System in February 2008 to replace aging PERC machines at roughly four times the cost of a proven, environmentally benign technology with twice the capacity.

### Post-Petition Management

In the third quarter of 2008, the Debtor retained new management leadership with John Reinhold acting as Strategic Advisor beginning August 2008 and Henry Cook becoming a consultant in November 2008 and assuming the acting CEO role beginning February 2009.   The new management team assessed the situation and elected to voluntarily enter Chapter 11 Reorganization in December 18, 2008 to enable a reorganization of the business by: (1) restructuring leases; (2) closing non-performing locations; (3) decommissioning  the Solvair Cleaning System and replacing it with a conventional Hydrocarbon machine with sufficient capacity to process all Dry Cleaning in a single shift with higher quality and dramatically reduced costs and downtime; (4) restructuring operations to reduce payroll, utilities and other expenses leading to a 41% (YTD as of 7/31/2009) reduction in operating expenses.   As a result of the forgoing, the Debtor has been able to improve Operating Income by approximately $330,000 (YTD as of 7/31/2009).

## Debt Structure

The Debtor has a secured line of credit with KeyBank National Association ("KeyBank LOC") which has a current outstanding balance of approximately $300,000.00. The KeyBank LOC is essentially secured by the assets of the Debtor. The Debtor is current making post-petition interest only payments on the obligation.

## Post-Petition Events

Subsequent to the Petition Date, the Debtor streamlined its business which included, among other things, assuming certain non-residential leases, modifying certain non-residential leases, and terminating certain non residential leases. See Docket ## 30, 32, 33, 34, 42, and 43. The Debtor also entered into a post-petition line of credit to allow it to, among other things, upgrade its computer systems so as to better manage it operations. See Docket ## 46, 47, and 53.

## Present and Projected Earnings

Debtor's year to date earnings through July 31, 2009 as stated by Quickbooks on an accrual basis are approximately $17,000. However when corrected for unbooked administrative claims related to Henry Cook's Consulting agreement and other expenses the year-to-date operating performance is essentially break even. To implement the restructuring of the business, the Benson Seidman Trust (50% shareholder) provided a $50,000 Line of Credit and a $92,991 equipment lease.

Debtor's projected earnings are anticipated to be moderately positive (5-10% of sales) on an annual basis with significant seasonal variations. Fluctuations in sales due to widely varying Dry Cleaning demand and proportionally high fixed costs will require a significant level of working capital and/or Line(s) of Credit to ensure cash is available to cover negative cash flow in the summer and winter months. In addition, the deferred maintenance and replacement of essential equipment will require significant ongoing reinvestment of earnings over many years to restore the company's operational infrastructure. As a result, management of cash flow on a near breakeven basis is anticipated unless and until significant new revenue opportunities can be identified and pursued.

The Debtors submit this Disclosure Statement in support of the Plan attached as Exhibit A.  The Debtors believe that the Plan which implements an absolute priority distribution provides the best alternative for the Debtors' Creditors in this Case.

This Disclosure Statement is being provided by the Debtors to all of the Debtors' known Creditors and other parties in interest pursuant to Section 1125 of the Bankruptcy Code.  The purpose of this Disclosure Statement is to provide information so that Creditors and other parties in interest can make a reasonably informed decision in exercising any right to vote for acceptance or rejection of the Plan (to the extent they have the right to vote).  The Plan, a summary of which is included herein, specifies the classes of Creditors and equity holders and the treatment of the Claims and Interests thereof.  The Bankruptcy Court will, if this Disclosure Statement is approved, set a time and date for a hearing to consider acceptance of the Plan.

**THIS DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO, SHOULD BE READ IN ITS ENTIRETY. THE DESCRIPTION OF THE PLAN CONTAINED HEREIN IS A SUMMARY ONLY AND IS QUALIFIED BY REFERENCE TO THE TERMS AND CONDITIONS OF THE PLAN ITSELF. NO REPRESENTATIONS CONCERNING THE DEBTORS, THE DISPOSITION OF THE DEBTORS' ASSETS AND THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS AND/OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO CHRISTIAN H.DRIBUSCH, ESQ., ATTORNEY FOR THE DEBTOR, THE PATROON BUILDING, FIVE CLINTON SQUARE, ALBANY, NEW YORK 122073, WHO, IN TURN, SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

A.    **Right to Vote**

In order to be entitled to vote on the Plan, a Creditor must have timely filed a Proof of Claim (unless the Creditors Claim has been accurately scheduled by the Debtors as not disputed, liquidated and not contingent). Any Creditor whose claim has already been accurately scheduled by the Debtors and not disputed, liquidated and not contingent is, to the extent and in the amount scheduled, permitted to vote (subject, however, to objection by the Debtors that such vote is in bad faith or should not be counted for some other reason). A Creditor may vote to accept or reject the Plan by filling out and mailing the ballot which will be mailed to parties entitled to vote upon

approval of the Plan ("Ballot"). The Ballot will include instructions for its proper completion and return in a timely fashion.

The last date by which Ballots must be received will be set forth in the ballot which will accompany the Plan. No Ballot received after that date will be counted. Whether a Creditor or other party in interest votes for the Plan or not, such person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of classes of Creditors and is confirmed by the Court. Absent some affirmative act constituting a vote, a Creditor will not be included in determining whether the requisite approval has been obtained; however, blank Ballots received from any Creditor will be counted as acceptances of the Plan. The allowance or disallowance of a Claim or Interest for voting purposes does not necessarily mean that all or a portion of the Claim or Interest will be allowed or disallowed for distribution purposes.

In order for the Plan to be accepted by Creditors, a majority in number and at least two-thirds in amount of Claims allowed (for voting purposes) and voting in each impaired class of Claims must vote to accept the Plan (subject to other Bankruptcy Code limitations on voting). A Plan can, in some cases, also be confirmed as long as at least one impaired class of Claims votes to accept the Plan, as long as certain other requirements of Section 1129(b) of the Bankruptcy Code are met. Given the importance of the matter, Creditors are urged to fill in, date, sign and promptly mail the Ballots. Please be sure to properly complete the Ballot form and legibly identify the correct name of the claimant. Certain Creditors have claims in more than one Class and should vote a Ballot for each Class in which they are a Creditor pursuant to the attached Exhibits. Ballots voted by Creditors for a Class in which they are not identified as a Creditor pursuant to the attached Exhibits or without a Class noted will not be counted.

The information contained in this Disclosure Statement has been derived primarily from the records of the Debtors, but has not been independently verified nor subjected to audit. Every reasonable effort has been made to present accurate information; however, the accuracy of the information contained herein cannot be guaranteed. Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible documents, which are either on file with the Bankruptcy Court or can be made available upon request. While every effort has been made to retain the meaning of such other documents or the portions transposed, please be

cautioned that any reliance on the contents of such other instruments should depend on a thorough review of the documents themselves.

**B.      Debtor's Assets**

| | |
|---|---:|
| Store leases, improvements, signage and equipment | $150,000 |
| Plant lease, improvements, signage and equipment | $150,000 |
| Vehicles | $30,000 |
| Cash | $38,000 |
| A/R | $15,000 |
| Inventory, Supplies | $25,000 |
| WIP/Finished Goods | $100,000 |
| Perth Dry Cleaning & Coin Laundry Location | $165,000 |
| Warranty Claim on R.R. Streets & Co. Solvair Cleaning System | $117,000 |
| **Total Estimated Asset Value** | **$790,000** |

## II.      SUMMARY OF THE DEBTORS' CHAPTER 11 PLAN

**THE FOLLOWING IS A SUMMARY OF THE PROVISIONS OF THE PLAN AND, ACCORDINGLY, IS NOT AS COMPLETE AS THE FULL TEXT OF THE PLAN.  THE PLAN SHOULD BE READ IN ITS ENTIRETY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.**

**A.      Overview of the Plan**

The Plan contemplates that the Debtors will pay a substantial part of the Allowed Secured Claims, all the Allowed Administrative Expense Claims and Allowed Priority Claims, and a ten percent (10%) distribution to General Unsecured Claimants, in Cash on or about the Effective Date unless earlier payment is provided for therein.  The Holders of Common Stock Interests in the Debtor will receive no distribution under the Plan pursuant to said Interests and on the Effective Date, the Common Stock of the Debtor will be redistributed; 45% to David Siegal, 45% to the Benson Seidman trust and 10% to Henry Cook..

Exhibits B-D are schedules of Claims in these cases.  These Exhibits identify how such Claims were scheduled by the Debtors, whether or not a proof of claim was filed and in what amount and whether or not the Debtors plan to object to such Claim, for what reason and in what amount.  The Debtors reserve their right to modify, amend, correct or further object to any Claim on any basis, including objections arising under Section 502(d) of the Bankruptcy Code.

The Debtor will set aside a Claims Reserve pending resolution of the Disputed Claims to be resolved through the claims objection process.

### B.   Administrative Claims

Allowed Administrative Expense Claims (other than Claims for compensation and reimbursement of expenses of Professionals) will be paid in full, in Cash, on the Effective Date of the Plan (or as otherwise agreed or as soon thereafter as practicable), or, if such Claim becomes Allowed after the Effective Date, within five (5) days after such Claim becomes Allowed, unless other payment terms are agreed to between the Debtors and the Holder of any such Claim.  Any fees due and owing to the United States Trustee shall be paid in full as they become due, or as soon thereafter as is practicable. All payments on Allowed Administrative Expense Claims shall be paid only from amounts available in the Debtor's account(s) unless otherwise specifically provided for in this Plan.  A schedule of Claims in this group is attached as Exhibit B.  Exhibit B also includes a list of Holders of Administrative Expense Claims who have agreed to defer payment of their Administrative Expense Claims until there are sufficient proceeds in the Estate to pay such Claims.

Unless otherwise ordered by the Bankruptcy Court, and other than Administrative Expense Claims of Professionals, requests for payment of Administrative Expense Claims must be Filed and served on the Debtor no later than thirty (30) days after confirmation of this Plan by Final Order.  Any Entity that is required to File and serve a request for payment of an Administrative Expense Claim and that fails to timely File and serve such request, shall be forever barred, estopped and enjoined from asserting such Claim against the Debtors, the Estate of the Debtors or their respective property.

Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before the Confirmation Date shall File an application for allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Confirmation Date.  Objections to applications of Professionals or other Entities for compensation or reimbursement of expenses must be Filed no later than twenty (20) days after the filing of such application.  To the extent such application is approved by the Bankruptcy Court, the applicant shall be entitled to an Allowed Claim to be paid in full within five (5) days of the entry of an order of the Bankruptcy Court approving such application.

## C.     Classification of Claims and Interests

The Plan provides for the following classes of Claims and Interest Holders:

<u>Class 1 – Secured Claims</u>.  Class 1 is the allowed secured claim of KeyBank National Association.  Class 1 is not impaired.

<u>Class 2 – Priority Claims</u>.  Class 2 consists of all Allowed Priority Claims against the Debtors.  Class 2 is not believed to be impaired.

<u>Class 3 – General Unsecured Claims</u>.  Class 3 consists of Allowed General Unsecured Claims.  Class 3 is impaired.

<u>Class 5 – Common Stock and Interest and Claims Relating Thereto</u>.   Class 5 consists of all Common Stock Interests in the Debtors and Claims relating thereto.  Class 5 is impaired.

## D.     Treatment of Classes under the Plan

<u>Class 1 – Secured Claims</u>.  Holders of Allowed Secured Claims shall be paid by the Debtors the Allowed Amount of such Claim, including all applicable interest and other charges to which the Holder of such Allowed Claim may be entitled under applicable law or contract, to the extent permitted under the applicable provisions of Section 507(a) of the Bankruptcy Code, in Cash.  The Debtor shall pay KeyBank $100,000 on the Effective Date of the Plan. The KeyBank loan shall remain in place under current terms after the Effective Date.

<u>Class 2 – Priority Claims</u>.  Holders of Allowed Priority Claims shall be paid by the Debtors the Allowed Amount of such Claim, including all applicable interest and other charges to which the Holder of such Allowed Claim may be entitled under applicable law or contract, to the extent permitted under the applicable provisions of Section 507(a) of the Bankruptcy Code, in Cash, on the later of: (a) the Effective Date (or as soon thereafter as practicable) or (b) the first Business Day after such Claim becomes an Allowed Claim (or as soon thereafter as practicable).  A schedule of the Claims in this Class is attached to this Disclosure Statement as Exhibit C.

<u>Class 3 – General Unsecured Claims</u>.  Entities that are holders of General Unsecured Claims in this class which are Allowed shall be paid ten percent (10%) of their Allowed Claim payable on the later of (a) the Effective Date (or as soon thereafter as is practicable), or (b) the first Business Day after such Claim becomes an Allowed Claim (or as soon thereafter as is practicable).  A schedule of Claims in this Class is attached to this Disclosure Statement as Exhibit D.

Class 4 – Common Stock.  Holders of Common Stock Interests in the Debtors shall receive no distribution under the Plan pursuant to said Interests.   Henry Cook will waive fifty percent (50%) of his administrative claim in exchange for a ten percent (10%) ownership interest in the reorganized Debtor.   David Siegal will waive his general unsecured claim in the approximate amount of $1,219,678.33   in exchange for a forty-five percent (45%) ownership interest in the reorganized Debtor.  The Benson Seidman Trust will waive its general unsecured claim in the approximate amount of $824,275.00   in exchange fo a forty-five percent (45%) ownership interest in the reorganized Debtor.

## III.    ACCEPTANCE OR REJECTION OF THE PLAN

### A.    Impaired Classes Entitled to Vote

Classes 1  and 3 are impaired under the Plan.  Each holder of an Allowed Claim or Allowed Interest in Classes 1  and 3 shall be entitled to vote to accept or reject the Plan.

### B.    Acceptance by an Impaired Class of Claims

A Class of Creditors shall have accepted the Plan if Creditors holding at least two-thirds in the aggregate dollar amount and more than one-half in number of the Allowed Claims or Allowed Interests of such Class that have accepted or rejected the Plan, vote to accept the Plan.

### C.    Presumed Acceptance of Plan by Unimpaired Classes

 Class 1 is not impaired under the Plan, and, therefore, are conclusively presumed to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 1 do not have a right to vote on the Plan.

### D.    Deemed Acceptance of Plan

Class 4 is impaired under the Plan.  Each holder of a Claim or interest in Class 4 will neither receive, nor retain any property under the Plan.  Class 4 holders have agreed to exchange their general unsecured debt for a forty-five percent interest in the Reorganized Debtor thereby allowing a greater distribution to the Class 3 general unsecured creditors.  Henry Cook has agreed to exchange one-half of his administrative claim for a ten percent (10%) interest in the reorganized Debtor thereby allowing a greater distribution to general unsecured creditors.  Holders of Claims in Class 4 are deemed to have accepted the Plan.

9

IV.     **MEANS FOR IMPLEMENTATION OF THE PLAN**

On the Effective Date (or as soon thereafter as is practicable), or unless provided for earlier pursuant to the terms hereof, the Debtor shall distribute Cash from the Debtor's account(s) to the holders of Allowed Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed General Unsecured Claims, as provided under the terms of the Plan, in satisfaction of such Claims.

As a source of funds for Cash distributions to Creditors under the terms of the Plan, the Debtor will have liquidated or will liquidate its interests in its Perth Dry Cleaning and Laundromat location through a sale for $165,000.00 to Pleasant Laundromats, Inc. owned by James and Barbara Partyka pursuant to the terms, provisions and conditions of a purchase agreement substantially similar to Exhibit E annexed hereto. The Debtor was anticipating additional funds for working capital, capital investment and Cash distributions from the settlement of a Warranty Claim formally presented to R.R. Streets & Co., Inc. for the Solvair Cleaning System on May 1, 2009 (Exhibit F). As of September 15, 2009 the Debtor and Ross Beard, the CEO of R.R. Streets & Co. had agreed on a price of $117,000 to settle the Warranty Claim (Exhibit G). However it now appears that R.R. Streets & Co. is unwilling to honor the Warranty Claim without a law suit so these funds are not included in the Plan.

V.     **CONDITIONS PRECEDENT**

**Conditions Precedent to Confirmation Date.**  The occurrence of the Confirmation Date of the Plan is subject to satisfaction or waiver of each of the following conditions:

i)     the Bankruptcy Court has entered the Confirmation Order in form and substance satisfactory to the Debtor; and

ii)     the Debtor has received the consent of any third parties or governmental units whose consent is required for confirmation.

**Conditions to Effective Date**.  The occurrence of the following shall be a separate condition to the Effective Date of the Plan:

(a)     the Confirmation Order has become a Final Order; and

(b)     the Debtor has consummated the closing of the Perth Dry Cleaning and Laundromat location.

**Waiver of Conditions**.  The Debtors shall have the right to waive any of the foregoing conditions to the Confirmation Date, or to the Effective Date.  Without limiting the foregoing, the Effective Date may occur notwithstanding the pendency of an appeal of the Confirmation Order or any order related thereto so long as there is no stay in effect.  The Effective Date may occur before the expiration of time to take an appeal or to seek reconsideration of the Confirmation Order without the giving of any notice to any objecting party.  In the event of any such appeal, the Debtor may seek the dismissal of such appeal as moot following the Effective Date of the Plan.

## VI.      DISTRIBUTIONS UNDER THE PLAN

**Distributions**.  All distributions under the Plan shall be made by the Debtor.

**Method of Payment**.  Any Cash payment made by the Debtor pursuant to the Plan shall be in U.S. dollars, either by check or wire transfer.

**Timing of Payment**.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be due on the next succeeding Business Day.

**Setoff**.  Nothing contained herein shall be deemed to waive the Debtor's statutory or common law right of setoff.

**De Minimis Distributions**.  The Debtor shall not be required to distribute Cash to any Creditor if the amount of Cash to be distributed to such Creditor is less than $50.00.

**Unclaimed Distributions to Creditors**.

i)       **Non-Negotiated Checks**.  If the Holder of an Allowed Claim fails to present for payment a check issued to such Holder pursuant to the Plan within ninety (90) days of the date such check was issued, or if any distributions are returned to the Debtors due to an incorrect or incomplete address for which the Debtors has not received a correct address, then the amount of Cash attributable to such check or distribution shall be deemed to be Unclaimed Distributions in respect of such Holders Class of Claims and the payee of such check or distribution shall be deemed to have no further Claim in respect of such check or distribution, and shall not be entitled to participate in any further distributions under the Plan.

ii)      **Revesting of Unclaimed Distributions**.  All Unclaimed Distributions shall revest in the Debtors.

iii)   **Treatment of Disputed Claims**.  Disputed Claims shall be treated as follows under the Plan:

(a)   **Objections to Claims**.  Except as otherwise provided by the Bankruptcy Court or in the Plan, all objections to Claims shall be Filed and served on the Holders of such Claims on or before the later of (i) ninety (90) days after the Confirmation Date, (ii) ninety (90) days after a particular Proof of Claim is Filed, except that such Claim shall not be deemed an Allowed Claim until after the ninety (90) day period lapses, and (iii) such additional date as the Bankruptcy Court may fix upon application of the Debtor; provided, however, that no party in interest shall be required to File an objection to any Claim listed in the Schedules as disputed, contingent, unliquidated or undetermined and for which no Proof of Claim was Filed, which Claim shall be barred and disallowed in its entirety.  Exhibits B, C, and D, include a column indicating if a particular Claim is disputed and will be objected to and what amount the Debtors will assert such Claim is worth in their objection.  The Debtors reserve their right to amend, modify, correct or further object to Claims for any reason, including objections arising under Section 502(d) of the Bankruptcy Code.

(b)   **No Distributions Pending Allowance**.  Notwithstanding any other provision of the Plan to the contrary, no distribution shall be made to the Holder of a Disputed Claim or the Holder of a Claim who is the subject of a proceeding against it by the Debtor, unless and until such Disputed Claim becomes an Allowed Claim or such proceeding is resolved.

(c)   **Distributions After Allowance**.  Once a Disputed Claim becomes an Allowed Claim, distribution on account of such Claim shall be made in accordance with the provisions of the Plan governing the Class of Claims to which the respective Claim belongs.

(d)   **Estimation of Disputed, Contingent or Unliquidated Claims**.  Prior to the Effective Date, to effectuate distributions pursuant to the Plan and avoid undue delay in the administration of this Case, on request of the Debtor, the Bankruptcy Court shall estimate the amount of each Disputed Claim or Contingent or Unliquidated Claim for which the Disputed, Contingent and Unliquidated Claims Reserve (as defined below) has been or will be established (the amount so estimated for each Claim being the Estimated Amount).  The Estimated Amount shall be fixed by Final Order, which shall be deemed the amount of such Claim for all purposes under the Plan.

(e) **Claims Reserve.** On or prior to the Effective Date, the Debtor shall establish the Disputed, Contingent and Unliquidated Claims Reserve in an aggregate amount sufficient to pay each Creditor holding a Disputed Claim or Contingent or Unliquidated Claim as contemplated by the Plan the lesser of (i) the Estimated Amount or (ii) the amount of Cash that such Creditor would have been entitled to receive under the Plan if such claim had been an Allowed Claim on the Effective Date (such account being the a Disputed, Contingent and Unliquidated Claims Reserve or "Claims Reserve").

## VII. EXECUTORY CONTRACTS

### A. Assumption or Rejection of Executory Contracts and Unexpired Leases.

i) **Executory Contracts and Unexpired Leases.** All executory contracts and unexpired leases that exist between the Debtors and any Entity which have not been assumed or rejected prior to the Effective Date shall be deemed rejected as of the Effective Date. Nothing contained herein shall constitute a waiver of any claim, right or cause of action that the Debtor may hold against any party to any executory contract or unexpired lease with the Debtor, including the insurer under any policy of insurance.

ii) **Options**. Any options, warrants or other equity interests representing the right to acquire Old Common Stock shall be canceled as of the Effective Date. All Claims arising thereunder shall be classified in Class 3.

iii) **Approval of Assumption, Rejection or Assumption and Assignment of Leases and Contracts**. Entry of the Confirmation Order shall constitute the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases to be rejected pursuant to the Plan. Notice of the hearing on Confirmation of the Plan shall constitute notice to any non-Debtor party to an executory contract or unexpired lease, which is to be rejected under the Plan, of the Debtor's intent to reject such contract or lease.

iv) **Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**. All Proofs of Claim arising out of the rejection of an executory contract or unexpired lease pursuant to Article VII of the Plan must be Filed within thirty (30) days after the Effective Date unless an earlier date has been established by Bankruptcy Court order. Any Holder of a Claim arising out of the rejection of an executory contract or unexpired lease who fails to File a Proof of Claim within such time shall

be forever barred, estopped and enjoined from asserting such Claim against the Debtor or the Estate. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims in Class 3 under the Plan. Nothing contained herein shall extend the time for Filing a Proof of Claim for rejection of any contract or lease rejected prior to the Confirmation Date.

## VIII.  EFFECTS OF PLAN UPON CONFIRMATION

**Revesting of Assets**. Except as otherwise set forth herein, subject to the provisions of and for the purposes of distributions in accordance with the Plan, all Assets including all Avoiding Power Causes of Action, shall revest in the Debtor on the Confirmation Date for distribution to creditors in accordance with the Plan. Such revested property shall be free and clear of all liens, claims, encumbrances and interests, except as otherwise provided in the Plan.

**Injunction.** As of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability against the Debtors affected by the Plan are enjoined from taking any action to collect or recover in any manner on account of any such Claims, debts or liabilities from any or all of the Assets, except as otherwise provided in the Plan.

**Retention of Jurisdiction**. The Bankruptcy Court shall retain and have jurisdiction over the Case until substantial consummation of the Plan for the following purposes:

i)  to adjudicate all controversies concerning the classification or allowance of any Claims or Interests;

ii)  to liquidate any Claims which are disputed, contingent or unliquidated;

iii)  to determine any and all objections to the allowance of Claims or Interests, or counterclaims to any Claim;

iv)  to determine any and all applications for allowance of compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

v)  to determine any applications pending on the Effective Date for the rejection or assumption of executory contracts or unexpired leases or for the assumption and assignment, as the case may be,

of executory contracts or unexpired leases to which the Debtors is a party or with respect to which it may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

vi)    to adjudicate any actions brought by the Debtors for any Causes of Action or otherwise regarding any property of the Estate at any time prior to expiration of the relevant statute of limitations;

vii)    to determine any and all applications, adversary proceedings and contested or litigated matters that may be pending on the last date for objections to Claims;

viii)    to consider any modifications of the Plan, remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Court;

ix)    to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan;

x)    to consider and act on the compromise and settlement of any Claim or cause of action by or against the Estate;

xi)    to issue orders in aid of execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code; and

xii)    to determine such other matters as may be set forth in the Confirmation Order or which may arise in connection with the Plan or the Confirmation Order.

**Effectuating Documents; Further Transactions; Timing**.  The Debtor is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously.

**Modification of the Plan**.  The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify the Plan and related documents in any manner prior to the entry of the Confirmation Order. After entry of the Confirmation Order, the Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan and related documents in accordance with, and to the extent permitted by, Section 1127(b) of the Bankruptcy Code, and remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be

necessary to carry out the purpose and intent of the Plan.  Every amendment or modification of the Plan shall supersede and render null and void all prior versions of the Plan.

## IX.   CORPORATE EXISTENCE AND DISCHARGE AFTER CONFIRMATION

**General**.  This Debtor shall continue as an entity after Confirmation and shall be discharged pursuant to Bankruptcy Code Section 1141.

## X.   MISCELLANEOUS PROVISIONS

**Exemption from Transfer Taxes**.  Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of securities or other property under the Plan; the creation, transfer, filing or recording of any mortgage, deed of trust, financing statement or other security interest; or the making, delivery, filing or recording of any deed or other instrument of transfer under the Plan, shall not be subject to any stamp tax, real estate tax, conveyance, filing or transfer fees, mortgage, recording or other similar tax or other government assessment.  All recording officers and other entities whose duties include recordation of documents lodged for recording shall record, file and accept such documents delivered under the Plan without the imposition of any charge, fee, governmental assessment or tax.

Pursuant to Section 1141(d) of the Bankruptcy Code, confirmation will discharge Claims or Interests against the Debtor.  Except as otherwise set forth in the Plan, on and after the Effective Date, all persons and entities that have held, hold or may hold (a) any Claim against or Interest in the Debtor or Debtor in Possession be permanently enjoined from and against (i) commencing or continuing in any  manner any suit, action or other proceeding of any kind against the Debtor, the Debtor in Possession, or the Debtor,s officers and directors, Debtor's Professionals, or the Estate with respect to any such Claim or Interest, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, the Debtor in Possession, or Debtor's officers and directors, Debtor's Professionals, or the Estate, (iii) creating, perfecting or enforcing any lien or encumbrance of any kind against the Debtor, the Debtor in Possession, or Debtor's officers and directors, Debtor's Professionals, or the Estate, or against any of their properties or interests in property with respect to such Claim or Interest, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or the Debtor in Possession or against any property or interest in property of the Debtor, the Debtor in Possession, or the Estate, as such Plan confirmed by

Final Order of the Bankruptcy Court shall be res judicata as to any of the foregoing acts concerning or related to any such Claim or Interest administered by the Plan, and (b) any Claim, right, action, Cause of Action against or Interest against the Debtor, the Debtor in Possession, or Debtor's officers and directors, Debtor's Professionals, or the Estate shall be permanently enjoined from and against commencing or continuing any suit, action or proceeding against, asserting or attempting to recover any Claim against or Interest in, or otherwise affecting the Debtor's, the Debtor's in Possession, the Estate or Debtors' officers and directors, with respect to any matter that is the subject of the Plan. The foregoing enjoinment of the commencement or continuation of any suit, action or proceeding against, asserting or attempting to recover any Claim against or Interest in, or otherwise against the Debtor, the Debtor in Possession, or Debtor's officers and directors in no way forecloses the commencement or continuation of valid Chapter 5 claims under the Bankruptcy Code against the Debtor, the Debtor in Possession, or Debtor's officers and directors.

**Revocation or Withdrawal of the Plan**. The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Effective Date. If the Debtor revokes or withdraws the Plan, then the Plan shall be deemed null and void.

**Binding Effect**. The Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the Holders of all Claims and Interests and their respective successors and assigns. Confirmation of the Plan binds each of the Holders of Claims and Interests to the terms and conditions of the Plan, whether or not such Entity has accepted the Plan.

**Construction**. The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to construction of the Plan.

**Time**. In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein, the provisions of Bankruptcy Rule 9006 shall apply.

**Headings**. The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor are intended in any manner to affect any interpretation of the provisions of the Plan.

**Governing Law**. Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations of any Entity arising under the Plan shall be governed by, and construed and

enforced in accordance with, the internal laws of the State of New York, without regard to New York choice of law provisions.

**Payment of Statutory Fees**.  No later than the Effective Date, the Debtors shall have paid or shall pay all fees due to the United States Trustee through the Effective Date.  Such fees which accrue after the Effective Date and until the Case is closed shall be reserved for.

**Benefit Programs**.  As of the Confirmation Date, all scheduled programs or plans maintained by the Debtors for the benefit of present or former employees and dated on or before the Petition Date which have not been previously terminated shall be deemed to be terminated. Any Entity with a Claim arising from such termination shall be treated as a Holder of a General Unsecured Claim.

**Reserve**.  No later than the Effective Date, the Debtor shall have paid all fees due to the United States Trustee through the Effective Date, and establish a reserve of $1,000 for unpaid fees, and  post-petition allowed priority claims which accrue after the Effective Date.

**Cramdown**.  At the Confirmation Hearing, the Debtor may seek Confirmation of the Plan notwithstanding the rejection of the Plan by any impaired Class of Creditors or Interest Holders.

**Execution of Plan Documents**.  Upon application by the Debtor, the Court may issue an order directing any necessary party to execute, deliver, or to join in the execution or delivery of an instrument or document, and to perform any act necessary for the consummation of the Plan.

**Closing of the Case**.  Unless otherwise ordered by the Bankruptcy Court, the Case shall be deemed closed six months after the Effective Date.  Closing of the Case shall not affect the pendency of any adversary proceeding or contested matter filed before the Case is closed.

**Exculpation.**  The Debtor, and itsr respective members, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers and other Professionals retained by any such persons) shall have no liability to any holder of any Claim or Interest or any other person for any act or omission in connection with, or arising out of, this Case, including, without limitation, with respect to the Disclosure Statement, the Plan, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, objections to Claims, the pursuit of Avoiding Power Causes of Action, or the property to be distributed under the Plan, except for any act or omission constituting bad faith, self dealing,

breach of fiduciary duty, reckless or willful misconduct, or gross negligence (including malpractice constituting gross negligence) as determined by a final court order and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan, the Bankruptcy Code, and applicable law.

**Post-Confirmation Date Fees and Expenses.**

Fees and Expenses of Professionals.  After the Confirmation Date, the Debtor shall pay the reasonable fees and expenses of the professional persons employed by the Debtor in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such professionals may be engaged and, after the Effective Date, may enter into reasonable contingency fee arrangements with respect to affirmative claims brought or maintained by the Liquidating Trustee against third parties.

## XI.    LIQUIDATION ANALYSIS

Should GC Ltd.  file under Chapter 7 of the Bankruptcy Code on the date of this Disclosure Statement it is estimated that the following assets would be realized by the trustee in the following amounts:

| | |
|---|---|
| Store leases, improvements, signage and equipment | $0 |
| Plant lease, improvements, signage and equipment | $0 |
| Vehicles | $0 |
| Cash | $38,000 |
| A/R | $0 |
| Inventory, Supplies | $1,000 |
| WIP | $0 |
| Perth Dry Cleaning & Coin Laundry Location | $84,000 |
| Solvair Cleaning Machine | $45,000 |
| **Total Estimated Liquidation Value** | **$168,000** |

The value of the Perth location is discounted by 50% in a liquidation because the Purchase Agreement is contingent upon GC Ltd. providing ongoing services to the Purchaser in order to maintain the current services offered. The value of the other store locations is discounted to $0 in a liquidation because the stores are not self-sufficient and Dry Cleaning businesses are typically valued as a multiple on earnings, which are currently approximately $0 as described previously. The value of the Solvair cleaning machine in a liquidation is reduced by approximately 60% because of the limited market for this technology.

The estimated Liquidation Value is substantially less than the Secured Claim and there would be no funds available for Administrative, Priority or Unsecured creditors.

## XII.    REQUIRED VOTES

> **SECTION 1126(c) OF THE BANKRUPTCY CODE PROVIDES THAT A CLASS OF CLAIMS ACCEPTS A PLAN IF ACCEPTED BY CREDITORS HOLDING AT LEAST TWO THIRDS IN AMOUNT AND MORE THAN ONE-HALF IN NUMBER OF ALLOWED CLAIMS OF SUCH CLASS HELD BY CREDITORS THAT HAVE ACCEPTED OR REJECTED THE PLAN (AND WHO ARE ELIGIBLE TO VOTE).**

> **SECTION 1126(d) OF THE BANKRUPTCY CODE PROVIDES THAT A CLASS OF INTERESTS ACCEPTS A PLAN IF ACCEPTED BY PERSONS HOLDING AT LEAST TWO-THIRDS IN AMOUNT OF THE ALLOWED INTERESTS OF SUCH CLASS OF EQUITY HOLDERS THAT HAVE ACCEPTED OR REJECTED THE PLAN (AND WHO ARE ELIGIBLE TO VOTE).**

> **IN THE EVENT THAT THE PLAN IS NOT ACCEPTED BY ANY CLASS OF CREDITORS OR A CLASS OF INTERESTS WHICH IS IMPAIRED, THE DEBTORS WILL ATTEMPT CONFIRMATION OF THE PLAN IN ACCORDANCE WITH THE PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE.**

As stated, one criterion for confirmation of the Plan by the Bankruptcy Court is the requisite acceptance of the Plan by each impaired class of claimants. A Ballot to be used for voting to accept or reject this Plan will be enclosed with all copies of the Disclosure Statement mailed to the Creditors entitled to vote. Each Creditor entitled to vote must complete and submit the Ballot for each Class in which it is a creditor pursuant to the attached Exhibits.

In order to accept or reject the Plan, each creditor entitled to vote must execute the Ballot in accordance with the instructions contained thereon (provided, however, that Ballots returned which do not indicate acceptance or rejection shall be counted as acceptances of the Plan) and return the same so as to be received on or before the date indicated below. The completed Ballot should be mailed to:

> Law Office of Christian H. Dribusch
> The Patroon Building
> Five Clinton Square
> Albany, NY 12207

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED ON OR BEFORE 5:00 p.m. ON**

**_____.**

## XIII.    CONFIRMATION OF THE PLAN

In order for the Plan to be confirmed, the Bankruptcy Court must, after notice, hold a hearing on the question of confirmation. A party in interest may object to confirmation of the Plan and may appear at the confirmation hearing to prosecute such objection. Confirmation of the Plan is contingent upon satisfaction of the requirements of Bankruptcy Code Section 1129, including findings of the Bankruptcy Court concerning the following issues:

## A. Feasibility

The Bankruptcy Court is required to find that sufficient funds will be available to fund distributions to Creditors. In light of the expected realization of proceeds from the liquidation of the Debtor's interests in the Perth Dry Cleaning and Laundomat Location, the Debtor believes that it will have sufficient Cash to make all the distributions to creditors pursuant to the terms of the Plan. As of now, there may be insufficient funds to pay Administrative Expense Claims within twenty (20) days of a Final Order confirming the Plan.

## B. "Cram Down" Provisions

In the event that any impaired voting Class of Claims or Interests does not accept the Plan, the Debtors intends to seek confirmation of the Plan under the "cram down" rules of Section 1129(b) of the Bankruptcy Code. Under the "cram down" rules, the Bankruptcy Court must find that each holder of a Claim or Interest whose Claim or Interest is impaired (i) has accepted the Plan, or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date of the Plan, has a value not less than the amount such holder would receive if the Debtor's Estate were liquidated under Chapter 7 of the Bankruptcy Code on such date. The Debtor believes that the Plan satisfies this requirement, based on the reasons set forth in the preceding paragraph. The Debtor also believes that the Plan as drafted meets the "fair and equitable" test of Bankruptcy Code Section 1129(b)(2) and that it does not discriminate unfairly. Accordingly, confirmation under Section 1129(b) of the Bankruptcy Code is appropriate.

## XIV.  CONCLUSION

The Debtor submits that the Plan complies in all respects with Chapter 11 of the Bankruptcy Code, and recommend that holders of Claims who are entitled to vote on the Plan vote to ACCEPT the plan.  The Debtor, once again, remind such holders that each holder must either appear in person at the Confirmation Hearing to vote on the Plan, or return a signed and completed Ballot so as to be received (at the address noted above) prior to the date set forth on the Ballot.

DATED:  October 14, 2009

GREENER CLEANERS LTD.

By: _____/s/ Henry Cook_____
Name: _____Henry Cook_____
Title: _____Chief Executive Officer_____

LAW OFFICE OF CHRISTIAN H. DRIBUSCH

By: _/s/ Christian H. Dribusch_
         Christian H. Dribusch
The Patroon Building
Five Clinton Square
Albany, New York 12207
Telephone No. (518) 436-1662

Counsel for the Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re

GREENER CLEANERS LTD.                    Chapter 11
                                         Case No. 08-14239


                        Debtor
_____


**CHAPTER 11 PLAN OF REORGANIZATION FOR
GREENER CLEANERS, LTD**




Dated:  October 14, 2009











LAW OFFICE OF CHRISTIAN H. DRIBUSCH
Attorneys for Debtor and Debtor in Possession
The Patroon Building
Five Clinton Avenue
Albany, New York 12207
Telephone No. (518) 436-1662

Greener Cleaners, Ltd., Debtor and Debtor in Possession in this Chapter 11 case (the "Debtor") hereby proposes for itself the following Chapter 11 Plan of reorganization pursuant to Section 1121(a) of the Bankruptcy Code.

This Plan provides for an absolute priority distribution to holders of Claims.

# ARTICLE 1

## DEFINITIONS

As used in the Plan, the following terms shall have the respective meanings specified below (such meanings to be equally applicable to the singular and plural forms of the terms defined):

**Administrative Expense Claim(s)** means a Claim for payment of any costs or expenses of administration of the Case incurred after the commencement of the Case allowable under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary expenses of preserving the estate of the Debtor; (b) the actual and necessary expenses of operating the business of the Debtor (such as wages, salaries for services rendered); (c) indebtedness or obligations incurred or assumed by the Debtor in connection with the conduct of its business, the acquisition or lease of property, or the rendition of services to the Debtor; (d) allowances of compensation for legal and other services and reimbursement of expenses awarded pursuant to Sections 330(a), 331 and 503(b) of the Bankruptcy Code, and (e) all fees or charges assessed against the Estate under Section 1930, title 28, United States Code; provided, however, that an Exempt Tax shall not be an Administrative Expense Claim.

**Allowed**, when used as an adjective preceding the words Claim or Interest, it means any Claim against or Interest in the Debtor: (a) proof or application for allowance of which was (i) Filed on or before the date designated by the Bankruptcy Court as the last date for Filing a Proof of Claim against or Proof of Interest in the Debtor, (ii) later Filed with Bankruptcy Court with leave after notice and a hearing, or (iii) if no Proof of Claim or Proof of Interest or application for allowance was Filed, which Claim or Interest has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent; and (b) which (i) is due and payable and as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or the Bankruptcy Court, or (ii) as to which any objection has been determined by Final Order of the Bankruptcy Court to the extent such objection has been resolved in favor of the Holder of such Claim or Interest. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any claim that the Debtors may hold against the Holder thereof, to the extent such claim may be set off pursuant to applicable law.

**Assets** means all property of the Estates of the Debtor.

**Avoiding Power Causes of Action** means rights and remedies accruing to the Debtors pursuant to 11 U.S.C. §§ 544(b), 547, 548, 549, 550, 553(b).

**Ballot(s)** means the ballots accompanying the Disclosure Statement and the Plan upon which Creditors and other parties entitled to vote on the Plan shall have indicated their acceptance or rejection of the Plan.

**Bankruptcy Code** means Sections 101 et. seq. of Title 11 of the United States Code.

**Bankruptcy Court** means the United States Bankruptcy Court for the Northern District of New York or any court having competent jurisdiction to hear appeals or certiorari proceedings therefrom, or any

successor thereto that may be established by act of Congress or otherwise, and that has competent jurisdiction over the Case.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Case.

**Bar Date** is the last date for Filing Proofs of Claim and Proofs of Interest as fixed by the Bankruptcy Court.

**Bidding Procedures Order** means the Order of this Court entered December 24, 2008 (Docket No. 140) approving procedures for the auction of all Assets of the Debtors.

**Business Day** means any day except Saturday, Sunday or a legal holiday as such term is defined in Bankruptcy Rule 9006(a).

**Case** means the above-captioned cases under Chapter 11 of the Bankruptcy Code in which Greener Cleaners is the Debtor.

**Causes of Action** means all legal and equitable claims, demands, or causes of action held by the Debtors against any entity, including Avoiding Power Causes of Action.

**Cash** means cash and cash equivalents held by the Debtor.

**Claim** means a claim within the meaning of Section 101(5) of the Bankruptcy Code.

**Class** means a group of substantially similar Claims or Interests as classified in the Plan pursuant to Section 1123(a)(1) of the Bankruptcy Code.

**Closing Date** is the date on which the Case is closed by order or final decree of the Bankruptcy Court pursuant to Section 350 of the Bankruptcy Code.

**Committee** means the Official Committee of Unsecured Creditors appointed in the Case pursuant to Section 1102 of the Bankruptcy Code.

**Common Stock** means the common stock of the Debtor issued and outstanding as of the Petition Date, and includes any options or warrants with the right to acquire common stock of the Debtors.

**Confirmation Date** means the date the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**Confirmation Hearing** means the hearing before the Bankruptcy Court to consider confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code.

**Confirmation Order** means an order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**Contingent or Unliquidated Claims** mean Claims listed as contingent or unliquidated in the Debtors' Schedules or in the Proof of Claim or Proof of Interest filed by any Creditor.

**Creditor** means any Entity that has a Claim against the Debtors that arose on or before the Petition Date or a Claim against the Estate of any kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code.

**Debtor** means Greener Cleaners, Ltd., as debtor and debtor in possession, through the date on which the Confirmation Order is entered.

**Disallowed**, when used as an adjective preceding the words Claim or Interest, means any Claim or Interest, or portion of either thereof, which (a) is listed in the Debtor's Schedules as disputed, contingent or unliquidated and in respect of which a Proof of Claim or Proof of Interest is not Filed in a timely manner, (b) is not listed in the Schedules and in respect of which a Proof of Claim or Proof of Interest was not Filed in a timely manner, or (c) has been disallowed by a Final Order.

**Disbursing Agent** means the party authorized to make distributions in accordance with the Plan and Bankruptcy Rule 3020(a), which party shall be the Debtor.

**Disputed Claim** means (a) a Claim which is not an Allowed Claim, or (b) a Claim or portion thereof timely Filed prior to the Bar Date or deemed timely Filed under applicable law or under the Plan, as to which an objection Filed or to be Filed (as set forth herein) by the Debtor has not been withdrawn on or before any date fixed for Filing such objections by the Plan, the Bankruptcy Court, the Bankruptcy Code, or the Bankruptcy Rules, and which has not been denied by a Final Order. To the extent an objection relating to the allowance of only a part of the Disputed Claim has been timely Filed or deemed timely Filed, such Claim shall be a Disputed Claim only to the extent of the amount disputed in the objection. Prior to the time that an objection has been or may be timely Filed, a Claim shall be considered a Disputed Claim to the extent that the amount of the Claim specified in the Proof of Claim exceeds the amount of the Claim listed in the Schedules as other than disputed, contingent or unliquidated.

**Disclosure Statement** means the Debtor's written disclosure statement and its appendices, as amended, supplemented or further modified from time to time, with respect to the Plan.

**Effective Date** means a Business Day determined by the Debtor and upon which (a) no stay of the Confirmation Order is in effect and (b) the conditions to the Effective Date set forth in Section 7.02 of the Plan have been satisfied or waived. The Debtor shall file a notice of the Effective Date within three (3) days after its occurrence, which shall be served upon parties in interest.

**Entity** means an entity within the meaning of Section 101(15) of the Bankruptcy Code.

**Estate** means the estate of the Debtor created upon the commencement of the Case pursuant to Section 541 of the Bankruptcy Code.

**Exempt Tax** means any stamp, recording or similar tax or charge (including any penalties, interest or additions thereto) within the meaning of Section 1146(a) of the Bankruptcy Code which may be imposed by the laws of any state upon the transactions contemplated under, or necessary for the success of, the Plan, including without limitation, any mortgage recording, securities transfer, deed transfer, documentary transfer or gains taxes.

**File, Filed, Filing or Files** shall mean file, filed, filing or files, respectively, with the Bankruptcy Court in the Case.

**Final Order** means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on the docket of such court, that has not been reversed or stayed, and as to which: (a) the time to appeal or petition for certiorari has expired and no timely-filed appeal or petition for certiorari is pending, or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

**General Unsecured Claim** means any Claim against the Debtor which arose or which is deemed by the Bankruptcy Code to have arisen prior to the Petition Date, and which is not an Administrative Expense Claim, Administrative Operating Expense Claim, or Secured Claim.

**Holder** means any entity holding a Claim or Interest, and includes the beneficial Holder of such Claim or Interest.

**Interest** means any and all rights arising out of the ownership of Common Stock, including all Claims against the Debtor resulting from the rescission of a purchase or sale of Common Stock, for damages arising from the purchase or sale of Common Stock or for reimbursement or contribution allowed under Section 502 of the Bankruptcy Code on account of such a claim, and all rights arising out of contracts, options or warrants to purchase or sell Common Stock.

**Local Rules** means the Local Bankruptcy Rules of the Bankruptcy Court, as applicable to the Case.

**Liens** means any and all liens, including encumbrances, security interests, rights of setoff, licenses, leases, mortgages, pledges, charges, rights of first refusal, and restrictions of any kind or nature whatsoever.

**Petition Date** means December 22, 2008, the date of the Debtor's Filing of the voluntary petitions for relief commencing this Case.

**Plan** means this Chapter 11 Plan of Liquidation and all schedules and exhibits thereto for the Debtors, as amended, supplemented or further modified from time to time. Any appendices to the Plan are incorporated into and made a part hereof as if fully set forth herein.

**Priority Claim** means any Claim to the extent entitled to priority in payment under Sections 507(a)(2)- (9) of the Bankruptcy Code.

**Professionals** means Entities whose appointment has been approved by final order of the Bankruptcy Court pursuant to Bankruptcy Code Section 327 prior to entry of the Confirmation Order.

**Proof of Claim** or **Proof of Interest** means a Filed Proof of Claim or Proof of Interest.

**Record Date** means the date on which Creditors entitled to vote on the Plan are determined by their record ownership of Claims, which date shall be the date of Filing of the Plan.

**Schedules** means the Schedules of Assets and Liabilities and Statements of Financial Affairs, as amended, supplemented or further modified from time to time, filed by the Debtor in accordance with the Bankruptcy Rules.

**Secured Claim** means a Claim that is secured by a Lien on property in which the Estate has an interest or that is subject to setoff under Bankruptcy Code § 553, to the extent of the value of the claimholder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code § 506(a).

**Unclaimed Distribution** means, in respect of any Class of Claims, all Cash or other property deemed to be Unclaimed Distributions pursuant to Section 8.06 the Plan.

**Document References**. All references to documents shall include all addenda, exhibits and schedules attached thereto or referred to therein.

Exhibit "A"

**Other Definitions**. A term used and not defined herein, but that is defined in the Bankruptcy Code, shall have the meaning set forth therein. The words herein, hereof, hereto, hereunder, and others of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. The word including shall mean including, without limitation. The singular shall include the plural and vice versa unless the context otherwise requires.

**ARTICLE 2**

**ADMINISTRATIVE CLAIMS**

2.01 **Administrative Expense Claims**. Administrative Expense Claims will be paid in full, in Cash, on the Effective Date of the Plan (or as soon thereafter as is practicable), or in the case of Professionals as otherwise provided by Court Order or, if such Claim becomes Allowed after such date, within five (5) days after such Claim becomes Allowed, unless other payment terms are agreed to between the Debtors and the Holder of any such Claim. A current schedule of the Claims in this Class and their status is attached to the Disclosure Statement as Exhibit B. Exhibit B also includes a list of Holders of Administrative Expense Claims who have agreed to defer payment of their Administrative Expense Claims until there are sufficient proceeds in the Estate to pay such Claims. Any fees due and owing to the United States Trustee shall be paid as due, or as soon thereafter as practicable.

2.02 **Bar Date for Administrative Expense Claims**.

(a) **In General**. Unless otherwise ordered by the Bankruptcy Court, and other than Administrative Expense Claims of Professionals, requests for payment of Administrative Expense Claims must be Filed and served on the Debtor no later than thirty (30) days after the Effective Date. Any Entity that is required to File and serve a request for payment of an Administrative Expense Claim and that fails to timely File and serve such request, shall be forever barred, estopped and enjoined from asserting such Claim against the Debtor, the Estate of the Debtor or its property.

(b) **Professionals**. Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before the Confirmation Date shall File an application for allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Confirmation Date. Objections to any application of Professionals or other Entities for compensation or reimbursement of expenses must be Filed no later than twenty (20) days after the Filing of such application. To the extent such application is approved by the Bankruptcy Court, the applicant shall be entitled to an Allowed Claim to be paid in full within five (5) days of the entry of an order by the Bankruptcy Court approving such application or as soon as such funds are available.

**ARTICLE 3**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

3.01 **Class 1 –Secured Claim**: Class 1 is the allowed secured claim of KeyBank National Association against the Debtor. Class 1 is impaired.

3.02 **Class 2 - Priority Claims:** Class 2 consists of all Allowed Priority Claims against the Debtor. Class 2 is not believed to be impaired.

3.03 **Class 3 - General Unsecured Claims:** Class 3 consists of all Allowed General Unsecured Claims against the Debtor. Class 3 is impaired.

3.04 **Class 5 - Common Stock and Interests and Claims Relating Thereto:** Class 5 consists of all Common Stock Interests in the Debtors and Claims related thereto. Class 5 is impaired.

Exhibit "A"

3.05 **Classification Rules**.   A Claim is in a particular Class only to the extent that the Claim qualifies within the description of Claims of that Class, and such Claim is in a different Class to the extent that the remainder of the Claim qualifies within the description of the different Class.  Pursuant to Section 1123(a)(4) of the Bankruptcy Code, all Allowed Claims of a particular Class shall receive the same treatment unless the Holder of a particular Allowed Claim agrees to a less favorable treatment for such Allowed Claim.  The inclusion of a Creditor by name in any Class is for purposes of general description only, and includes all Entities claiming as beneficial interest holders, assignees, heirs, devisees, transferees or successors in interest of any kind of the Creditor named.

## ARTICLE 4

## TREATMENT OF CLASSES UNDER THE PLAN

4.01 **Class 1 – Secured Claims**:  Each Holder of an Allowed Secured Claim shall be paid by the Debtor the Allowed amount of such Claim, including all applicable interest and other charges to which the Holder of such Allowed Claim may be entitled under applicable law or contract, to the extent permitted under the applicable provision of Section 507(a) of the Bankruptcy Code, in Cash.  KeyBank will be paid $100,000.00 of the proceeds from the sale of the Debtors' assets upon the Effective Date (or as soon thereafter as applicable).  The KeyBank loan shall remain in place under current terms after the Effective Date.

4.02 **Class 2 - Priority Claims**:  Each Holder of an Allowed Priority Claim shall be paid by the Debtor the Allowed amount of such Claim, including all applicable interest and other charges to which the Holder of such Allowed Claim may be entitled under applicable law or contract, to the extent permitted under the applicable provision of Section 507(a) of the Bankruptcy Code, in Cash, on the later of: (a) the Effective Date (or as soon thereafter as is practicable) or (b) the first Business Day after such Claim becomes an Allowed Claim (or as soon thereafter as is practicable).  A current schedule of the Claims in this Class and their status is attached to the Disclosure Statement as Exhibit C.

4.03 **Class 3 - General Unsecured Claims**:  Holders of General Unsecured Claims in this class shall be paid ten percent (10%) of their Claim by the Disbursing Agent payable on the later of: (a) the Effective Date (or as soon thereafter as is practicable) or (b) the first Business Day after such Claim becomes on Allowed Claim (or as soon thereafter as is practicable).  A current schedule of the Claims in this Class and their status is attached to the Disclosure Statement as Exhibit D.

4.05 **Class 5 - Common Stock Interests**:  Holders of Common Stock Interests in the Debtors shall receive no distribution under the Plan pursuant to said Interests. Henry Cook will waive fifty percent (50%) of his administrative claim in exchange for a ten percent (10%) ownership interest in the reorganized Debtor. David Siegal will waive his general unsecured claim in the approximate amount of $1,219,678.33  in exchange for a forty-five percent (45%) ownership interest in the reorganized Debtor.  The Benson Seidman Trust will waive its general unsecured claim in the approximate amount of $824,275.00   in exchange fo a forty-five percent (45%) ownership interest in the reorganized Debtor.

4.06 **Controversy Concerning Impairment**.  In the event of a controversy as to whether any Creditor or Holder of an Interest or Class of Creditors or Class of Holders of Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

4.07 **Injunction**.  The treatment of, and consideration, if any, to be received by Holders of Allowed Claims and Allowed Interests under the Plan when accepted, shall enjoin such Holders from taking any action to collect or recover in any manner on account of any such Claims, debts or liabilities from any or all of the Assets, except as otherwise provided in the Plan.

## ARTICLE 5

## ACCEPTANCE OR REJECTION OF THE PLAN

5.01 **Impaired Classes Entitled To Vote**. Classes 1 and 3 are impaired under the Plan. Each Holder of an Allowed Claim or Allowed Interest in Classes 1 and 3 shall be entitled to vote to accept or reject the Plan. Class 5 is deemed to have accepted the Plan.

5.02 **Acceptance by an Impaired Class of Claims**. A Class of Creditors shall have accepted the Plan if Creditors holding at least two-thirds in the aggregate dollar amount and more than one-half in number of the Allowed Claims or Allowed Interest of such Class that have accepted or rejected the Plan, vote to accept the Plan.

5.03 **Presumed Acceptance of Plan by Unimpaired Classes**. Class 2 is unimpaired under the Plan and, therefore, is conclusively presumed to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and do not have a right to vote on the Plan.

## ARTICLE 6

## MEANS FOR IMPLEMENTATION OF THE PLAN

6.01 **Common Stock**. On the Effective Date, all the Common Stock of the Debtors will be cancelled. New shares of the Reorganized Debtor will be issued to David Siegal and Benson Seidman Trust in exchange for their general unsecured claims. New shares of the reorganized Debtor will be issued to Henry Cook in exchange for one-half of his administrative claim.

6.02 **Cash Distributions**. On the Effective Date or as soon thereafter as is practicable, the Debtor shall pay the Secured Claims, Administrative Expense Claims, Priority Claims and General Unsecured Claims, to the extent such Claims are Allowed Claims then due. In the case of any such Claim that is not an Allowed Claim on the Effective Date, the Disbursing Agent shall remit payment promptly to the Holder of such Claim when such Claim becomes an Allowed Claim.

6.03 **Source of Funds**. As a source of funds for Cash distributions to Creditors under the terms of the Plan, the Debtor will have liquidated or will liquidate its interests in its Perth Dry Cleaning and Laundromat location through a sale for $165,000.00 to Pleasant Laundromats, Inc. owned by James and Barbara Partyka pursuant to the terms, provisions and conditions of a purchase agreement substantially similar to Exhibit E annexed to the Disclosure Statement.

Estimated Distributions -

|  | Amount of Claims | Estimated Distribution | Approximate Percentage |
|---|---|---|---|
| Administrative Expense | $36,000 | $36,000 | 100% |
| Class 1 | $300,000 | $300,000 | 100% |
| Class 2 | $1,740 | $1,740 | 100% |
| Class 3 | $270,000 | $27,000 | 10% |
| Class 4 | $2,043,953 | $0 | 0% |
| Total | $2,651,693 | $364,740 | 14% |

# ARTICLE 7

## MEANS FOR IMPLEMENTATION OF THE PLAN

On the Effective Date (or as soon thereafter as is practicable), or unless provided for earlier pursuant to the terms hereof, the Debtor shall distribute Cash from the Debtor's account(s) to the holders of Allowed Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Claims and Allowed General Unsecured Claims, as provided under the terms of the Plan, in satisfaction of such Claims.

# ARTICLE 8

## CONDITIONS PRECEDENT

8.01 **Conditions Precedent to Confirmation Date**. The occurrence of the Confirmation Date of the Plan is subject to satisfaction or waiver of each of the following conditions:

    (a)    the Bankruptcy Court has entered the Confirmation Order in form and substance satisfactory to the Debtors; and

    (b)    the Debtors has received the consent of any third parties or governmental units whose consent is required for confirmation;

8.02 **Conditions Precedent to Effective Date**. The occurrence of the following shall be a separate conditions to the Effective Date of the Plan:

    (a)    the Confirmation Order has become a Final Order; and

    (b)    the Debtor has consummated the closing of the Perth Dry Cleaning and Laundromat location.

8.03 **Waiver of Conditions**. The Debtor shall have the right to waive any of the foregoing conditions to Confirmation Date, or to the Effective Date. Without limiting the foregoing, the Effective Date may occur notwithstanding the pendency of an appeal of the Confirmation Order or any order related thereto so long as there is no stay in effect. The Effective Date may occur before the expiration of time to take an appeal or to seek reconsideration of the Confirmation Order without the giving of any notice to any objecting party. In the event of any such appeal, the Debtors may seek the dismissal of such appeal as moot following the Effective Date of the Plan.

# ARTICLE 9

## DISTRIBUTIONS UNDER THE PLAN

9.01 **Powers of the Debtor**. The Debtor, among other things, shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Debtor by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Debtor to be necessary and proper to implement the provisions hereof.

9.02 **Distributions**. All distributions under the Plan shall be made by the Debtor. Distributions to Allowed Claims shall be made as provided above.

9.03 **Method of Payment**. Any Cash payment made by the Debtor pursuant to the Plan shall be in U.S. dollars, either by check or wire transfer.

9.04 **Timing of Payment**. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be due on the next succeeding Business Day.

9.05 **Setoff**. Nothing contained herein shall be deemed to waive the Debtor's statutory or common law right of setoff.

9.06 *De Minimis* **Distributions**. The Debtor shall not be required to distribute Cash to any Creditor if the amount of Cash to be distributed to such Creditor is less than $50.00.

9.07 **Unclaimed Distributions to Creditors**.

(a) **Non-Negotiated Checks**. If the Holder of an Allowed Claim fails to present for payment a check issued to such Holder pursuant to the Plan within ninety (90) days of the date such check was issued, or if any distributions are returned to the Debtor due to an incorrect or incomplete address for which the Debtor has not received a correct address, then the amount of Cash attributable to such check or distribution shall be deemed to be Unclaimed Distributions in respect of such Holders Class of Claims and the payee of such check or distribution shall be deemed to have no further Claim in respect of such check or distribution, and shall not be entitled to participate in any further distributions under the Plan.

(b) **Revesting of Unclaimed Distributions**. All Unclaimed Distributions shall revest in the Debtor.

9.08 **Treatment of Disputed Claims**. Disputed Claims shall be treated as follows under the Plan:

(a) **Objections to Claims**. Except as otherwise provided by the Bankruptcy Court or in the Plan, all objections to Claims shall be Filed and served on the Holders of such Claims on or before the later of (i) ninety (90) days after the Confirmation Date, (ii) ninety (90) days after a particular Proof of Claim is Filed, except that such Claim shall not be deemed an Allowed Claim until after the ninety (90) day period lapses, and (iii) such additional date as the Bankruptcy Court may fix upon application of the Debtor; provided, however, that no party in interest shall be required to File an objection to any Claim listed in the Schedules as disputed, contingent, unliquidated or undetermined and for which no Proof of Claim was Filed, which Claim shall be barred and disallowed in its entirety. Exhibits B, C, and D to the Disclosure Statement include a column indicating if a particular claim is disputed and will be objected to and what amount the Debtor will assert such Claim is worth in their objection. The Debtor reserves its right to amend, modify, correct or further object to Claims for any reason, including objections arising under Section 502(d) of the Bankruptcy Code.

(b) **No Distributions Pending Allowance**. Notwithstanding any other provision of the Plan to the contrary, no distribution shall be made to the Holder of a Disputed Claim or the Holder of a Claim who is the subject of a proceeding against it by the Debtor, unless and until such Disputed Claim becomes an Allowed Claim or such proceeding is resolved.

(c) **Distributions After Allowance**. Once a Disputed Claim becomes an Allowed Claim, distribution on account of such Claim shall be made in accordance with the provisions of the Plan governing the Class of Claims to which the respective Claim belongs.

(d) **Estimation of Disputed, Contingent or Unliquidated Claims**. Prior to the Effective Date, to effectuate distributions pursuant to the Plan and avoid undue delay in the administration of this Case, on request of the Debtor, the Bankruptcy Court shall estimate the amount of each Disputed Claim or Contingent or Unliquidated Claim for which the Disputed, Contingent and Unliquidated Claims Reserve (as defined below) has been or will be established (the amount so estimated for each Claim being the Estimated Amount). The Estimated Amount shall be fixed by Final Order, which shall be deemed the amount of such Claim for all purposes under the Plan.

(e) **Claims Reserve.** On or prior to the Effective Date, the Debtor shall establish the Disputed, Contingent and Unliquidated Claims Reserve in an aggregate amount sufficient to pay each Creditor holding a Disputed Claim or Contingent or Unliquidated Claim as contemplated by the Plan the lesser of (i) the Estimated Amount or (ii) the amount of Cash that such Creditor would have been entitled to receive under the Plan if such claim had been an Allowed Claim on the Effective Date (such account being the Disputed, Contingent and Unliquidated Claims Reserve or Claims Reserve).

# ARTICLE 10

# EXECUTORY CONTRACTS

### 10.01 **Assumption or Rejection of Executory Contracts and Unexpired Leases**.

(a) **Executory Contracts**. All executory contracts that exist between the Debtors and any Entity which have not been assumed or rejected prior to the Effective Date shall be deemed rejected as of the Effective Date. Nothing contained herein shall constitute a waiver of any claim, right or cause of action that the Debtor may hold against any party to any executory contract with the Debtors, including the insurer under any policy of insurance.

(b) **Options**. Any options, warrants or other equity interests representing the right to acquire Common Stock shall be canceled as of the Effective Date. All Claims arising under such warrants or options shall be classified in Class 3.

(c) **Unexpired Leases**. All unexpired leases that exist between the Debtor and any Entity, which have not been assumed or rejected prior to the Effective Date shall be deemed rejected. Nothing contained herein shall constitute a waiver of any claim, right or cause of action that the Debtors may hold against any lessor.

(d) **Approval of Assumption, Rejection or Assumption and Assignment of Leases and Contracts**. Entry of the Confirmation Order shall constitute the approval, pursuant to Section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases to be rejected pursuant to the Plan. Notice of the hearing on Confirmation of this Plan shall constitute notice to any non-debtor party to an executory contract or unexpired lease, which is to be assumed or rejected under this Plan, of the Debtor's intent to reject such contract or lease.

(e) **Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**. All Proofs of Claim arising out of the rejection of an executory contract or unexpired lease pursuant to this Article 9 of the Plan must be Filed within thirty (30) days after the Effective Date unless an earlier date has been established by Bankruptcy Court Order. Any Holder of a Claim arising out of the rejection of an executory contract or unexpired lease who fails to File a Proof of Claim within such time shall be forever barred, estopped and enjoined from asserting such Claim against the Debtor or the Estate. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims in Class 3 under the Plan. Nothing contained herein shall extend the time for Filing a Proof of Claim for rejection of any contract or lease rejected prior to the Confirmation Date.

# ARTICLE 11

## EFFECTS OF PLAN UPON CONFIRMATION

       11.01 **Revesting of Assets**.  Except as otherwise set forth herein, subject to the provisions of and for the purposes of distributions in accordance with the Plan, all Assets, including all Causes of Action, shall revest in the Debtor on the Confirmation Date.  Such revested property shall be free and clear of all liens, claims, encumbrances and interests, except as otherwise provided in the Plan.

       11.02 **Injunction**.  As of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability against the Debtor affected by the Plan are enjoined from taking any action to collect or recover in any manner on account of any such Claims, debts or liabilities from any or all of the Assets, except as otherwise provided in the Plan.

       11.03 **Retention of Jurisdiction**.  The Bankruptcy Court shall retain and have jurisdiction over the Case until substantial consummation of the Plan for the following purposes:

       (a)     to adjudicate all controversies concerning the classification or allowance of any Claims or Interests;

       (b)     to liquidate any Claims which are disputed, contingent or unliquidated;

       (c)     to determine any and all objections to the allowance of Claims or Interests, or counterclaims to any Claim;

       (d)     to determine any and all applications for allowance of compensation and reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

       (e)     to determine any applications pending on the Effective Date for the rejection or assumption of executory contracts or unexpired leases or for the assumption and assignment, as the case may be, of executory contracts or unexpired leases to which the Debtors is a party or with respect to which it may be liable, and to hear and determine, and if need be to liquidate, any and all Claims arising therefrom;

       (f)     to adjudicate any actions brought by the Debtors for any Causes of Action or otherwise regarding any property of the Estate at any time prior to expiration of the relevant statute of limitations;

       (g)     to determine any and all applications, adversary proceedings and contested or litigated matters that may be pending on the last date for objections to Claims;

       (h)     to consider any modifications of the Plan, remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Court;

       (i)     to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan;

       (j)     to consider and act on the compromise and settlement of any Claim or cause of action by or against the Estate;

       (k)     to issue orders in aid of execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code; and

(l)     to determine such other matters as may be set forth in the Confirmation Order or which may arise in connection with the Plan or the Confirmation Order.

11.04 **Effectuating Documents; Further Transactions; Timing**.  The Debtor is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  All transactions that are required to occur on the Effective Date under the terms of the Plan shall be deemed to have occurred simultaneously.

11.05 **Modification of the Plan**.  The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify the Plan and related documents in any manner prior to the entry of the Confirmation Order.  After entry of the Confirmation Order, the Debtor may, upon order of the Bankruptcy Court, amend or modify the Plan and related documents in accordance with, and to the extent permitted by, Section 1127(b) of the Bankruptcy Code, and remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Every amendment or modification of the Plan shall supersede and render null and void all prior versions of the Plan.

## ARTICLE 12

## CORPORATE EXISTENCE AFTER CONFIRMATION

12.01 **General**.  Upon the closing of the Case, the Debtor shall continue to operate as a legal entity.

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

13.01 **Exemption from Transfer Taxes**.  Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of securities or other property under the Plan; the creation, transfer, filing or recording of any mortgage, deed of trust, financing statement or other security interest; or the making, delivery, filing or recording of any deed or other instrument of transfer under the Plan, shall not be subject to any stamp tax, real estate tax, conveyance, filing or transfer fees, mortgage, recording or other similar tax or other government assessment.  All recording officers and other entities whose duties include recordation of documents lodged for recording shall record, file and accept such documents delivered under the Plan without the imposition of any charge, fee, governmental assessment or tax.

13.02 **Discharge and Permanent Injunction**.   Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided by law, confirmation will discharge Claims or Interests against the Debtor.  Except as otherwise set forth in the Plan, on and after the Effective Date, all persons and entities that have held, hold or may hold (a) any Claim against or Interest in the Debtor or Debtor in Possession be permanently enjoined from and against (i) commencing or continuing in any  manner any suit, action or other proceeding of any kind against the Debtor, the Debtor in Possession, or the Debtor,s officers and directors, Debtor's Professionals, or the Estate with respect to any such Claim or Interest, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, the Debtor in Possession, or Debtor's officers and directors, Debtor's Professionals, or the Estate, (iii) creating, perfecting or enforcing any lien or encumbrance of any kind against the Debtor, the Debtor in Possession, or Debtor's officers and directors, Debtor's Professionals, or the Estate, or against any of their properties or interests in property with respect to such Claim or Interest, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or the Debtor in Possession or against any property or interest in property of the Debtor, the Debtor in Possession, or the Estate, as such Plan confirmed by Final Order of the Bankruptcy Court shall be res judicata as to any of the foregoing acts concerning or related to any such Claim or Interest administered by the Plan, and (b) any Claim, right, action, Cause of Action against or Interest against the Debtor, the Debtor in Possession, or Debtor's officers and directors, Debtor's Professionals, or

the Estate shall be permanently enjoined from and against commencing or continuing any suit, action or proceeding against, asserting or attempting to recover any Claim against or Interest in, or otherwise affecting the Debtor's, the Debtor's in Possession, the Estate or Debtors' officers and directors, with respect to any matter that is the subject of the Plan. The foregoing enjoinment of the commencement or continuation of any suit, action or proceeding against, asserting or attempting to recover any Claim against or Interest in, or otherwise against the Debtor, the Debtor in Possession, or Debtor's officers and directors in no way forecloses the commencement or continuation of valid Chapter 5 claims under the Bankruptcy Code against the Debtor, the Debtor in Possession, or Debtor's officers and directors.

13.03 **Revocation or Withdrawal of the Plan**. The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Effective Date. If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void.

13.04 **Binding Effect**. The Plan shall be binding upon, and shall inure to the benefit of, the Debtors, the Holders of all Claims and Interests, and their respective successors and assigns. Confirmation of the Plan binds each of the Holders of Claims and Interests to the terms and conditions of the Plan, whether or not such Creditor or Interest Holder has accepted the Plan.

13.05 **Construction**. The rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to construction of the Plan.

13.06 **Time**. In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein, the provisions of Bankruptcy Rule 9006 shall apply.

13.07 **Headings**. The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor are intended in any manner to affect any interpretation of the provisions of the Plan.

13.08 **Governing Law**. Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations of any Entity arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without regard to New York choice of law provisions.

13.09 **Benefit Programs**. As of the Confirmation Date, all scheduled programs or plans maintained by the Debtors for the benefit of present or former employees and dated on or before the Petition Date which have not been previously terminated shall be deemed to be terminated. Any Entity with a Claim arising from such termination shall be treated as a Holder of a General Unsecured Claim.

13.10 **Reserve**. No later than the Effective Date, the Debtors shall have paid all fees due to the United States Trustee through the Effective Date, and establish a reserve of $10,000 for unpaid fees.

13.11 **Cramdown**. At the Confirmation Hearing, the Debtors may seek Confirmation of this Plan notwithstanding the rejection of the Plan by any impaired Class of Creditors or Interest Holders.

13.12 **Execution of Plan Documents**. Upon application by the Debtors, the Court may issue an order directing any necessary party to execute, deliver, or to join in the execution or delivery of an instrument or document, and to perform any act necessary for the consummation of this Plan.

13.13 **Closing of Case**. Unless otherwise ordered by the Bankruptcy Court, the Case shall be deemed closed six months after the Effective Date. Closing of the Case shall not affect the pendency of any adversary proceeding or contested matter filed before the Case is closed.

13.14  **Exculpation**.  The Debtors, the Committee, the Disbursing Agent, and their respective members, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers and other Professionals retained by any such persons) shall have no liability to any holder of any Claim or Interest or any other person for any act or omission in connection with, or arising out of, this Case, including, without limitation, with respect to the Disclosure Statement, the Plan, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, objections to Claims, the pursuit of Avoiding Power Causes of Action, acts of the Liquidating Trustee, choice of the Liquidating Trustee, or the property to be distributed under the Plan, except for any act or omission constituting bad faith, self dealing, breach of fiduciary duty, reckless or willful misconduct, or gross negligence (including malpractice constituting gross negligence) as determined by a final court order and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan, the Bankruptcy Code, and applicable law.

13.15  **Post-Confirmation Date Fees and Expenses**.

After the Confirmation Date, the Liquidating Trustee shall, out of the assets in the Liquidating Trust, pay the reasonable fees and expenses of the professional persons employed by the Debtors and/or the Liquidating Trustee in connection with the implementation and consummation of the Plan, the claims reconciliation process and any other matters as to which such professionals may be engaged and, after the Effective Date, may enter into reasonable contingency fee arrangements with respect to affirmative claims brought or maintained by the Liquidating Trustee against third parties.  The fees and expenses of such professionals shall be subject to the approval of the Bankruptcy Court.

Dated:  October 14, 2009

GREENER CLEANERS LTD.

By:    */s/ Henry Cook*
Name:   Henry Cook
Title:    Chief Executive Officer


LAW OFFICE OF CHRISTIAN H. DRIBUSCH

By:  */s/ Christian H. Dribusch*
        Christian H. Dribusch
The Patroon Building
Five Clinton Square
Albany, New York 12207
Telephone No. (518) 436-1662

Counsel for the Debtor and Debtor in Possession

Exhibit "A"

**Administrative      08-14239-1 rel Greener Cleaners. Ltd.**

| Name | Amount |
| --- | --- |
| Christian H. Dribusch, Esq. | Subject to Court Approval |
| Henry Cook | $25,000.00<br>Subject to Court Approval |
| Young, Summer, LLP | Subject to Court Approval |
| Morwhite | $6,361.69 |
| F. Susan Seidman Credit Shelter Trust | $50,000.00 |
| Lease Agreements per Lease Assumption Order | Current |
| Utilities per Utilities Adequate Assurance Order | Current |
| Lease of Post-Petition Equipment | Current |
| Pamela Kneis | $1,000.00 paid |

*Priority*                     **08-14239-1rel Greener Cleaners. Ltd.**

| Name | Total Scheduled | Proof of Claim Total | Amount Total Allowed | Greener Assests Claim | Agree/ Object | Reason |
|------|------|------|------|------|------|------|
| NYS Dept of Conservation | unknown | $36,500 | | $0 | Object | 1) Root cause of environmntal issues has been removed at significant expense,2) Penalty reduces funds available for unsecured creditors, 3) Current management not responsible for penaltie so no change in behavior would be incetivized by penalty |
| NYS Dept of Unemployment | $302.21 | 302.21 | | $302.21 | | |
| NYS Dept of Tax & Finance | 105.74 | 105.74 | | 105.74 | | |
| Dept. of Treasury-IRS | 1,332.48 | 1,332.48 | | 1,332.48 | | |
| Total | | | | $1,740 | | |

Exhibit "C"

## 08-14239-1-rel  Greener Cleaners, Ltd.
## Exhibit D

| Name | Total Scheduled | Proof of Claim Total | Amount Greener Assets is Total Allowed Claim | Agree/ Object | Reason |
|---|---|---|---|---|---|
| A.B.C. Fire Equipment | $67.14 | 67.41 | 67.41 | Agree | |
| Adirondack Tire Corp. | 1,020.14 | 1,430.91 | 1430.91 | Agree | |
| AJ Sign Co. | 437.4 | | 437.4 | Agree | |
| Aldrich Equipment | 1,674.72 | | 1,674.72 | Agree | |
| Allied Waste Service #964 | 894.5 | | 894.5 | Agree | |
| Altamont Avenue Asso., LLC | 26,241.87 | | 26,241.87 | Agree | |
| Benson Seidman Living Trust | 98,194 | 824,275.00 | 0.00 | Agree | Waived in exchange for shares |
| Brandywine and State, LLC | 2,502.71 | | 2,502.71 | Agree | |
| c/o Schuyler Real Estate | | | | | |
| Champa Properties | 0 | | 0 | Agree | |
| Crisafulli Bros. | 1,654.83 | 1,654.83 | 1,654.83 | Agree | |
| Culligan | 28.22 | | 28.22 | Agree | |
| Culligan Mohawk Valley | 44.36 | | 44.36 | Agree | |
| Culligan Water | 51.77 | 407.8 | 407.8 | Agree | |
| David M. Siegal | 522,753.92 | 1,219,678.33 | 0.00 | | Wavied in exchange for shares |
| Ecolab, Inc. | 801.64 | 801.64 | 801.64 | Agree | |
| Empire Shoe Rebuilders | 1,588.00 | | 1,588.00 | Agree | |
| Energetix Energy Services | 8,026.72 | 8,031.39 | 8,031.39 | Agree | |
| Exodus Pest Elimination | 75.60 | | 75.60 | Agree | |
| Exxon Mobil Fleet/GECC | 249.47 | 5,877.37 | 523.64 | Object | Discrepancy Claim & GC records |
| Felthousen's Inc. | 88.56 | 88.56 | 88.56 | Agree | |
| Hart Alarm Systems | 388.80 | | 388.80 | Agree | |
| Hess Corporation | 24,368.54 | | 24,368.54 | Agree | |
| Hess Fleet Cards | 2,815.82 | | 2,815.82 | | |
| Ideal Office Center | 1,770.34 | | 1,770.34 | Agree | |
| J.W.Stevens Company | 275.40 | 275.4 | 275.40 | Agree | |
| Karner Corners Realty, LLC. | 4,660.00 | | 4,660.00 | Agree | |
| Kem Plant, LLC. | 25,000 | 38,105.91 | 38,105.91 | Agree | |
| Kem Plaza, Inc. | 32,855.72 | 28,000 | 28,000.00 | Agree | |
| Kenneth Buess | 409.51 | | 409.51 | Agree | |
| L&A Automotive Center, Inc. | 119.88 | | 119.88 | Agree | |
| Lovell Saftey Management | 188.58 | | 188.58 | Agree | |

Exhibit "D"

| | | | | | |
|---|---|---|---|---|---|
| Malta Associates, LLC | 6,674 | | 6,674 | Agree | |
| Michael Allen McCabe | 0.00 | | 0.00 | Agree | |
| Morwhite, Inc. | 12,000.91 | 23,816.13 | 16,682.35 | Object | Discrepancy Claim & GC records |
| National Grid | 18,562.98 | 9,479.99 | 9,479.99 | | Discrepancy Claim & GC records |
| | | | | | |
| Peter Elitzner | 0.00 | | 0.00 | Agree | |
| Reality Equities NM LLC | 11,460.65 | | 11,460.65 | Agree | |
| Rensselaer City Plaza | 3,396.58 | | 3,396.58 | Agree | |
| Saratoga Water Services | 50.08 | | 50.08 | Agree | |
| Shaker Pine Inc. | 8,500 | | 8,500 | Agree | |
| Siegal Law Office, LLC | 2,206.79 | | 0.00 | Agree | Waived in exchange for shares |
| Sky Four Realty Co. | 4,033.22 | 15,452.00 | 15,452.00 | Agree | |
| Slingerland Associates, LLC | 3,624.22 | | 3,624.22 | Agree | |
| Solvents Petroleum Service | 3,348.91 | 3,348.91 | 3,348.91 | Agree | |
| Suedart | 6,284.88 | | 6,284.88 | Agree | |
| The Shopper At Wilton, LLC | 1,969.64 | 16,500.00 | 16,500.00 | Agree | |
| Time Warner Cable | 214.71 | 27.8 | 27.8 | Agree | |
| Tri-City Fire Extinguisher | 48.60 | | 48.60 | Agree | |
| TS Latham, LLC | 5,070 | | 5,070 | Agree | |
| Verizon | 2,815.06 | | 2,815.06 | Agree | |
| Young, Sommer LLc | 663.20 | | 663.20 | Agree | |
| Zimmerman Properties, LLC | 3,000.00 | | 3,000.00 | Agree | |
| | 853,172.59 | 2,197,319.38 | 260,674.66 | | |

Exhibit "D"

# ASSET PURCHASE AND SALE AGREEMENT

This Agreement is made this ___ day of _____, 2009 by and between **GREENER CLEANERS, LTD**. also known as Kem Cleaners, a New York corporation having an office at 801- 809 State Street, Schenectady, New York 12307 (hereinafter referred to as "the Seller"), and **JAMES PARTYKA and BARBARA PARTYKA**, residing at _____ , Hagaman, New York _____ (hereinafter referred to individually and collectively as the "Purchaser").

WHEREAS, Seller is engaged in the dry cleaning and laundromat business at Kem Plaza, 4803 St Route 30 North, Town of Amsterdam, County of Montgomery, (hereinafter referred to as the "Business" ); and

WHEREAS, Seller has acquired certain tangible business assets in connection with the performance of the Business, and Seller also has developed substantial goodwill, customer relations and other intangible assets in connection with the Business; and

WHEREAS, Purchaser desires to acquire Seller's intangible and tangible business assets (hereinafter referred to as "Business Assets") upon the terms and conditions as hereinafter set forth; and

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration exchanged between the parties, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

Exhibit "E"

1.  Preamble.  The preamble hereto is made a part hereof.

2.  Purchase and Sale of Assets.  Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Business Assets as follows:

| Asset | Price |
|---|---|

a.  Equipment – see Schedule attached      $ 75,000.00
    The Equipment is sold "as is" as located in the Business premises, without warranty of any kind, including warranty of merchantability or fitness for a particular purpose.

b.  Lease and Leasehold Improvements      $ 40,000.00
    Purchaser will sign the lease annexed hereto.

c.  Goodwill                              $ 50,000.00

3.  Accounts Receivable.  Seller's accounts receivable,  and processed inventory on hand as of the date of the Closing, are not part of this transaction and all amounts collected thereon shall be the exclusive property of Seller.

4.  Cash in Vending and Laundromat Machines.  On the Closing Date, directly after the Closing, Seller shall remove all cash and coins from the vending machines and bill changer and said cash and coins shall be the Seller's property.

5.  Payment of the Purchase Price.  The purchase price shall be paid by Purchaser to Seller on the Closing Date by a deposit of $15,000.00 on the signing of this agreement, to be held in escrow in the trust account of Siegal Law Offices, LLC, Albany New York, and the balance, $150,000.00 by certified or bank check payable to the order of Seller.

6. <u>Dry Cleaning Services.</u>

a. Seller will provide dry cleaning, pressing, pick-up and delivery service Monday through Friday at the Business location at Kem Plaza. The charges for the above service will be 55% of the recommended retail price charged in all Seller's stores for similar service. Professional shirt laundering is included in the above services. One pick-up and delivery per day will be made at a time established by Seller during normal dry cleaning store business hours. Therefore "next day" service is the fastest available for items taken in prior to pick – up. Seller will make its counter training and procedures available to all Purchaser's store personnel for so long as Seller is providing dry cleaning services.

b. Bills will be issued and payable weekly on Friday for transactions in the preceding week Saturday through Friday. Repairs and alterations will be billed at 75% of the suggested retail price for the service. All other "Outside Work", such as wedding gown processing, suedes and leathers, pillow renovation, rugs, will be billed at 75% of Seller's suggested retail price for its own stores.

c. Purchaser will provide computer sales reports as generated from the existing computer system and successors each Saturday from which the weekly billing will be generated. No deliveries will be made in the event the weekly bill has not been paid on time.

d. Garment invoicing, tagging, bagging and sales reporting is the responsibility of Purchaser's store personnel.

e.     Claims will be resolved using the National Fair Claims Guide for Textile Products. Purchaser shall be responsible for defending and otherwise handling all claims brought by its customers.

f.     For a period of 30 days following the Closing and thereafter until 30 days after Seller gives notice to purchaser, Purchaser may use the existing Kem signage in the Business location and on the façade of Kem Plaza and may do business under the Kem name provided however, that at no time will Purchaser hold itself out as the agent of or in any way able to act for Seller, that this arrangement does not make Seller and Purchaser partners, joint venturers or any other sort of joint enterprise owners or operators, that the parties are and will remain for so long as this arrangement continues, that of vendor and customer; that Purchaser will keep the Business premises neat, clean and orderly so as to reflect well on the Kem name, and treat it customers and provide service commensurate with a first class dry cleaning and laundromat store, and will make no comment, directly or indirectly, to the public or its customers about the operation of the stores of the Seller. During the period of this arrangement Seller may place discreet signage on and in the Business premises stating to the effect that the store of the Purchaser is owned and operated independently of the Kem Cleaners stores. Use of the Kem trade name will be discontinued immediately if Seller is not the processor of the work.

g.     Either party may cancel this service aspect of the agreement, set forth in this paragraph 6, at any time effective 30 days after giving written notice to the other of

their intention to do so and immediately following the giving of notice in the event of breach of this agreement by the other party.

7.    <u>Representation of Seller</u>.  Seller hereby represents that it owns the assets to be transferred herein, and has the authority to sell the same to Purchaser.

8.    <u>Contingency, Lease and Pending Closing</u>.

a.    <u>Contingency</u>.    This agreement is contingent upon the Seller's obtaining, at its own expense, any and all approvals necessary, which the Seller agrees to do diligently and to keep Purchaser advised of progress upon request. Seller represents that this sale does not constitute the sale of all or substantially all the assets of Seller. In the event that the necessary approvals are not obtained within 120 days of the singing of this agreement by both parties, this agreement shall be null and void, the deposit shall be returned to Purchaser and each party shall have no liability or accountability to the other on account of this agreement. This agreement is also contingent upon Kem Plaza's signing the ease annexed hereto at the Closing.

b.    <u>Lease.</u>        Seller is a month to month tenant at the premises set forth in the lease annexed hereto which the Purchaser will sign at the Closing. The "Demised Premises" set forth in the annexed lease is referred to in this agreement as the "Business Premises".

c.    <u>Pending Closing</u>.    Pending the Closing, Seller will operate the Business in the same fashion as it has, and will maintain the Business as it has, keeping the Business Premises neat and clean. Notwithstanding the forgoing however, Seller

may make whatever pricing and procedurally, computer software and the like changes it wishes so long as such changes are applicable to at least most of Seller's other stores.

9. <u>Sales Tax</u>. Purchaser acknowledges that it shall be solely responsible for any and all sales taxes arising from the within transactions. On the Closing Date, Purchaser shall deliver to Seller Purchaser's check in the amount of $_____ payable to New York State Sales Tax as and for payment of sales arising out of the sale of the Equipment.

10. <u>Closing Date</u>. The Closing Date shall be a date mutually agreed upon by the parties, but in no event later than the 10th day following the obtaining of the approvals under paragraph 8 of this agreement, unless that day is a Saturday, Sunday or legal holiday, in which event the next business day shall be the Closing Date. At. 1030 on the Closing Date at the offices of Siegal Law Offices, LLC, 16 Corporate Woods Boulevard, Albany, New York 12211-2350, the following shall be delivered:

a. Certified or bank check in the amount of $150,000.00 pursuant to paragraph 2, to the order of Seller.

b. Check payable to New York State Sales Tax for the amount of tax arising out of this transaction.

c. Any other documents necessary to consummate these transactions reasonably requested by counsel for Seller or Purchaser, including but not limited to the annexed lease.

11.    Broker.  The parties agree that no commission or fee is due any person, as a broker or finder, in connection with this agreement and each agrees to defend and indemnify the other for claims made by such persons.

12.    Survival.  The terms, covenants, conditions and representations in and of this agreement shall survive the delivery of property and payment of sums at the Closing Date, and shall not merge into said acts.  The parties hereto agree to perform such further acts as may be necessary or required to complete the transactions specified in this agreement.

13.    Controlling Law, Venue, Notice and Attorneys' Fees.  This agreement shall be construed according to the laws of the State of New York.  Any litigation under this agreement shall have as its venue the County of Albany.  The prevailing party in any litigation shall be awarded, in addition to damages and injunctive relief, its attorneys' fees and court costs.  The court shall decide which party prevailed. Notice may be given by certified mail or overnight delivery service if properly addressed in a secure wrapper acceptable to the delivery service with all necessary fees paid or billing authorized, or in person. If not in person delivery the notice may be sent to the party's address above or as set forth by notice to a substitute address, and in the case of Purchaser, to the Business premises if given after the Closing Date. Notice shall be deemed given upon delivery if delivered in person or three days after mailing if given by certified mail, or one day after delivery to the overnight delivery service if given by overnight delivery.

14.    Binding Effect, Severability, No Modification.  This agreement shall bind

the parties, their successors and assigns. Each obligation herein is severable and the invalidity of one promise, term or covenant shall not cause the entire agreement to fail. This agreement sets forth the entire agreement of the parties and may not be altered, amended or modified except by a writing subscribed by the party to be charged.

15. <u>Attorney</u>. Purchaser and Principal acknowledge that this agreement was prepared by the law firm of Siegal Law Offices, LLC, for and on behalf of Seller. Said law firm has not rendered any advice to Purchaser and Purchasers acknowledge that they were given the opportunity to consult legal counsel and have chosen not to do so. In the event of any ambiguity in this agreement, the fact that this agreement was drafted by the said law firm shall not be used in any proceeding to construe the agreement.

IN WITNESS WHEREOF, the parties have indicated their intention to be bound hereto by subscribing this agreement.


_____      _____      _____
Henry Cook, GM             James Partyka                  Barbara Partyka
Kem Cleaners


ACKNOWLEDGEMENTS

STATE OF NEW YORK )
COUNTY OF _____          )        ss.:

On the _____ day of _____ 2009, before me personally came HENRY COOK to me known, who, being by me duly sworn, did depose and say that he resides in _____; that he is the General Manager of GREENER CLEANERS, LTD. also known as Kem Cleaners the corporation described in and which executed the above instrument; and that he signed his name thereto by order of the board of directors of said corporation.

_____
Notary Public, State of New York
Qualified in County
My Commission Expires on


STATE OF NEW YORK )
COUNTY OF MONTGOMERY)          ss.:


On the _____ day of _____, 2009, before me, the undersigned, a Notary Public in and for said State, personally appeared JAMES PARTYKA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to be that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.


_____
Notary Public, State of New York
Qualified in the County of:
My Commission Expires on

STATE OF NEW YORK                )
COUNTY OF _____              )     ss.:


On the _____ day of _____, 2009, before me, the undersigned, a Notary Public in and for said State, personally appeared BARBARA PARTYKA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to be that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.


.


_____
Notary Public, State of New York
Qualified in the County of:
My Commission Expires on:

# EQUIPMENT LIST

| | |
|---|---|
| Top Loaders | 14 |
| 35 LB | 8 |
| 50 LB | 3, 1 not working |
| Double Stacked | 6 |
| Singles | 11 |
| Bill Changer | 1 |
| Soap Vending Machine | 1 |
| Laundry Bag Dispenser | 1 |
| Laundry Carts | 1 |
| Counters | 3 |
| Computers | 2 |
| Printers | 1 |
| Conveyor Belt | 2 |
| Water Tank  1500 Gallons | 1 |
| Water System Pressure Tanks | 2 |
| Hot Water Furnace | 1 |
| Hot Water tank | 1 |
| Desk | 1 |
| 8 feet Ladder | 1 |
| 5 Tier Wooden Shelve | 1 |
| Plastic Bag Rack | 1 |

Exhibit "E"

## EXHIBIT A

Exhibit "E"

Direct Dial:  212.468.4814
Personal Fax:212.621.0920
Email:gschwartz@dglaw.com

May 1, 2009

**VIA CERTIFIED MAIL – RETURN RECEIPT**

Mr. Ross L. Beard
President
R.R. Streets & Co. Inc.
184 Shuman Boulevard
Naperville, IL 60563-8464

Dear Mr. Beard:

Our firm represents KEM Cleaners, Inc. d/b/a Greener Cleaners ("KEM").  I am writing with regard to the problems that KEM has encountered relating to the Solvair Cleaning System machine (the "Machine") which R.R. Streets & Co., Inc. ("Streets") sold to our client in February of 2008 for the sum of $150,000, which amount has been paid in full.

I am aware that the parties have been attempting to negotiate a resolution of the issues relating to the Machine.  I have been following the email correspondence between the parties and have reviewed the relevant documents.  It was my hope that this matter could be resolved without a messy public litigation.

However, in view of your April 20 email to Mr. Reinhold which contained thinly veiled threats with regard to "defamatory, libelous and slanderous remarks," as well as "tortious interference," I thought that it was appropriate that I respond.  Simple principal of law:  one cannot defame, or libel, or slander a person, product or company by making a true statement.  As for any alleged "tortious interference," you can be comfortable that no basis for any such claim has, or will, arise.  You are correct however when you state that "we have freedom of speech in the country."

As has been thoroughly documented to you by Mr. Reinhold, Mr. Cook and, the previous President of Kem Cleaners who we understand is now a Solvair employee, the Machine sold to KEM was inherently defective and failed in numerous respects to live up to the claims that Streets makes for it in its marketing materials.  After our client spent in excess of an additional $100,000 in direct costs to install the Machine, purchase the required ancillary equipment and make the Machine operational, it became clear that the

Exhibit "F"

Solvair Cleaning System as purchased, and used in accordance with the directions for use, could not be made to function in an acceptable manner. Our client promptly and repeatedly brought the problems to Streets' attention, and on numerous occasions Streets responded and sent their technicians to try to fix the Machine. Unfortunately Streets was never able to do so successfully and you agreed with Mr. Cook after his second letter to you on November 19, 2008 that Streets would provide a hydrocarbon machine for the use of Kem Cleaners. At that time you told Mr. Cook that, "Streets will take care of the problem." And you concluded that conversation by saying, "We will do the right thing. Streets always does the right thing." Mr. Beard, that is exactly what our client has been and continues to ask for.

For your convenience, I have attached as Exhibit A a few of the relevant emails and a certified letter that notified you formally of some of the problems with the Machine of which you and other Streets personnel were already aware.

The Purchase Agreement (the "Agreement") between the parties provides certain specific protections to the purchasers of the Solvair Cleaning System.

Section 9 of the Agreements states that if the "purchase of the Solvair Cleaning System is not completed due to non performance of Streets regarding any of the terms and conditions of the Agreement, all monies paid or deposited pursuant to this Agreement by the Buyer shall be promptly returned to the Buyer." Certainly the Machine's failure to perform inures to Streets as a most basic example of non performance under the contract. It just doesn't work. Our client had the right to rely on the description of the Machine's capabilities as set forth in presales presentations and as still promoted on www.solvaircleaningsystems.com. This description has turned out to be inaccurate in material respects as you have been repeatedly so informed. You are well aware that use of your Machine resulted in frequent damage to customer's garments, delays caused by Machine breakdowns, increased operating costs, the poor quality of the Machine's output etc., (see Exhibit B) with the ultimate result that KEM has suffered material damage to its reputation and substantial loss of revenue.

Section 11 of the Purchase Agreement provides that the Buyer accept the Machine upon "the successful operation of the system for three full cycles." Although technically you may argue that this criterion has been met, the reality is that the Machine never functioned properly and failed repeatedly as measured by the specifications and standards of your own marketing materials and as documented in the sorry history reflected in the maintenance log that KEM provided. KEM management and personnel should not be penalized for accommodating Streets' failed attempts over a six month period to resolve the problems. As a result I believe my client has reasonable equitable argument that your Machine should not be considered to have been accepted.

2

Exhibit "F"

Further, in Section 17 of the Agreement Streets warrants that for one year after delivery the Machine will be free from defects in materials and workmanship. Since that clearly is not the case, Streets was obligated under this warranty provision to "repair, replace or correct any such defect" which obligation Streets was never able to fulfill. The Machine was never free of defects. As documented above, it simply never functioned properly in spite of Streets' repeated efforts to correct the problems.

Your recommendation that KEM consider reselling the Machine to a third party is preposterous. Putting aside any legal liability that KEM might become exposed to as a result of such a sale, our client could not in good conscience sell a defective machine to an unsuspecting third party.

We are therefore requesting that you honor your warranty and take back the defective machine and refund the purchase price in full. If you do so, our client, in return, will absorb the loss of the $100,000 plus spent to install the Machine, and will make no claim with regard to the damage to its reputation suffered by the numerous burned and otherwise damaged customer garments, the delays in providing service to customers resulting from both the numerous breakdown, the limited capacity of the Machine, as well as the cost of purchasing a replacement machine (a new RealStar with greater capacity, at about one third the price).

I would encourage you to consider these points and to continue your dialogue with Mr. Reinhold in good faith to see if the parties are able to reach a settlement without incurring the financial costs and damage to reputation which would result from such a litigation. I am well aware of your dislike for responding to both email and phone message on this subject. However, I want to be clear that this matter will not go away simply by the continuation of your tactic of non response. If you think it would be more productive, we are open to continuing the dialogue with Mr. J. L. Mayberry who is carbon copied on this correspondence.

This letter is written without prejudice to KEM's rights and remedies, all of which are expressly reserved.

Very truly yours,

DAVIS & GILBERT LLP

By:

cc:     J.L. Mayberry (VIA CERTIFIED MAIL-RETURN RECEIPT)
        John Reinhold

3

Exhibit "F"

# EXHIBIT A

Henry L Cook
8044 Links Way
Port St Lucie, FL 34986

772-461-5939

VIA E-Mail

November 9, 2008

Mr. Ross Beard, President
R.R. Streets Co., Inc.

Naperville, IL

Dear Mr. Beard:

I have been asked by the owners to assist Kem Cleaners of Schenectady, NY in addressing the serious problems they are currently facing with their business. My son Jeff and I visited Kem Cleaners in August to learn about the Solvair Cleaning system. A few weeks ago I got a follow-up call from Mark Rockcastle to see if we might be interested in the Solvair program in our plant. When I told him we were not he said that Kem was struggling and might be for sale.

After speaking with the owners and having Bob Joel visit our Village Cleaners plant in Syracuse, I was retained by the owners to help solve their problems.

Last week I visited the Kem plant in Schenectady. My mentor Dick Waterfield of Vara's Cleaners in Hamburg, NY, a former Streets representative, joined me.

Our dry cleaning business has been a loyal Streets customer since 1950 that I know of. My grandfather probably was too. His firm started in 1914. Obviously, Dick too is a Streets user. Over the years we have trusted, even revered, Streets' integrity and the excellent technical service and reliable products we have received from you.

These were our shared observations regarding the Solvair System at Kem Cleaners:
1. A thirty pound machine in a business doing 5000 pounds of dry cleaning per week is grossly inadequate.
2. Acetate linings in many suit coats and ladies jackets were coming out as if they had been exposed to free water in the cleaning cycle.
3. Despite recent addition of a tier of all-carbon filters, a sample of solvent from the working tank was coal black in color.
4. Some garments present with basket marks, possibly caused by mixed weight garments in the same load. These marks can only be removed by re-cleaning, cannot be predicted in advance and may occur again at random.

5. The machine has only been installed for a few months but has had numerous breakdowns. Pump, valve and carbon filter replacements have been made, mostly by Bob Joel.
6. Kem has installed a tensioning finishing machine in an effort to rectify distortion and wrinkled linings caused by the cleaning process.
7. Kem has installed a 3HP boiler to reduce energy costs for their 20 hour per day operation of the Solvair machine. They were told 1½ HP was all that was needed but doubled that for a safety margin. In fact, the 3HP boiled cannot maintain pressure during distillation and is inadequate for the job.
8. The cleaning system appears to require a high level of technical competence to operate. It needs a "baby sitter."
9. The many glitches are being addressed with patches, i.e. carbon filter, tensioning finishers, new pumps and now talk of adding a full size Puritan filter system. It appears that we are putting "lipstick on a pig."

It is my understanding that Streets is sending two representatives to Kem Cleaners this Wednesday, November 12, 2008. I will be arriving from Florida Wednesday afternoon and would appreciate the opportunity to be in on the meeting. I expect to be at the plant shortly after 3 P. M.

I feel that the best remedy is to replace the Solvair system with two Hydrocarbon dry to dry machines having a combined capacity of at least 100 pounds per hour. Some of the extra funds due Kem could be used to replace some finishing equipment too.

This is unpalatable for Streets, no doubt, but it is the right thing to do.

Sincerely,


Henry L. Cook

C.c. John Reinhold
    Dave Siegal

| Date | Function | Time in Hours |
|------|----------|---------------|
| 5/7/2008 | Solvair Delivery. Unloaded Solvair and related supplies. | |
| 5/9/2008 | Work on Solvair Install. (6 hrs.) | |
| 5/12/2008 | Work on Solvair Install. (8 hrs) | |
| 5/17/2008 | Worked on Solvair all day (9hrs.) | |
| 5/21/2008 | CO2 Hook up by Airgas | |
| 5/24/2008 | Grouted Solvair (6 hrs) | |
| 5/31/2008 | Solvair, hook up connections (9.5 hrs) | |
| 6/1/2008 | Solvair install. 8:10am to 11:30 pm | |
| 6/3/2008 | Solvair set up all day | |
| 6/4/2008 | In at 8:10am. Frank Majdan upset. Work on chiller install. Finished at 12:45 am on 6/5 | |
| 6/5/2008 | In at 8am. Worked with Frank, Jason and Dylan on Slovair install all day. | |
| 6/6/2008 | Worked on Solvair all day from 8:30am to 11:30pm | |
| | 96 Hour Week | |
| 6/7/2008 | Started processing with Solvair. | |
| | In at 7:30am Problem with lint filter | |
| | Changed out with Jason. Beth, Alli, Diana & John | 2 |
| | In also. Finished @ 7:30pm. (Saturday) | |
| 6/12/2008 | Replaced seal in Valve P48. | 1.00 |
| 6/17/2008 | Replaced CF Pump with help from Wendy and Diana. | 4.00 |
| 6/26/2008 | Drained 2.5 Gal CF from storage tank | 0.50 |
| 6/28/2008 | Worked with Ron Devine from Cool Clean to repair leak at base of Heat Exchanger. | 4.50 |
| 7/1/2008 | Performed CO2 Tank Maintenance w/Dylan on phone. Found P42 Valve not operating correctly. | 8.00 |
| 7/2/2008 | Replaced P42 Valve Actuator & Ball Rings | 1.50 |
| 7/12/2008 | Changed all CF, Changed CF Filters & All Carbon Filters. Needed additional CF. Performed Still maintenance. Removed 7 gal. clean CF after distillation. All work done with Tom Opsahl from Solvair. | 7.50 |
| 7/13/2008 | Had to add CF and cook down to bring CF level back to normal after filter change. | 5.00 |
| 7/14/2008 | Spoke with Tim Racette & John Turner re. CF temp. | 0.50 |
| 7/19/2008 | Installed new CO2 filter on back of Solvair with new stainless steel lines. Rebuilt P46 valve. | 5.00 |
| 7/22/2008 | Took CF samples for Tom and looked for CO2 leaks. | 1.00 |
| 7/23/2008 | CO2 Tank maintenance. | 2.00 |
| 8/4/2008 | Replaced computer screen on Solvair. Changed CO2 filter. | 0.50 |
| 8/6/2008 | Lint filter and CO2 Tank maintenance. | 2.00 |
| 8/9/2008 | Ron Devine from Cool Clean in. Helped replace CF Pump with new model. Replace braided high pressure hoses between compressor and high pressure side. Replaced bolts on door. | 5.00 |
| 8/16/2008 | Full CF distill. | 9.00 |
| 8/27/2008 | Added 2.5 gal. CF | 1.00 |
| 8/29/2008 | Performed still maint. Two times. | 1.50 |
| 9/3/2008 | Changed packing on P73 Valve with Dylan K. (Solvair) on phone. | 1.00 |
| 9/8/2008 | Changed out CF Pump. | 2.50 |
| 9/17/2008 | Wheel marks. Changed all-carbon filters early. | 1.00 |

| Date | Description | Hours |
|---|---|---|
| 9/24/2008 | Solvair iced up. Worked to thaw out and installed new CO2 filter. | 1.00 |
| 10/11/2008 | Filter change and full CF distill. | 13.50 |
| 10/18/2008 | Worked with Tom Opsahl and welder to install second all-carbon filter housing and change filters. | 15.00 |
| 11/10/2008 | Pressure problem. Diag. w/Dylan and resumed. | 0.50 |
| 11/15/2008 | Tom O. & Frank Majdan in to do full CF replacement. Stayed with them until 10:30pm. Everyone irritable. | 15.00 |
| 11/19/2008 | Repair water supply line. | 1.00 |
| 12/8/2008 | Replaced seals in P41 valve. | 1.00 |
| 12/10/2008 | Changed out CF Pump. | 2.00 |
| 12/13/2008 | Replaced transmission buffer between CF Pump and Motor. Had to realign three times! | 4.00 |
| 12/16/2008 | CF vent line blew off top of filter housing. Ad to get repair parts and install. CF all over machine and floor. | 1.50 |
| 1/7/2009 | Changed Vacuum Oil. | 0.50 |
| 1/8/2009 | Changed all filters. | 3.00 |
| 1/16/2009 | Replaced O-rings on CF Rake. | 0.25 |
| 1/30/2009 | Replaced door gasjet seal. | 1.00 |
| 2/6/2009 | Replaced all-carbon filters and polished CF. | 1.00 |
| | | 124.25 |

Mr. Ross Beard

February 13, 2009

R.R. Street & Co. Inc.
184 Shuman Blvd.
Naperville, IL 60563-8464

Ross,

It is clear that you are a very busy man and the situation with your faulty Solvair machine at Greener Cleaners is obviously a difficult one for Streets and an annoyance for you personally. I am sorry to be a burden, but unfortunately, the Solvair is a major problem for Greener Cleaners and one that must be dealt with before we are able to complete our reorganization and emerge from Chapter 11.

I take your commitment to deal with this expeditiously as sincere and chose to write a formal letter to outline our grievances, objectives and timeline in order to facilitate our mutual objective of resolving this matter amicably. As you know, based upon ample evidence, the Solvair machine that was sold to Greener Cleaners has failed to perform by every measure. The reliability of the machine has been abysmal; the quality of the dry cleaning produced has been substandard; our operating costs have soared; the machine is unable to process fabrics routinely handled by traditional machines, and; the capacity of the machine has steadily been reduced as your technicians have attempted to resolve the aforementioned problems.

We have provided Streets with more than adequate time and opportunity to resolve these performance problems and, despite the best efforts of your technicians, the machine is still an ongoing calamity. On February 16, 2009 we will be bringing on-line a hydrocarbon machine, similar to the one specified in the offer you dangled and then revoked, to take on the primary responsibility of Greener Cleaners production. With the hydrocarbon machine we are optimistic that we will be able to stem the loss of our customer base that we attribute to the poor quality and sporadic delivery cycle caused by your Solvair technology.

In reviewing www.solvaircleaningsystem.com I see that the product is still being marketed as it was to Greener Cleaners, e.g. 30 minute cycle time, improved productivity, etc., so I can only assume that the problems we are having with our machine are not true for the product in general; apparently we received a lemon.

Our proposal for dealing with this situation is straightforward. Take back your faulty machine and reimburse us for the original cost and for our direct out of pocket expenses for installation and de-installation. We need to have a formal, signed agreement to this effect no later than March 1, 2009. The

machine needs to be removed by March 7, 2009 with a cashier's check for your reimbursement of our expenses delivered the day you remove the equipment.

Although we are firm on the general parameters and timeline, I am open to discussion as we truly wish to resolve this difficult situation amicably. Please contact me.


Sincerely,


John Reinhold, on behalf of Greener Cleaners, LTD.

858-243-5085

# EXHIBIT B

Mr. Ross Beard

March 4, 2009

R.R. Street & Co. Inc.
184 Shuman Blvd.
Naperville, IL 60563-8464

Ross,

I was delighted to receive your email yesterday indicating that you are prepared to discuss our concerns relating to the performance of your Solvair machine. Frankly, since you had not responded to my numerous phone messages and emails since my certified letter of February 13 I was under the impression that you preferred a legal settlement.

To be blunt, your first proposal is a non-starter. We believe it would be unethical, if not fraudulent, to offer for sale a machine we know to be severely deficient and beyond repair. Our opinion is based upon the following facts:

1. You claim that *"Solvair's technical support team will ensure that the Solvair cleaning system is installed and commissioned correctly, and that it operates trouble free from the start."*

   Despite Street's previously stellar reputation and the obvious competence and professionalism of your technicians, after nine months you were unable to solve the numerous problems with the machine you sold us. Your Solvair has had frequent breakdowns, some requiring days to resolve and obviously impacting our ability to meet garment delivery commitments. Pump, valve and carbon filter replacements have been made, and operating changes as prescribed by Streets were implemented. Prior to the sale you specified a 1.5 HP boiler was required to operate your Solvair machine. To provide a margin of error, we procured a 3 HP boiler. Streets project manager, Frank W Majdan, who worked for eight days straight at Kem Cleaners from November 12, 2008 to November 19, 2008 stated that, "a 5 to 7 HP boiler is required to operate the Solvair system." When a 3HP boiler was used it was unable to maintain pressure during distillation. Despite all the best efforts of your team we were forced to buy a new hydrocarbon machine and severely cut back the use of your Solvair to the point that it is now irrelevant to our operations.

2. You claim that *"The Solvair cleaning process offers tangible benefits for both drycleaning business operators and their customers, including high productivity, longer garment life, and fewer garment claims."*

   Contrary to your claim, for example, we found that acetate and triacetate linings in garments pose a problem that is unique to the Solvair processing. They are wrinkled, distorted in shape, shrunken and sometimes ruined when cleaned in the Solvair machine. Garments with acetate

linings processed by your Solvair are unacceptable to customers without extensive extra finishing efforts. As you are aware, Kem installed a tensioning finishing machine in an effort to rectify distortion and wrinkled linings caused by the cleaning process at a cost of approximately $11,000, specifically to deal with garments ruined from processing in your Solvair system. In addition to this capital coos, recurring finishing costs were also dramatically increased and yet the quality of garments remained subpar. Even when finished, using the specially procured ancillary equipment, many garments were required to be passed on to the sewing department where the linings would be detached from the facing materials in the sleeves and body of the jacket, then re-sewn to correct the distortion. The Solvair damage to acetate linings affects 5-10% or more of men's and lady's suit coats, sport coats and Blazers. In that Kem Cleaners typically processes 200 such garments a day having 10 or 20 damaged garments everyday is an unacceptable condition. The cleaning of similar garments with other technologies does not cause this damage.

3. You claim that Solvair has *"Reduced need for garment classification and stain removal results in less need for training and skilled labor; factors that can contribute to lower operating costs."*

   As you were made aware in Henry Cook's letter of 11/9/2008 some garments present with basket marks, possibly caused by mixed weight garments in the same load. These marks can only be removed by re-cleaning, cannot be predicted in advance and may occur again at random.

4. You claim that *"Delicate items can be cleaned with heavy items, dark colored items with light colored items, and fabrics likely to cause dye transfer cleaned with items vulnerable to dye pick up. There is also no need to accumulate certain types of items (such as lighter weight garments) in order to run full loads throughout the day."*

   Our experience is that dye transfer and "basket marks" occur with your Solvair machine. It is our impression that traditional classification with regard to weight and colors is desirable if not required with you system.

5. You claim that *"While perchloroethylene, hydrocarbon, and water are each effective at removing a narrow range of contaminants, the unique nature of the Solvair cleaning process provides better overall removal of a much broader range of contaminants."*

   Every single employee at Kem Cleaners would testify that both the old Perc machines and the new hydrocarbon machine outperform your Solvair hands down. The mood of Kem's employees changed overnight when the hydrocarbon machine came online and they were once again able to provide their customers with the quality for which Kem had previously been known.

6. You claim that, *"Solvair Cleaning Systems are designed for passive operation. A touch of a button and minimal routine maintenance are all that is required. Solvair Cleaning Systems are pre-programmed for optimal cleaning, thereby eliminating the need for operators to make processing and operating adjustments."*

Our experience is that the cleaning system requires a high level of technical competence to operate and that it needs a full time "baby sitter". The many glitches have been addressed with patches, i.e. carbon filter, tensioning finishers, larger boilers, new pumps and changes to operating procedure, i.e. increased frequency of filter changes. The unreliability of the Solvair equipment caused numerous and sometimes lengthy shutdowns in production. The downtime impacted the productivity of finishers, inspectors and assemblers who had no garments on which to work. The prolonged breakdowns, because a replacement part had to be shipped in and installed before production could resume was particularly damaging to the business as garments were not ready when promised. Kem's store managers can document furious previous high-value customers now lost due to your Solvair machine's failures.

7. You claim that, "The total processing cycle time, including cleaning and drying, is designed to be 30 minutes or less. This facilitates more pounds cleaned per hour, thereby achieving high equipment productivity."

   In their efforts to get our machine to perform your technicians increased our cycle time from 30 to 44 minutes, <u>a 32% reduction in capacity</u> and they were still unable to resolve our many problems.

8. You claim, and we believe, that "Solvair understands the requirements of drycleaning business operations "

   Streets knew that our primary motivation for buying Solvair was so that we could decommission our Perc machines and that we would be relying solely on your machine for dry cleaning. Streets knowingly sold us a thirty pound machine for a business doing 5000 pounds of dry cleaning per week. This necessitated operating an expensive second "night shift" to achieve the required cleaning room capacity.

9. You claim, "IMPROVED PRODUCTIVITY & COMPETITIVE COSTS"

   Prior to the installation of the Solvair, Streets provided Kem with significant projected cost savings using the Solvair system, including a dramatic decline in natural gas usage. In fact, the boiler capacity specified by Streets was vastly undersized and the actual boiler required to operate the machine resulted in significant capital outlays and <u>utility costs in the plant increased by 35%!</u> In addition, mechanic costs were several times higher due to the frequent breakdowns. Additional labor costs were incurred solely because of the low productivity of the Solvair system.

10. You promote, "A Unique, Gentle Drying Technology That Uses No Heat".

    You neglect to mention that the cold temperature processing, unique to the Solvair system, is not so gentle on garment buttons which frequently become brittle and break in processing. This causes dissatisfied customers unless entire sets of buttons are replaced on their garments. The cost of having inventories of replacement buttons on hand and then sewing them on is a costly and unnecessary expense created by the use of the Solvair system.

Need I go on? All of the above claims are taken verbatim from your website and all of our experience can be verified by multiple individuals, including Streets personnel, with years of Dry Cleaning experience. Most of the facts related to our experiences with your machine have been communicated to you directly, either verbally or in writing, over the past nine months.

On the bright side, we are in complete agreement with your second alternative, indicating that you are prepared to purchase the unit from us and organize for its decommissioning and removal from Kem. In fact, we are unable to conceive of any other alternative that would be acceptable. However, we vehemently disagree with your assertion that *"There is no basis for us to refund the total purchase amount of the system"*. We believe that any objective person reviewing these facts, and the others I have not yet found the energy to document, would agree that my offer of February 13 was overly generous.

Recall that in November of 2008 you personally agreed that a thirty pound machine was inadequate to serve the needs of Kem Cleaners and you said that Streets would provide a hydrocarbon machine in Kem's cleaning room. For more than two months you held out and watered down the offer before reneging. When Kem principals agreed to proceed without Streets we had a machine shipped, installed and running 13 days later. More than two months of continued poor quality leading to further loss of customers and exceptionally high operating costs continued as we waited for you to fulfill your promise. Once again, you equivocated and ultimately chose not to accept my February 13 settlement offer which expired on March 1.

Currently we are willing to accept as compensation for our losses $256,927.54 which is the original estimate of our startup costs and which does not include compensation for the damages to our business that were incurred by reliance on your machine. In return we will allow you to decommission and remove the Solvair machine at your expense and we will agree to keep the settlement confidential.

Let me be clear, time is of the essence and we will not tolerate further equivocation. This offer expires March 12, 2009 and you may be assured that our next offer will not be as generous. Also, please be advised that we do not feel bound by any written or implied confidentiality agreement at this time.

I continue to be open to discussion as we truly wish to resolve this difficult situation amicably. Please feel free to contact me anytime.


Sincerely,


John Reinhold, on behalf of Greener Cleaners, LTD, (once again) dba Kem Cleaners.

858-243-5085

# AGREEMENT

This agreement (hereinafter referred to as Agreement), is hereby entered into on this ___ day of September, 2009, between ~~R.~~ Solvair, LLC.~~R. Street & Co. Inc.~~, a Delaware Limited Liability Corporation~~Corporation~~ with its principal place of business at 184 Shuman Blvd. #150, Naperville, IL 60563 (hereinafter referred to as "Solvair~~Street~~") and **Greener Cleaners, Ltd**, formerly known as Kem Cleaners, Inc., with its principal place of business at 809 State Street, Schenectady, NY 12307, (hereinafter referred to as "Buyer"). Buyer and Solvair are hereinafter in this Agreement individually referred to as "Party" or collectively as "Parties."

WHEREAS, Buyer purchased from R. R. Street & Co. Inc, ,a related entity to Solvair~~Street~~, by Purchase Agreement dated February 8, 2008 a Solvair Cleaning System~~;,~~ and

WHEREAS ~~the~~ Buyer now wishes to sell its~~return the~~ Solvair Cleaning System to ~~Street~~Solvair, ~~and~~ Solvair ~~Street~~ is willing to purchase Buyer's ~~accept return of the~~ Solvair Cleaning System,

NOW THEREFORE, the parties agree as follows:

1.  Sale~~Return~~ of Buyer's Solvair Cleaning System~~Equipment~~.

    (a)  Buyer shall sell ~~return~~ to Solvair~~Street~~ its~~the~~ Solvair Cleaning System together with its~~the~~ Lattner 3 horsepower boiler, serial number 54044, (the Solvair Cleaning System and the aforementioned boiler are collectively referred to as the "Equipment"). Solvair~~Street~~ will organize the pick up of the Equipment at its own cost and expense at the Buyer's location set forth above. Upon pick~~ing~~ up of the Equipment, Solvair~~Street~~ will make payment~~refund~~ to the Buyer by certified check payable to the order of the Buyer, in the amount of One Hundred Seventeen Thousand and 00/100 Dollars ($117,000.00) by delivery of the check to the Buyer at the Buyer's place of business when the Equipment is picked up. Risk of loss or damage

shall pass to Solvair at the time of pickup at Buyers location. Tile to the Solvair Cleaning System will pass to Solvair upon payment in full to Buyer.

(b) The pickup of the Equipment by Solvair, ~~Street~~ and the payment ~~refund~~ of One Hundred Seventeen Thousand and 00/100 Dollars ($117,000.00) to Buyer shall occur by giving Buyer at least 48~~on 24~~ hours' notice to the Buyer and ~~in all events~~, will occur on or before the 30th———— day of September————— 2009, providing that this transaction has been approved by the United States Bankruptcy Court, Northern District of New York, at least seven business days prior to scheduled pick-up of the equipment.

(c) The Buyer warrants and represents that prior to ~~upon~~ pickup of the Equipment by Solvair~~Street~~, Buyer will provide documentation to Solvair that the Equipment will be free and clear of any liens and encumbrances created by Buyer existing at the sufferance of the Buyer. The transfer of the Equipment is "as is", without any warranty of merchantability or fitness for a particular purpose. However, Buyer represents that, since the time it discontinued use of the Equipment, it has not caused any damage or loss, and will not permit any damage or loss to occur to the Equipment that would cause the Equipment to be inoperable.

2. Release. Upon the pickup of the Equipment and the payment of ~~the refund of~~ One Hundred Seventeen Thousand and 00/100 Dollars ($117,000.00), each party releases the other and any of its related entities, of and from any and all claims, liability and accountability associated with the Equipment and its sale to Solvair, including, but not limited to those specified in the Purchase Agreement of February, 8, 2008 executed by Buyer and R. R. Street & Co. Inc.~~.~~ The pickup of the Equipment and the payment~~partial refund of the purchase price~~ shall make this release operative on that date.

3.    <u>Nondisclosure</u>.  Upon the pickup of the Equipment and the payment of the refund set forth above, Buyer and Solvair agrees not to disclose to any third parties, except by legal compulsion, through subpoena or similar device upon notice to SolvairStreet, any of the terms and conditions of this Agreement. deficiencies Buyer  Each party to this Agreement also agrees that it will not cause or permit its owners, officers, employees, agents, personal representative, heirs or assigns to disseminate information in any form, orally, written or electronic which includes statements of a derogatory nature regarding the other party's products, services, operations or personnel. In the event that a party does cause or permit such action, it agrees that it and its owners will be responsible for payment of any and all of the other party's expenses involved in pursuit of legal remedy against it.  contends exist with respect to the performance of the Equipment, and the performance by Street under the warranty and service agreements associated with the purchase of the Solvair Cleaning System.  By signing this agreement, Street does not acknowledge the correctness of any claim by the Buyer of any problem, breach of warranty or failure to service the Solvair Cleaning System.

4.    <u>Entire Understanding and Purchase Agreement</u>. The parties executed a purchase agreement as of February 8, 2008.  This refund agreement modifies the purchase agreement only insofar as there is conflict between the express terms of this refund agreement and the purchase agreement.  In all other respects, the purchase agreement shall remain in full force and effect. This Aagreement represents the entire Aagreement of the parties hereto with respect to the subject matter herein, and it is agreed that there are no other duties, obligations , and liabilities. This Agreement and may not be modified except by a subsequent writing signed by both parties.

.

Page **3** of **5**

5.    Governing Law.  Any legal action brought by or against either party under the terms of this Agreement shall be governed by the laws of the State of Illinois, and venue for said action shall be within the County of DuPage and the State of Illinois respectively.

6.    Agreement is Binding. This Agreement shal be binding on all parties herein, their heirs, assigns and personal representatives. Each person signing this Agreement represents and warrants that he or she is duly authorized and has the legal capacity to execute and deliver this Agreement.

75.    Approval of the Bankruptcy Court.  Buyer is currently in Chapter 11 in the United States Bankruptcy Court, Northern District of New York.  This agreement is contingent upon the Buyer's obtaining at its own cost and expense, all necessary approvals of the Bankruptcy Court.

GREENER CLEANERS, LTD.

By_____
        Hank Cook, General Manager

Solvair LLC.R.R. STREET & CO. INC

By _____
      L. Ross Beard

        President and CEO
_____

This agreement has been approved by the shareholders of Greener Cleaners, Ltd:

_____
Shareholder: Gaye Seidman Reinhold,
Trustee of the Benson Seidman Trust


_____
Shareholder: David M. Siegal


_____
(Capacity) John Reinhold