**Christian H. Dribusch (507021)**
The Patroon Building
Five Clinton Square
Albany, NY 12207
(518) 436-1662

**Hearing Date:** **December 23, 2009**
**Hearing Time:** **10:30 a.m.**
**Hearing Location:** **James T. Foley Courthouse**
**445 Broadway**
**Albany, NY 12207**

Attorney for Debtor

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

**GREENER CLEANERS, LTD.,**

Debtor.

Chapter 11
Case No.: 08-14239

**MOTION AUTHORIZING DEBTOR'S
SALE OF ASSETS OUTSIDE THE
ORDINARY COURSE OF BUSINESS
PURSUANT TO 11 U.S.C. §363**

---

Greener Cleaners, Ltd,, a New York corporation, debtor and debtor-in-possession

herein (the "Debtor"), by and through its undersigned counsel, hereby moves this Court for

entry of an order authorizing the Debtor to sell certain assets outside the ordinary course of

business and enter into a sale agreement (the "Motion"). The proposed agreement is attached

Exhibit A. In further support of this Motion, the Debtor alleges:

## BACKGROUND

1.      On December 18, 2008 (the "Petition Date"), the Debtor filed in this Court a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").

2.      The Debtor has continued in possession of its property and has continued to

operate and manage its business as debtor-in-possession pursuant to Bankruptcy Code

§1107(a) and §1108.

3.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §157 and

§1334.

4.     Venue is proper I this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §1408 and §1409.

5.     The statutory predicate for the relief sought is Bankruptcy Code §363(b)(1).

6.     Prior to the Petition Date, the Debtor operated as a dry cleaner with thirteen (13) retail stores and a main plant in Schenectady, New York.

## **RELIEF REQUESTED**

7.     The Debtor has entered into a sale Agreement ("Asset Purchase Agreement") a copy of which is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

8.     The Debtor has a pre-petition line of credit facility with KeyBank National Association secured by most of the personal property of the Debtor.   The KeyBank line of credit facility has approximately $300,000.00 outstanding.   The Debtor is currently making interest only payments on the facility.   The Debtor seeks authority to pay down $100,000 on the KeyBank National Association line of credit from the proceeds of sale as more particularly described in its Plan of reorganization and hold the balance to be distributed in accordance with the terms, provisions and conditions of its Plan of reorganization.

9.     In its business judgment, the Debtor has decided to consolidate its business operations.  To effectuate the consolidation and acquire the necessary items to streamline its operations, the Debtor needs to obtain pay down its debt to KeyBank National Association and retain additional funds for working capital and distribution to creditors.

10.     By this Motion, the Debtor requests an Order pursuant to Bankruptcy Code §363(b)(1) authorizing the sale of the Assets, free and clear of all liens and other interests, to **James and Barbara Partyka**  ("Purchaser"), according to terms set forth in the Asset Sale Agreement, subject to higher and better offers made on the return date of the Motion.

11.     The essential terms of the proposed sale are set forth in detail in the Asset purchase Agreement, and are summarized as follows:

a.     Equipment                                    $75,000.00

b.     Lease and Leasehold Improvements             $40,000.00

c.     Goodwill                                     $50,000.00

d.     Debtor to provide dry cleaning, pressing, and pick-up and delivery service Monday through Friday at the Kem Plaza business location at 55% of the retail price charged at Debtor's other locations.

e.     Purchaser responsible for sales applicable sales taxes.

f.     Contingent of Purchaser entering acceptable lease.

12.     The Debtor seeks entry of an order authorizing the entry into the Asset Purchase Agreement pursuant to Bankruptcy Code §363(b) and (f).

## AUTHORITY FOR MOTION

13.     Bankruptcy Code § 363(b)(1) authorizes the trustee (or a debtor in possession, who has the rights and powers of a trustee) to use, sell or lease property of the estate other than in the ordinary course of business.

14.      The Debtor may sell free and clear of an interest (including a lien) of an entity other than the estate only if:

(1) Applicable nonbankruptcy law would permit a sale of such property free of the interest;

(2) The other entity consents;

(3) The interest is a lien and the sale price is greater than the aggregate value of all liens on such property;

(4) The interest is in bona fide dispute; or

(5) The entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

15.     As discussed in *In re Lionel Corporation,* 722 F.2d 1063 (2nd Cir. 1983), a debtor seeking to sell substantially all of its assets other than in the ordinary course of business must demonstrate some business justification that the proposed sale will aid the reorganization effort. Since the proposed sale only encompasses one location with the Debtor retaining numerous other locations and its plant, the Debtor believes that the *Lionel* factors should not control the proposed sale.

16.      When property is to be sold free and clear of adverse interests, a motion must be made in accordance with Federal Rules of Bankruptcy Procedure Rules 6004(c) and 9014. Thus, when there is an intent to sell an asset free and clear of liens, both notice to creditors and the commencement of a contested matter are required.

17.     In determining whether to approve a proposed sale under Bankruptcy Code § 363, courts generally apply standards that, although stated variously ways, represent essentially a business judgment test. See, *Committee of Security Holders v. Lionel Corp,* 722 F.2d 1063, 1071 (2nd Cir. 1983).

18.     Once the Debtor has articulated a rational business justification, a presumption attaches that the decision was made on an informed basis, in good faith and in the honest belief that the action is in the best interest of the Debtor.  See, *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.,* 147 B.R. 650, 656 (SDNY 1992).

19.     In the event that the Court determines that the *Lionel* factors apply, the Debtor submits that the proposed sale meets such criteria. It is respectfully submitted that the sale of

the Assets outside the ordinary course of business before the approval of a disclosure statement and confirmation of a plan is justified because the proposed sale of the Assets will afford the Debtor the opportunity to eliminate its expenses in maintaining the Assets, generate funds to pay down its secured debt, and generate funds to fund the streamlining of its ongoing operations.  Further, the proposed sale is consistent with the Debtor's intention to propose a reorganization plan in this Chapter 11 case.

20.     The proposed sale is subject to higher and better offers.

21.     The Purchaser is not an "insider" or "affiliate" of the Debtor.

22.     Upon information and belief, the Debtor's total estimated liabilities exceed the purchase price.

23.     The Debtor proposes to sell the Assets free and clear of lien and encumbrances including KeyBank National Association's lien, provided, however, that the Debtor is to be authorized to remit $100,000 of the proceeds towards its obligations due KeyBank National Association upon consummation of the sale with the balance to be held for distribution in accordance with the terms, conditions and provisions of a proposed plan of reorganization.

24.     Notice of the Motion and Motion has been given to the mailing matrix.   In light of the nature of the relief requested herein, the Debtor submits that no further notice need be given.

25.     No previous application for the relief requested herein has been made by the Debtor to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order pursuant to 11 U.S.C. § 363(b)(1) authorizing the sale of the Assets free and clear of all liens and other interests, such liens and other interests to attach to the proceeds of sale, pursuant to the terms and conditions set forth in this Motion and the annexed asset Sale Agreement, together with such other and further relief as to this Court may seem just and proper.

Dated this 1st day of December, 2009

By: */s/ Christian H. Dribusch*

Christian H. Dribusch
The Patroon Building
Five Clinton Square
Albany, NY 12207
(518) 436-1662

## ASSET PURCHASE AND SALE AGREEMENT

This Agreement is made this 14th day of November, 2009 by and between

**GREENER CLEANERS, LTD**. also known as Kem Cleaners, a New York

corporation having an office at 801- 809 State Street, Schenectady, New York 12307

(hereinafter referred to as "the Seller"), and **JAMES PARTYKA and BARBARA**

**PARTYKA**, residing at 36 Dania Drive, Hagaman, New York 12086 (hereinafter

referred to individually and collectively as the "Purchaser").

WHEREAS, Seller is engaged in the dry cleaning and laundromat business at Kem

Plaza, 4803 St Route 30 North, Town of Amsterdam, County of Montgomery,

(hereinafter referred to as the "Business" ); and

WHEREAS, Seller has acquired certain tangible business assets in connection

with the performance of the Business, and Seller also has developed substantial

goodwill, customer relations and other intangible assets in connection with the

Business; and

WHEREAS, Purchaser desires to acquire Seller's intangible and tangible business

assets (hereinafter referred to as "Business Assets") upon the terms and conditions as

hereinafter set forth; and

NOW THEREFORE, in consideration of the mutual promises and covenants

contained herein and other good and valuable consideration exchanged between the

parties, the receipt and adequacy of which is hereby acknowledged, the parties agree as

follows:

Exhibit "A"

1. <u>Preamble</u>. The preamble hereto is made a part hereof.

2. <u>Purchase and Sale of Assets</u>. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Business Assets as follows:

| Asset | Price |
|---|---|
| | |

a.    Equipment – see Schedule attached        $ 75,000.00
The Equipment is sold "as is" as located in the Business premises, without warranty of any kind, including warranty of merchantability or fitness for a particular purpose.

b.    Lease and Leasehold Improvements        $ 40,000.00
Purchaser will sign the lease annexed hereto.

c.    Goodwill                                          $ 50,000.00

The Seller warrants the equipment will be in the same working condition at the closing as it was on October 20, 2009. Certain pieces of equipment were in need of repair on that date. The Buyer will make those repairs and in consideration thereof at the closing the Buyer will receive a credit of $10,000.00 against the purchase price.

3. <u>Accounts Receivable</u>. Seller's accounts receivable, and processed inventory on hand as of the date of the Closing, are not part of this transaction and all amounts collected thereon shall be the exclusive property of Seller.

4. <u>Cash in Vending and Laundromat Machines</u>. On the Closing Date, directly after the Closing, Seller shall remove all cash and coins from the vending machines and bill changer and said cash and coins shall be the Seller's property.

5. <u>Payment of the Purchase Price</u>. The purchase price shall be paid by Purchaser to Seller on the Closing Date by a deposit of $15,000.00 on the signing of this agreement, to be held in escrow in the trust account of Siegal Law Offices, LLC,

Albany New York, and the balance, $150,000.00 by certified or bank check payable to the order of Seller.

6. <u>Dry Cleaning Services.</u>

a. Seller will provide dry cleaning, pressing, pick-up and delivery service Monday through Friday at the Business location at Kem Plaza. The charges for the above service will be 55% of the recommended retail price charged in all Seller's stores for similar service. Professional shirt laundering is included in the above services. One pick-up and delivery per day will be made at a time established by Seller during normal dry cleaning store business hours. Therefore "next day" service is the fastest available for items taken in prior to pick – up. Seller will make its counter training and procedures available to all Purchaser's store personnel for so long as Seller is providing dry cleaning services. The current prices Seller charges for its shirt laundry and dry cleaning services is attached.

b. Bills will be issued and payable weekly on Friday for transactions in the preceding week Saturday through Friday. Repairs and alterations will be billed at 75% of the suggested retail price for the service. All other "Outside Work", such as wedding gown processing, suedes and leathers, pillow renovation, rugs, will be billed at 75% of Seller's suggested retail price for its own stores.

c. Purchaser will provide computer sales reports as generated from the existing computer system and successors each Saturday from which the weekly billing will be generated. No deliveries will be made in the event the weekly bill has

Exhibit "A"

not been paid on time.

   d.   Garment invoicing, tagging, bagging and sales reporting is the responsibility of Purchaser's store personnel.

   e.   Claims will be resolved using the National Fair Claims Guide for Textile Products. Purchaser shall be responsible for defending and otherwise handling all claims brought by its customers.

   f.   Purchaser may use the existing Kem signage in the Business location and on the façade of Kem Plaza and may do business under the Kem name provided however, that at no time will Purchaser hold itself out as the agent of or in any way able to act for Seller, that this arrangement does not make Seller and Purchaser partners, joint venturers or any other sort of joint enterprise owners or operators, that the parties are and will remain for so long as this arrangement continues, that of vendor and customer; that Purchaser will keep the Business premises neat, clean and orderly so as to reflect well on the Kem name, and treat it customers and provide service commensurate with a first class dry cleaning and laundromat store, and will make no comment, directly or indirectly, to the public or its customers about the operation of the stores of the Seller. During the period of this arrangement Seller may place discreet signage on and in the Business premises stating to the effect that the store of the Purchaser is owned and operated independently of the Kem Cleaners stores. Use of the Kem trade name will be discontinued immediately if Seller is not the processor of the work.

Exhibit "A"

g.   Either party may cancel this service aspect of the agreement, set forth in this paragraph 6, at any time effective 30 days after giving written notice to the other of their intention to do so and immediately following the giving of notice in the event of breach of this agreement by the other party.

h.   So long as Purchaser is not in breach of this agreement Seller covenants that it will not compete with Purchaser in the business of retail dry cleaning services or own operate a laundromat within 10 miles of Kem Plaza for a period of five years from the date of the Closing.

7.   Representation of Seller.  Seller hereby represents that it owns the assets to be transferred herein, and has the authority to sell the same to Purchaser. At the Closing Seller will provide shareholder and director resolutions authorizing this sale and agreement, and a certificate of the State of New York showing that Seller is a corporation in good standing.

8.   Contingency, Lease and Pending Closing.

a.   Contingency.   This agreement is contingent upon the Seller's obtaining, at its own expense, any and all approvals necessary, including but not limited to that of the Bankruptcy Court, which the Seller agrees to do diligently and to keep Purchaser advised of progress upon request. Seller represents that this sale does not constitute the sale of all or substantially all the assets of Seller. In the event that the necessary approvals are not obtained within 120 days of the signing of this agreement by both parties, this agreement shall be null and void, the deposit shall be returned to

Exhibit "A"

Purchaser and each party shall have no liability or accountability to the other on account of this agreement. This agreement is also contingent upon Kem Plaza's signing the lease annexed hereto at or before the Closing.

      b.    <u>Lease.</u>    Seller is a month to month tenant at the premises set forth in the lease annexed hereto which the Purchaser will sign simultaneously with this agreement. Both this agreement and the lease shall be held in escrow pending the fulfillment of the contingency set forth in paragraph (8)(a) above. The "Demised Premises" set forth in the annexed lease is referred to in this agreement as the "Business Premises". At the Closing the Seller's lease obligations shall be current with the landlord in the lease and the Purchaser may pay part of the purchase price directly to the landlord as necessary to bring the lease current. All rent paid in advance shall be prorated with a credit to the Seller to be paid by the Purchaser at the Closing.

      c.    <u>Pending Closing.</u>    Pending the Closing, Seller will operate the Business in the same fashion as it has, and will maintain the Business as it has, keeping the Business Premises neat and clean. Notwithstanding the forgoing however, Seller may make whatever pricing and procedurally, computer software and the like changes it wishes so long as such changes are applicable to at least most of Seller's other stores.

Exhibit "A"

9.    <u>Sales Tax</u>.  Purchaser acknowledges that it shall be solely responsible for any and all sales taxes arising from the within transactions.  On the Closing Date, Purchaser shall deliver to Seller Purchaser's check payable to New York State Sales Tax as necessary as and for payment of sales arising out of the sale of the Equipment.

10.    <u>Closing Date</u>.  The Closing Date shall be a date mutually agreed upon by the parties, but in no event later than the 10th day following the obtaining of the approvals under paragraph 8 of this agreement, unless that day is a Saturday, Sunday or legal holiday, in which event the next business day shall be the Closing Date.  At 10:30 a.m. on the Closing Date at the offices of Siegal Law Offices, LLC, 16 Corporate Woods Boulevard, Albany, New York 12211-2350, the following shall be delivered:

a.    Certified or bank check in the amount of $140,000.00 pursuant to paragraph 2, to the order of Seller with adjustments as specifically set forth in this agreement.

b.    Check payable to New York State Sales Tax for the amount of tax arising out of this transaction.

c.    Any other documents necessary to consummate these transactions reasonably requested by counsel for Seller or Purchaser, including but not limited to the annexed lease. The Closing is also subject to the Purchaser's obtaining at its expense a UCC lien search and Seller providing release of lien from Key Bank or any other holder of a security interest in the assets being transferred. Seller will indemnify Purchaser form any claims made by any person holding a security interest given by Purchaser or

Exhibit "A"

its predecessors in interest.

11.   Broker.  The parties agree that no commission or fee is due any person, as a broker or finder, in connection with this agreement and each agrees to defend and indemnify the other for claims made by such persons.

12.   Survival.  The terms, covenants, conditions and representations in and of this agreement shall survive the delivery of property and payment of sums at the Closing Date, and shall not merge into said acts.  The parties hereto agree to perform such further acts as may be necessary or required to complete the transactions specified in this agreement.

13.   Controlling Law, Venue, Notice and Attorneys' Fees.  This agreement shall be construed according to the laws of the State of New York.  Any litigation under this agreement shall have as its venue the County of Albany.  The prevailing party in any litigation shall be awarded, in addition to damages and injunctive relief, its attorneys' fees and court costs.  The court shall decide which party prevailed. Notice may be given by certified mail or overnight delivery service if properly addressed in a secure wrapper acceptable to the delivery service with all necessary fees paid or billing authorized, or in person. If not in person delivery the notice may be sent to the party's address above or as set forth by notice to a substitute address, and in the case of Purchaser, to the Business premises if given after the Closing Date. Notice shall be deemed given upon delivery if delivered in person or three days after mailing if given by certified mail, or one day after delivery to the overnight delivery service if given by overnight delivery.

Exhibit "A"

14. <u>Binding Effect, Severability, No Modification</u>. This agreement shall bind the parties, their successors and assigns. Each obligation herein is severable and the invalidity of one promise, term or covenant shall not cause the entire agreement to fail. This agreement sets forth the entire agreement of the parties and may not be altered, amended or modified except by a writing subscribed by the party to be charged.

15. <u>Attorney</u>. Purchaser and Principal acknowledge that this agreement was prepared by the law firm of Siegal Law Offices, LLC, for and on behalf of Seller. Said law firm has not rendered any advice to Purchaser and Purchasers acknowledge that they were given the opportunity to consult legal counsel and have chosen not to do so. In the event of any ambiguity in this agreement, the fact that this agreement was drafted by the said law firm shall not be used in any proceeding to construe the agreement.

IN WITNESS WHEREOF, the parties have indicated their intention to be bound hereto by subscribing this agreement.

Henry Cook, GM                    James Partyka                    Barbara Partyka
Kem Cleaners

Exhibit "A"

## ACKNOWLEDGEMENTS

STATE OF NEW YORK )
COUNTY OF Schenectady )     ss.:

On the 14th day of November 2009, before me personally came HENRY COOK to me known, who, being by me duly sworn, did depose and say that he resides in Port St. Lucie Florida ; that he is the General Manager of GREENER CLEANERS, LTD. also known as Kem Cleaners the corporation described in and which executed the above instrument; and that he signed his name thereto by order of the board of directors of said corporation.

GINA ROBINSON
Notary Public, State of New York
No. 01RO6138977
Qualified in Schenectady County
Commission Expires 12/24/13

Notary Public, State of New York
Qualified in County
My Commission Expires on

STATE OF NEW YORK )
COUNTY OF MONTGOMERY)     ss.:

On the 10th day of November, 2009, before me, the undersigned, a Notary Public in and for said State, personally appeared JAMES PARTYKA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to be that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

CHARLES R. SCHWARTZ
Notary Public, State of New York
Qualified in Montgomery County
Reg. No. 02SC6062209
Commission Expires July 30, 2013

Notary Public, State of New York
Qualified in the County of:
My Commission Expires on

Page 10 of 14

Exhibit "A"

STATE OF NEW YORK        )
COUNTY OF MONTGOMERY  )    ss.:

On the _10th_ day of _November_, 2009, before me, the undersigned, a Notary Public in and for said State, personally appeared BARBARA PARTYKA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to be that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

Notary Public, State of New York
Qualified in the County of:
My Commission Expires on:

CHARLES R. SCHWARTZ
Notary Public, State of New York
Qualified in Montgomery County
Reg. No. 02SC6062209
Commission Expires July 30, _2013_

Exhibit "A"

## EQUIPMENT LIST

| | |
|---|---|
| Top Loaders | 14 |
| 35 LB | 8 |
| 50 LB | 3, 1 not working |
| Double Stacked | 6 |
| Singles | 11 |
| Bill Changer | 1 |
| Soap Vending Machine | 1 |
| Laundry Bag Dispenser | 1 |
| Laundry Carts | 9 |
| Counters | 3 |
| Computers | 2 |
| Printers | 1 |
| Conveyor Belt | 2 |
| Water Tank 1500 Gallons | 1 |
| Water System Pressure Tanks | 2 |
| Hot Water Furnace | 1 |
| Hot Water tank | 1 |
| Desk | 1 |
| 8 feet Ladder | 1 |
| 5 Tier Wooden Shelve | 1 |
| Plastic Bag Rack | 1 |

Exhibit "A"

| | |
|---|---|
| Television | 1 |
| Laundromat chair sets | 7 |
| Folding tables | 4 |
| Chairs | 4 |

Exhibit "A"

# EXHIBIT A

Page 14 of 14

Exhibit "A"

<u>AGREEMENT OF LEASE</u>

THIS AGREEMENT OF LEASE, is made as of the ____ day of _____November, 2009, between **KEM PLAZA, INC.** a New York corporation having an office at 2nd Floor, c/o David Siegal, 16 Corporate Woods Blvd., Albany, New York 12211, (hereinafter referred to as "the Landlord"), and JAMES PARTYKA and BARBARA PARTYKA, residing at 36 Dania Drive, Hagaman, New York 12086_(hereinafter individually and collectively referred to as "the Tenant").

W I T N E S S E T H:

1.    <u>DEMISED PREMISES</u>:

1.01.    The Landlord hereby leases to the Tenant and the Tenant hereby hires from the Landlord, the premises located on Route 30 in the Town of Amsterdam, New York, (hereinafter referred to as the "Demised Premises") containing approximately 3,500 square feet, measured from the exterior faces of exterior walls and the center line of interior walls, and suitably identified on Exhibit I as "Kem", annexed hereto and by this reference made a part hereof. Those premises shown on Exhibit I, inclusive of the Demised Premises, consisting of the building (hereinafter referred to as the "Building") in which the Demised Premises is to be situated, the parking facilities, roadways and other improvements thereon and as may be located thereon in the future [(including additional building(s)] are hereinafter sometimes referred to as the "Shopping Center".

1.02.    The Tenant shall have, as appurtenant to the Demised Premises, the non-exclusive right in common with others to use, and to permit its customers to use, the public or common areas and facilities, parking areas, and roadways in the Shopping Center, but such right shall always be subject to reasonable rules and regulations from time to time established by the Landlord by suitable notice, and to the right of the Landlord to designate and change from time to time areas and facilities so to be used, including but not limited to the style, type, quantity and layout of said public and common areas, roadways and parking areas.

2.    <u>TERM</u>:

2.01.    The term of this lease shall be for  five (5) years, commencing on the closing of the purchase and sale agreement between the Tenant and Greener Cleaners, Ltd. (hereinafter referred to as the "Commencement Date") and terminating on the last day of the sixtieth month following that closing. If the Commencement Day is other than the 1st day of the month the rent

Exhibit "A"

shall be prorated from the Commencement Day to the end of the month in which the Commencement Date occurs. Possession of the Demised Premises shall be deemed given to the Tenant upon the Tenant's receipt of a key to the Demised Premises. In the event that the Tenant occupies the Demised Premises on a day earlier than the Commencement Date of this lease, the term of this lease shall commence on the day of occupancy, but the expiration date will remain as specified above, with the rent to be prorated from the day of occupancy to the first day of the next month and full rent to be paid for each succeeding month prior to the Commencement Date of this lease.

3. RENT:

3.01. The Tenant agrees to pay the Landlord, during the term aforesaid, the annual sum of Thirty-one Thousand Five Hundred and 00/100ths ($31,500.00) Dollars, payable in the monthly equal sum of Two Thousand Twenty-five and 00/100ths ($2,625.00) Dollars on the first day of each month of said term, in advance.

4. USE OF PREMISES:

4.01. The Tenant may use and occupy the Demised Premises for the purposes of operating a laundromat and dry cleaning drop store and for no other purpose or purposes.

4.02. The Tenant will not, nor will it permit any other persons to, do anything or bring anything in or upon the Demised Premises or to be kept therein which will in any way increase the rate of fire insurance on the Shopping Center, nor use or permit the Demised Premises to be used for any purpose which would cause an increase in the rate of fire insurance on the Shopping Center.

4.03. So long as the Tenant is in compliance with the terms of this lease, the Landlord will not lease any other portion of the Shopping Center to a tenant whose principal activity is any of the principal uses set forth in article 4.01.

5. TAXES:

5.01. In addition to the annual rental provided for in article "3" hereof, the Tenant agrees to pay to the Landlord, as additional rent, its proportionate share of all real property taxes, water and sewer rents, rates and charges, and assessments, including the cost of any contest of any assessment by the Landlord so long as said cost is offset by greater tax reductions, which may be levied or assessed against the said Shopping Center by any lawful authority for the

Exhibit "A"

period of the term of this lease, including the cost of any contest of any assessment by the Landlord so long as same is offset by greater tax reductions, which may be levied or assessed against the said Shopping Center by any lawful authority for the period of the term of this lease, other than any of the foregoing which according to the provisions of this lease are to be paid entirely by the Tenant or which according to the provisions of any other lease are the responsibility entirely of any other tenant in the Shopping Center. The Tenant's proportionate share shall be equal to the product obtained by multiplying such taxes and assessments by a fraction, the numerator of which shall be the number of square feet of floor area in the Demised Premises and the denominator of which shall be the total number of square feet of constructed gross leasable floor area in the said Shopping Center as of the day of assessment (hereinafter referred to as "the Tenant's Proportionate Share Percentage"). The parties agree that the Tenant's Proportionate Share Percentage is 22.43%. Should the State of New York or any political subdivision thereof or any governmental authority having jurisdiction thereover, impose a tax and/or assessment (other than a net income or franchise tax) upon or against the rental payable by the Tenant in the Shopping Center to the Landlord, or any other tax which is intended in whole or in part as a substitute for the current method of real estate taxation, such tax and/or assessment shall be deemed to constitute a tax and/or assessment against the Shopping Center for the purpose of this article.

5.02.   Upon receipt of all tax bills and assessment bills attributable to any calendar year during the term hereof, the Landlord shall furnish the Tenant with a written statement of the actual amount of the Tenant's Proportionate Share Percentage of the taxes and assessments of such year together with a copy of the official tax bill and calculations. The Tenant shall pay to the Landlord said amount within twenty (20) days from the receipt of said statement. The Landlord may require the Tenant to pay its proportionate share of said taxes and assessments during the term hereof in monthly installments on or before the first day of each calendar month, in advance, in an amount estimated the Landlord or estimated by any mortgagee holding a mortgage covering the Demised Premises. If the total amount paid by the Tenant under this article during the term of this lease shall be less than the actual amount due from the Tenant for such year as shown on such statement the Tenant shall pay to the Landlord the deficiency within twenty (20) days after demand therefore by the Landlord; and if the total amount paid by the

Exhibit "A"

Tenant hereunder for any such calendar year shall exceed such amount due from the Tenant for such calendar year, the Tenant shall be entitled to offset the excess against payments next thereafter becoming due under this article. For the calendar years in which this lease commences and terminates, the provisions of this article shall apply and the Tenant's liability for its proportionate share of the taxes and assessments for any such year shall be subject to a prorated adjustment based on the number of days of any such year during which term of this lease is in effect. A copy of a tax bill or assessment bill submitted by the Landlord to the Tenant shall at all times be sufficient evidence of the amount of taxes and/or assessments levied or assessed against the property to which such bill relates. Prior to or at the commencement of the term of this lease and from time to time thereafter throughout the term hereof, the Landlord shall notify the Tenant in writing of the Landlord's estimate of the Tenant's monthly installments due hereunder.

5.03. Nothing herein contained is intended to make the Tenant responsible for franchise, corporate or partnership taxes which are charged to the Landlord, including excise, inheritance, capital levy, transfer or income, profits or revenue, upon income of the Landlord, except that, in the event of the passage of any statute, act or law as the result of which the Landlord becomes obligated to pay any income tax or any other tax, charge, levy, assessment or imposition, in lieu or place of any general tax, school tax, or other real estate tax or assessment, which would otherwise be levied against and/or become a lien upon the Demised Premises, such tax, charge, levy, assessment or imposition shall be payable by the Tenant as provided for by this article "5".

6. <u>INSURANCE</u>:

6.01. The Landlord agrees to carry, or cause to be carried, during the term hereof public liability insurance on the common areas, providing coverage of not less than One Million ($1,000,000.00) Dollars for personal injury or death arising out of any one occurrence. The Landlord also agrees to carry during the term hereof insurance for fire, extended coverage, vandalism, malicious mischief, and such other hazards as the Landlord's first mortgagee may require, insuring the improvements located on the Landlord's property in the Shopping Center, including the Demised Premises and all appurtenances thereto (excluding the Tenant's merchandise, trade fixtures, furnishings, equipment, personal property and the Tenant's work) for not less than the full replacement cost thereof. The Tenant agrees to reimburse the Landlord, as

Exhibit "A"

additional rental hereunder, upon demand, but not more often than once a month, for the Tenant's Proportionate Share Percentage of the insurance costs for all insurance provided for herein, which share shall be computed to be the product which results by multiplying such costs by the Tenant's Proportionate Share Percentage.

6.02.   The Tenant agrees to carry public liability insurance on the Demised Premises during the term hereof, covering both the Tenant and the Landlord as assureds with terms and companies reasonably satisfactory to the Landlord, but in any event including coverage for the Tenant's indemnity to the Landlord contained in article "19" of this lease, for limits of not less than One Million ($1,000,000.00) Dollars for personal injury or death arising out of any one occurrence and providing that the Landlord and the Tenant shall be given a minimum of thirty (30) days written notice by the insurance company prior to cancellation, termination or change in such insurance. The Tenant also agrees to carry property damage insurance in the amount of not less than One Hundred Thousand ($100,000.00) Dollars for damage to property arising out of any one occurrence.  The Tenant further agrees to carry insurance against fire and such other risks as are from time to time included in standard extended coverage insurance, for the full insurable value covering all of the Tenant's merchandise, trade fixtures, furnishings, wall covering, carpeting, drapes, equipment, the Tenant's work, and all other items of personal property of the Tenant located on or within the Demised Premises. The Tenant shall provide the Landlord with copies of the policies or certificates evidencing that all of the aforesaid insurance coverage is in full force and effect and stating the terms thereof.

6.03.   The Tenant shall be responsible for the maintenance of the plate glass and doors in or on the Demised Premises but shall have the option either to insure the risk or to self insure.

6.04.   The Landlord and the Tenant agree that all of the policies of insurance required by this article "6" shall be placed with insurance companies licensed to do business in the State of New York.

7.   ADDITIONAL RENT:

7.01.   In addition to the annual rental provided for in article 3 hereof, the Tenant agrees to pay to the Landlord each year as additional rent its proportionate share of the Landlord's cost of operating and maintaining the Shopping Center, which share shall be determined by multiplying the cost of such maintenance by the Tenant's Proportionate Share Percentage.

Exhibit "A"

Shopping Center charges shall be based only on the current Building, its common areas and the parking areas, and not on any buildings or areas added later if those would result in higher charges.

7.02.    The additional rent provided to be paid in this article shall be computed on the basis of periods of three consecutive calendar months, commencing and ending on such dates as may be designated by the Landlord, and shall be paid by the Tenant within twenty (20) days upon receipt of quarterly bills therefore from the Landlord without any deduction or setoff whatever.

7.03.    For the purpose of this article, the Landlord's costs of operating and maintaining the aforesaid common areas shall mean the following:

All amounts paid by the Landlord as actual costs for maintaining, repairing and operating the common areas and installations therein (but only to the extent that the cost in question is not properly chargeable to "capital account" under generally accepted accounting principles) including, without limitation, cleaning; trash and garbage removal; snow and ice removal; blacktop and paving repair; cost and expenses of planting, replanting and replacing flowers and landscaping; water and sewage charges; maintenance and repair of utility systems; lighting; costs for direct labor in connection with repair,  maintenance and operation of the common areas and the following costs of Landlord's employee(s) is only if using the Landlord's employee is competitive with using an outside contractor to perform the service in question- unemployment taxes, Social Security taxes- sales and use taxes on material, equipment, supplies and services purchased for maintenance of the common areas; reasonable straight line depreciation of moveable equipment used in operation, repair and maintenance of common areas; reasonable rental of moveable equipment used in maintenance of the common areas, but in any case without duplicating charges on any such moveable equipment, but as to rental of such moveable equipment only if the rental thereof, will, in the good faith judgment of the Landlord, be less expensive than depreciation on owned equipment; and other similar direct costs properly chargeable to such operation; together with fifteen (15) percent of all such costs to cover the Landlord's administration and overhead costs.

Exhibit "A"

All statements submitted by the Landlord to the Tenant hereunder shall contain such reasonable detail as shall enable the Tenant to determine the basis thereof. The Tenant shall have the right to examine such statements and all supporting documents to substantiate same.

8.   ALTERATIONS:

8.01.   The Tenant may not make any installations, alterations or additions in or to the Demised Premises without written consent of the Landlord, which consent will not be unreasonably withheld. All alterations, improvements and installations made by the Tenant shall be at its sole cost and expense. The work shall be done in a good and workmanlike manner and in conformity with the building laws and regulations of the Town of Amsterdam, County of Montgomery, and State of New York. All shelving, partitions, fixtures, machinery and other equipment and property installed by the Tenant, other than that which replaces such items that are upon the premises at the Commencement Date of this lease, shall remain the property of the Tenant and shall upon termination of this lease, be removed by the Tenant. Any injury or damage caused to the Shopping Center by such removal shall be promptly repaired by the Tenant and said premises restored substantially to the condition as the same were at the commencement of this lease subject to ordinary wear and tear. If any such property is not removed from the Demised Premises prior to termination of this lease, then, upon the termination of this lease, at the option of the Landlord, such property shall immediately become the property of the Landlord.

8.02.   The Landlord shall, at its expense, complete the alterations as set forth in Exhibit II annexed hereto and by this reference made a part hereof, prior to the Commencement Date of this lease.

9.   REPAIRS:

9.01.   The Tenant shall take good care of the Demised Premises, maintain the same and shall, at the Tenant's own cost and expense, make all repairs necessary to preserve the Demised Premises in good order, including the HVAC system serving the Demised Premises, except the Landlord shall be responsible for all  repairs to the roof, exterior walls and foundation and plumbing, sewer, water and electrical connections existing at the Commencement Date which shall be the responsibility of the Landlord to attend to on a reasonably prompt basis, unless the necessity of said repair is caused by the negligence or wrongful acts of the Tenant in which case

Exhibit "A"

the Tenant shall pay for said repair as additional rent immediately upon submission of the bill therefore. At the end or other expiration of the term the Tenant shall return possession of the Demised Premises to the Landlord in good order and condition, with all Laundromat equipment, gas, electrical and plumbing removed such that the Demised Premises is returned to the Landlord in "vanilla box" condition, reasonable wear and tear excepted.

9.02 In the event that municipal water is provided to the Shopping Center, the Landlord will connect the Demised Premises to the municipal water but only the restrooms and fire suppression sprinkler system. The Landlord will leave the laundromat water source for the Demised Premises connected to the well system. Following the connection of municipal water the Tenant will be responsible for the maintenance of the well water system. If the laundromat be at any time connected to the municipal water system the Tenant will at their expense have it separately connected and metered in the Tenant's name and account. In the event that for whatever reason municipal water is supplied to the Demised Premises and the water to the laundromat cannot be metered separately or in the Tenant's name then in the event of separate metering the Tenant will pay as additional rent all water bills within 10 days of receipt by them. In the event that the laundromat cannot be separately metered the Landlord will obtain an estimate from an engineer as to the percentage of the Shopping Center's annual water used is used by the laundromat and the Tenant shall pay within 10 days of submittal to the Tenant as additional rent to the Landlord that laundromat estimated percentage of each water bill.

10. <u>DESTRUCTION BY FIRE OR OTHER CASUALTY</u>:

10.01. In the event the Demised Premises are hereafter damaged or destroyed or rendered partially untenantable for their accustomed uses by fire or other casualty insured under the coverage which the Landlord is obligated to carry pursuant to article 6, then the Landlord shall promptly repair said premises and restore the same to substantially the condition in which they were immediately prior to the happening of such casualty and from the date of such casualty until the Demised Premises are so repaired and restored, annual rent payments and all other charges and items of additional rent payable hereunder, except for any proportionate share of taxes and charges due under articles 5, 6 and 7 hereof, shall abate in such proportion as the part of the Demised Premises thus destroyed or rendered untenantable bears to the total Demised Premises, provided, however, that in the event fifty percent (50%) or more of the Demised

Exhibit "A"

Premises or the Building of which they are a part be hereafter destroyed or rendered untenantable by fire or other casualty during the last two (2) years of the term of this lease (based upon the cost to replace the premises damaged or destroyed as compared with the physical value of the improvements on the Demised Premises or said Building, as the case may be, immediately prior to such fire or other casualty as shown by certificate of the Landlord's architect), then either party hereto shall have the right to terminate this lease effective as of the date of such casualty, by giving to the other party hereto, within thirty (30) days after the happening of such casualty, written notice of such termination. If said notice be given within said thirty (30) day period, this lease shall terminate and annual rent and all other charges and items of additional rent shall abate as aforesaid from the happening of such a casualty, and the Landlord shall promptly repay to the Tenant any rent theretofore paid in advance which has not been earned at the date of such casualty. Except as herein expressly provided to the contrary, this lease shall not terminate nor shall there by any abatement of rent or other charges or items of additional rent as the result of a fire or other casualty. In determining what constitutes prompt repair of the Demised Premises consideration shall be given to the delays caused by strikes, adjustment of insurance and other causes beyond the Landlord's control.

10.02. If however the Building and/or the Demised Premises shall be substantially damaged or destroyed by any casualty as the result of a risk not covered by the forms of hazard insurance at the time then customarily carried on like improvements in the locality in which the Demised Premises are located (the parties agreeing that, as of the date of execution hereof, such form of insurance coverage is commonly known as Fire with Extended Coverage Endorsement No. 4 and Vandalism and Malicious Mischief coverage) the Landlord shall promptly restore, to the extent originally constructed by the Landlord (consistent, however, with zoning laws and Building codes then in existence), so much of such Building or the Demised Premises as were originally constructed by the Landlord to substantially the condition thereof at the time of such damage, unless the Landlord, within thirty (30) days after such loss gives notice to the Tenant of the Landlord's election to terminate this lease. If the Landlord shall give such notice then this lease shall terminate as of the date of such notice with the same force and effect as if such date were the date originally established as the expiration date hereof.

Exhibit "A"

10.03  Further, if there shall be substantial damage or destruction from any cause to Building(s) within the Shopping Center to such extent that continued operation of the Shopping Center would be uneconomical, the Landlord shall also have the right, within thirty (30) days after such damage, to terminate this lease by notice to the Tenant in which is stated a date as of which the Landlord desires the Tenant to surrender the Demised Premises, and this lease shall terminate as of the date so stipulated as if the same were the date originally established as the expiration date hereof. The term substantial damage or destruction as used herein shall refer to damage of such a character that the same cannot in ordinary course reasonably be expected to be repaired within sixty (60) days from the time that such work would commence.

11.   SIGNS:

11.01. The Tenant shall neither place, nor cause or allow to be placed, any sign or signs of any kind whatsoever at, in, on or about the Demised Premises, or in or on any windows or glass therein, without the prior written approval of the Landlord and necessary municipal authorities.  The size, design, character and location of any of the Tenant's signs shall be in conformity with the quality of the signs of the other tenants and the pylon sign, as prepared or approved by the Landlord and in accordance with building codes and local ordinances. Approval of all signs shall be in writing by the Landlord, and will not be unreasonably withheld.  In the case the Landlord shall deem it necessary to remove any such sign or signs in order to make any other repairs or alterations or improvements in or upon the Demised Premises or any other part of the Shopping Center, the Landlord shall have the right to do so, providing the sign(s) be removed and replaced at the Landlord's expense when the said repairs, alterations or improvements are completed. No handwritten signs will be permitted.

11.02. Upon termination of this lease by expiration or otherwise, the Tenant shall remove all of its signs, interior and exterior, within five (5) days after such termination and shall repair to the Landlord's reasonable satisfaction any damage caused by such removal.

11.03. The Landlord, at the Tenant's request, shall seek enforcement of sign ordinances of the Town of Amsterdam against any other tenant who is violating same.

12.   UTILITIES:

12.01. The Tenant shall be responsible for payment of all utilities servicing the Demised Premises exclusively.  For those utilities which are not separately metered or assessed the Tenant

Exhibit "A"

will pay the Tenant's proportionate share of such charges. The Tenant's proportionate share shall be equal to the product obtained by multiplying such charges and/or assessments by a fraction, the numerator of which shall be the number of square feet of floor area in the Demised Premises and the denominator of which shall be the total number of square feet of constructed gross leasable floor area in the Building serviced by the same meter or other measuring device.

13.    TRANSFERS OF LEASEHOLD:

13.01. Section 1. No Transfers. Except as otherwise expressly provided in this article, the Tenant shall not, without obtaining the prior written consent of the Landlord, which consent will not be unreasonably withheld or delayed, in each instance:

(a)    assign or otherwise transfer this lease, or any part of the Tenant's right, title or interest therein;

(b)    sublet all or any part of the Demised Premises or allow all or any part of the Demised Premises to be used or occupied by any other Persons; or

(c)    mortgage, pledge or otherwise encumber this lease, or the Demised Premises.

13.02. For the purposes of this article:

(a)    the transfer of more than thirty percent (30%) of any class of capital stock or other form of ownership interest of the tenant or subtenant, however accomplished, whether in a single transaction or in a series of related or unrelated transactions, shall be deemed an assignment of this lease, or of such sublease, as the case may be;

(b)    an agreement by any other person, directly or indirectly, to assume the Tenant's obligations under this lease shall be deemed an assignment;

(c)    any person to whom the Tenant's interest under this lease passes by operation of law, or otherwise, shall be bound by the provisions of this article; and

(d)    each modification, amendment or extension or any sublease to which the Landlord has previously consented shall be deemed a new sublease.

The Tenant agrees to furnish to the Landlord upon demand at any time such information and assurances as the Landlord may reasonably request that neither the Tenant, nor any previously permitted subtenant, has violated the provisions of this article.

Exhibit "A"

13.03. If the Landlord agrees to the Tenant's assigning this lease or to subletting all or any portion of the Demised Premises, the Tenant shall, prior to the effective date thereof (the "Effective Date"), deliver to the Landlord executed counterparts of any such agreement and of all ancillary agreements with the proposed assignee or subtenant, as applicable. The Landlord shall then have all the following rights, any of which the Landlord may exercise by written notice to the Tenant given within thirty (30) days after the Landlord receives the foregoing documents:

(a)     with respect to a proposed assignment of this lease, the right to terminate this lease on the Effective Date as if it were the Expiration Date;

(b)     with respect to a proposed subletting of the entire Demised Premises, the right to terminate this lease on the Effective Date as if it were the Expiration Date; or

(c)     with respect to a proposed subletting of less than the entire Demised Premises, the right to terminate this lease as to the portion of the Demised Premises affected by such subletting on the Effective Date, as if it were the Expiration Date, in which case the Tenant shall promptly execute and deliver to the Landlord an appropriate modification of this lease in form satisfactory to the Landlord in all respects.

13.04. If, pursuant to the exercise of the Landlord's option under section 13.03(c) above, this lease terminates as to only a portion of the Demised Premises, the rent and additional rent set forth in this lease shall be adjusted in proportion to the portion of the Demised Premises affected by such termination.

13.05. If the Landlord exercises any of its options under section 13.03, the Landlord may then lease the Demised Premises or any portion thereof to the Tenant's proposed assignee or subtenant, as the case may be, without liability whatsoever to the Tenant.

13.06. Notwithstanding the provisions of section "13.01" of this article, the Tenant may at any time during the lease term assign this lease or sublet the whole of the Demised Premises to any corporation which is a successor to or an affiliate of the Tenant upon notice to the Landlord. The term "successor" as used in this article shall include any corporation which shall acquire all or a majority of the assets and business of the Tenant whether by merger, consolidation, dissolution or otherwise and which continues the business of the Tenant in the Demised Premises. The term "affiliate" as used in this article shall include any corporation (i) which shall

Exhibit "A"

hold all or a majority of the shares of capital stock of the Tenant, or (ii) all or a majority of shares of capital stock of which shall be held by the Tenant, or (iii) all or a majority of shares of capital stock of which shall be held by the same person or corporation which shall hold all or a majority of the shares of capital stock of the Tenant as of the signing of this lease. Notwithstanding an assignment of this lease or a subletting of the Demised Premises by the Tenant, the obligations of the Tenant under this lease and the guaranty thereof, if any, of the terms, covenants and agreements on the part of the Tenant to be performed under this lease, shall remain in full force and effect.

14.    COMPLIANCE WITH LAWS:

14.01. The Tenant shall comply with all laws, orders and regulations of federal, state, county and municipal authorities, and with any direction pursuant to law of any public officer thereof, which shall impose any violation, order or duty upon the Landlord or the Tenant resulting from the use and occupancy of the Demised Premises by the Tenant. The Tenant shall have the right, upon giving notice to the Landlord, to contest any obligations imposed upon the Tenant pursuant to the provisions of this article, and to defer compliance during the pendency of such contest, provided that the failure of the Tenant to so comply will not subject the Landlord to prosecution or criminal penalty. The Landlord shall comply with any such laws, orders, regulations, directions and rules in respect to the Demised Premises, other than those imposing an obligation upon the Tenant as aforesaid, subject, however, to the right of the Landlord similarly to contest as aforesaid and defer compliance during the pendency of such contest.

15.    WAIVER OF REDEMPTION:

15.01. The Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of the Tenant being dispossessed or removed from the Demised Premises because of default by the Tenant pursuant to the covenants or agreements contained in this lease.

16.    DEFAULT:

16.01.        (a)    It is expressly understood and agreed that in case the Demised Premises shall be deserted or vacated, or if default be made in the payment of the rent or additional rent or any part thereof as herein specified, or if, without the consent of the Landlord, the Tenant shall sell, assign, or mortgage this lease or if default be made in the performance of

Exhibit "A"

any of the other covenants and agreements in this lease contained on the part of the Tenant to be kept and performed, or if the Tenant shall fail to comply with any of the statutes, ordinances, rules, orders, regulations and requirements of the Federal, State and local governments or of any and all their departments or bureaus, applicable to the Demised Premises, or if the Tenant shall file or there shall be filed against the Tenant a petition in bankruptcy or arrangement, or under any insolvency laws now or hereinafter enacted, or if the Tenant be adjudicated a bankrupt or make an assignment for the benefit of the creditors to take advantage of any insolvency act, if the Landlord so elects, the Landlord may at any time thereafter terminate this lease and the term hereof, on giving to the Tenant thirty (30) days notice in writing to cure such default, except in the case of non-payment of rent or additional rent no notice need be sent and the Tenant shall be in default under this lease and under this subparagraph sufficient to enable and cause the Landlord to terminate this lease upon passage of the 10th day following the due date of said rent or additional rent without the Landlord's being in receipt thereof, and if such default is not so cured within the above said 30 day or 10 day period, as may be applicable, this lease and the term hereof shall expire and come to an end on the date fixed in such notice as if the said date were the date originally fixed in this lease for the expiration hereof, or the Landlord may dispossess or remove the Tenant or any other occupant of the Demised Premises by summary proceedings or otherwise, and remove their effects and hold the Demised Premises as if this lease had not been made. The early termination of this lease and/or dispossess proceedings shall be without prejudice to the Landlord's remedies on account of the Tenant's default as set forth in paragraph (b) below.

      (b)    In the event of such dispossession, termination or removal and notwithstanding such action or the termination of this lease, (i) the Tenant shall be liable forthwith to pay the rent and additional rent payable under this lease up to the date of such dispossession, removal or termination and up to the date the Landlord re-rents the Demised Premises; (ii) the Landlord may re-let the Demised Premises, or any part or parts thereof, either in the name of the Landlord or otherwise, for a term or terms which may at the option of the Landlord be less than or exceed the period which would otherwise have constituted the balance of the term of this lease and may grant concessions or free rent for a reasonable time; and (iii) the Tenant shall pay to the Landlord as liquidated damages for the failure of the Tenant to observe

Exhibit "A"

and perform the covenants and agreements of the Tenant under this lease, any deficiency between the rent and additional rent payable by the Tenant under this lease and the net amount, if any, of the rents collected on account of the lease or leases of the Demised Premises for each month of the period which would otherwise have constituted the balance of the term of this lease. Amounts received by the Landlord after reletting shall first be applied against the Landlord's expenses incurred in any reletting, until the same are recovered, and until such recovery, the Tenant shall pay, as of each day when a payment would fall due under this lease, the amount which the Tenant is obligated to pay under the terms of this lease. the Tenant's liability prior to any such reletting and such recovery shall not in any way be diminished as a result of the fact that such reletting might be for a rent higher than the rent provided for in this lease. When and if such expenses have been completely recovered the amounts received from reletting by the Landlord as have not previously been applied shall be credited against the Tenant's obligations as of each day when a payment would fall due under this lease and only the net amount thereof shall be payable by the Tenant. Further, amounts received by the Landlord from such reletting for any period shall be credited only against obligations of the Tenant allocable to such period, and shall not be credited against obligations of the Tenant hereunder accruing subsequent or prior to such period; nor shall any credit of any kind be due for any period after the date when the term of this lease is scheduled to expire according to its terms. As an alternative, at the election of the Landlord, the Tenant will, upon such termination, pay to the Landlord as damages such a sum as at the time of such termination represents the amount of the excess, if any, of the value of the total rent and other benefits which would have accrued to the Landlord under this lease for the remainder of the term of the lease term if the lease obligations had been fully complied with by the Tenant over and above then cash rental value (in advance) of the Demised Premises for the balance of the term. the Landlord may make such reasonable alterations, repairs, replacements and decorations in the Demised Premises as the Landlord considers advisable and necessary for the purpose of reletting the Demised Premises, and the making of such alterations and decorations shall not operate or be construed to release the Tenant from liability under this lease. The failure or refusal of the Landlord to re-let the Demised Premises or any part thereof shall not release or affect the liability of the Tenant for damages under this lease, however the Landlord shall use reasonable effort to re-let the Demised Premises. The Landlord

Exhibit "A"

shall in no event be liable in any way whatsoever for inability or failure to re-let the Demised Premises except for failure to use reasonable effort to re-let the same or, in the event that the Demised Premises are re-let, for failure to use reasonable effort to collect the rent under such reletting.

        (c)    In all events of default by the Tenant in the performance of its obligations in this lease, the Tenant shall pay all of the Landlord's attorney's fees, witness fees and court costs in enforcing its rights under this lease.

        (d)    After default of payment of rent, or violation of any other provision of this lease, or after the expiration of this lease term, the Tenant moves out or is dispossessed and fails to remove any trade fixture or other property prior to such said default, removal, expiration of lease, or prior to the issuance of the final order or execution of the warrant, then and in that event, the said fixtures and properties shall be deemed abandoned by the said the Tenant, shall become the property of the Landlord, and the Tenant shall be deemed to have conveyed to the Landlord all its rights to said fixtures and properties but the Landlord shall not be liable for any of the Tenant's obligations in connection with said fixtures and properties.

17.    <u>CURING DEFAULT</u>:

17.01. If the Tenant shall default in the observance or performance of any covenant or agreement of this lease on the part of the Tenant to be observed or performed, beyond any period given to the Tenant to cure such default, the Landlord may perform the same for the account of the Tenant, and if the Landlord makes any expenditures or incurs any obligation for the payment of money in connection therewith, including, but not limited to, reasonable attorneys' fees in instituting, prosecuting or defending any action or proceeding, such expenditures paid, or obligations incurred, with interest and costs, shall be deemed to be additional rent and shall be paid by the Tenant to the Landlord within ten (10) days of rendition to the Tenant of any bill or statement therefore.

18.    <u>EMINENT DOMAIN</u>.

18.01. If the whole of the Demised Premises shall be acquired or condemned by Eminent Domain for any public or quasi-public use or purpose (hereinafter referred to as a "Taking"), then and in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding. Further, if so much of the Shopping Center shall be so taken that

Exhibit "A"

continued operation of the Shopping Center would in the Landlord's judgment be uneconomical, the Landlord shall have the right to terminate this lease by giving notice to the Tenant of the Landlord's desire to do so not later than thirty (30) days after the effective date of such Taking.

18.02. In the event of a Taking of less than the whole of the Demised Premises, this lease shall cease and expire with respect to the portion of the Demised Premises taken, upon vesting of title as a result of the Taking, and if the Taking results in the portion of the Demised Premises remaining after the Taking being less than 75% of the original size of the Demised Premises, the Tenant may elect to terminate this lease by giving notice to the Landlord of such election not more than forty-five (45) days after receipt by the Tenant of notice of the Taking. Notice by the Tenant shall state the date of termination, which date of termination shall not be more than ninety (90) days after the date on which such notice to the Landlord is given to the Landlord. Upon the date specified in such notice to the Landlord this lease and the term hereof shall cease and expire. If the Tenant does not elect to terminate this lease as aforesaid (i) the annual rent payable under this lease shall be reduced to an amount to be determined by multiplying the annual rent by a fraction, the numerator of which is the area of the Demised Premises remaining after the Taking, and the denominator of which is the total area of the Demised Premises immediately preceding the Taking, and (ii) after the determination and receipt of the Landlord's award on account of the Taking the Landlord shall expend as much of the award as necessary to restore the portion of the improvements remaining after the Taking to a complete architectural unit, as substantially the same as the condition prior to the Taking as is reasonable, for the use and occupancy of the Tenant. Should the net amount so awarded to the Landlord be insufficient to cover the cost of restoring the Demised Premises, in the reasonable estimate of the Landlord, the Landlord may, but shall have no obligation to, supply the amount of such insufficiency and restore the Demised Premises to such an architectural unit, with all reasonable diligence, or the Landlord may terminate this lease by giving notice to the Tenant not later than a reasonable time after the Landlord has determined the estimated net amount which may be awarded to the Landlord and the estimated cost of such restoration.

18.03. In the event of a Taking of the Demised Premises or any part thereof, the Landlord shall have and hereby reserves and excepts, and the Tenant hereby grants and assigns to the Landlord, all rights to recover for damages to the Shopping Center site, to the Demised Premises,

Exhibit "A"

the Building in which the same are located, and the leasehold interest hereby created, and to compensation accrued or hereafter to accrue by reason of such Taking, as aforesaid. By way of confirming the foregoing, the Tenant hereby grants, assigns to the Landlord, and covenants with the Landlord to grant and assign, to the Landlord all rights to such damages or compensation. Nothing contained herein shall be construed to prevent the Tenant from prosecuting in any condemnation proceedings any claims permitted by law to recover for relocation expenses, loss of business, or depreciation to, or cost of, removable trade fixtures, furniture and other personal property belonging to the Tenant, provided that such action shall not affect the amount of compensation otherwise recoverable by the Landlord from the Taking entity(ies).

19.    INDEMNIFICATION:

19.01. The Tenant does hereby covenant and agree with said the Landlord that it will indemnify and save harmless the Landlord from and against any and all liability, damage, penalties or judgments arising from injury to person or property sustained by anyone in and about the Demised Premises resulting from any act or acts of omission or commission of the Tenant, or the Tenant's officers, agents, servants, employees, contractors, assignees, or in any other way associated with or resulting from the Tenant's use of the Demised Premises. The Tenant shall, at its own cost and expense, defend any and all suits or actions (just or unjust) which may be brought against the Landlord or in which the Landlord may be impleaded with others upon any such abovementioned matter, claim or claims, except as may result from any act or acts of omission or commission of the Landlord, or the Landlord's officers, agents, servants, employees, assignees or contractors.

20.    END OF TERM:

20.01. Upon expiration or other termination of the term of this lease, the Tenant shall quit and surrender to the Landlord the Demised Premises, broom clean, in the vanilla box condition set forth in article 9, and in good order and condition, reasonable wear and tear and damage by fire or other casualty excepted.

21.    QUIET ENJOYMENT:

21.01. The Landlord covenants and agrees that the Tenant may peaceably and quietly enjoy the Demised Premises, subject, however, to the covenants and agreements contained in this lease.

Exhibit "A"

## 22. SUBORDINATION:

22.01. This instrument shall not be a lien against said Demised Premises with respect to any mortgage that is now on or that hereafter may be placed against said Demised Premises and/or the Shopping Center, and upon the recording of such mortgage or mortgages, the same shall have preference and precedence and be superior and prior in lien to this lease, irrespective of the date or recording of the same. The Tenant agrees to execute any such instrument, without cost, which may be deemed necessary or desirable to further effect the subordination of this lease to any such mortgage, and a refusal to execute such instrument shall entitle the Landlord, or the Landlord's assigns and legal representatives to the option of canceling this lease without incurring any expense or damage and the term hereby granted is expressly limited accordingly, provided, however, that a non-disturbance agreement shall have first been entered into in respect to such mortgage. The term "non-disturbance agreement" as used in this article shall mean an agreement in recordable form between the Tenant and the holder of any subsequent mortgage lien, which shall provide, in substance, that the Tenant shall attorn to any such mortgagee and that as long as the Tenant is not in default under this lease beyond any period given to the Tenant to cure such default, such holder will not name or join the Tenant as a party defendant or otherwise in any suit, action or proceeding to enforce, nor will this lease be terminated or otherwise affected by enforcement of, any rights given to such holder pursuant to the terms, covenants or conditions contained in such mortgage or mortgages, or any other documents held by such holder or any rights given to such holder as a matter of law. However, at the election of the holder of any mortgage on the Shopping Center this lease shall be prior and superior to the lien of any such mortgage. The Tenant agrees to make minor, reasonable changes to this lease as may be required by any such mortgagee, provided such mortgagee is a recognized lending institution and the said changes do not modify the substance of this agreement.

22.02. With reference to any assignment by the Landlord of the Landlord's interest in this lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is made to the holder of a mortgage on property which includes the Demised Premises, The Tenant agrees:

    (a) That the execution thereof by the Landlord and the acceptance thereof by the holder of such mortgage, shall never be treated as an assumption by such holder of the

Exhibit "A"

obligations of the Landlord hereunder, unless and until such holder shall, by notice to the Tenant, specifically otherwise elect; and

(b)     Except as aforesaid, such holder shall be treated as having assumed the Landlord's obligations hereunder only upon foreclosure of such holder's mortgage, the taking of possession of the Demised Premises, and such holder's acceptance of the Tenant's attornment.

23.     NO WAIVER:

23.01. The failure of the Landlord to seek redress for violation of, or to insist upon the strict performance of, any covenant or agreement contained in this lease shall not prevent a similar subsequent act or omission or a continuation of the same act or omission from constituting a default under this lease.

23.02. This lease contains the entire agreement between the parties, and cannot be changed, modified, or amended unless such change, modification or amendment is in writing and signed by the party against whom enforcement of such change, modification or amendment is sought.

23.03. No payment by the Tenant, or acceptance by the Landlord, of a lesser amount than shall be due from the Tenant to the Landlord shall be treated otherwise than as a payment on account. The acceptance by the Landlord of a check for a lesser amount with an endorsement or statement thereon, or with any letter accompanying such check, that such lesser amount is payment in full, or is conditional, or is tendered as or is considered to be a modification of the Landlord's rights under this lease or agreement to forebear from enforcing any rights under this lease, shall be given no effect, and the Landlord may accept such check without prejudice to any rights or remedies which the Landlord may have against the Tenant as though said payment had never been made, except the Tenant shall be given credit for the amount of such payment against the sum due the Landlord under this lease.

24.     WAIVER OF TRIAL BY JURY AND COUNTERCLAIMS:

24.01. The Landlord and the Tenant agree that they shall, and they hereby do, waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this lease. If the Landlord commences any summary proceeding for non-payment of rent or additional rent the

Exhibit "A"

Tenant will not interpose any counterclaim in such proceeding unless such counterclaim arises out of or is connected with this lease.

25.  MEMORANDUM OF LEASE:

25.01. Upon request of either party to this lease, the Landlord and the Tenant agree to execute and deliver a memorandum of this lease in recordable form, containing the information required by Section 291-c and 291-cc of the Real Property Law of the State of New York on condition that the Tenant simultaneously deliver to the Landlord's attorney a memorandum of termination of this lease in recordable form to be recorded upon the end of the term of this lease, whether said end of term occurs on the date scheduled, as the result of early termination for any reason or at the end of any extended term.

26.  INSPECTION OF PREMISES:

26.01. The Tenant agrees that the Landlord and its agents and/or representatives shall have the right to enter into and upon Demised Premises, or any part thereof, at all reasonable hours for the purpose of examining the same, or making such repairs or alterations therein as may be necessary for the safety and preservation thereof.

26.02 During the last six (6) months of the term of this lease the Tenant shall permit the Landlord and/or the Landlord's agents to show the Demised Premises to persons in connection with the prospective leasing of the same.

27.  NOTICES:

27.01. Any notice or demand required to be given under this lease, or pursuant to any law or governmental regulations, by the Landlord to the Tenant or by the Tenant to the Landlord shall be in writing and shall be given by certified mail, return receipt requested or by personal delivery. Unless otherwise required by law or governmental regulations, any such notice or demand shall be deemed given upon mailing if sent by certified mail, enclosed in a secure postage prepaid wrapper, addressed (i) to the Landlord, at the address of the Landlord first hereinabove set forth, or such other address as the Landlord may designate by notice to the Tenant, or (ii) to the Tenant, at the address of the Tenant first hereinabove set forth or such other address as the Tenant may designate by notice to the Landlord, or upon delivery if given by delivery.

Exhibit "A"

27.02. After receiving notice from any person, firm or other entity that it holds a mortgage which includes the Demised Premises as part of the mortgaged premises, no notice from the Tenant to the Landlord shall be effective unless and until a copy of the same is given to such holder, and the curing of any of the Landlord's default by such holder shall be treated as performance by the Landlord.

28.    CAPTIONS:

28.01. The captions preceding the articles of this lease are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provision of this lease.

29.    SUCCESSOR AND ASSIGNS:

29.01. The covenants and agreements contained in this lease shall bind and inure to the benefit of the Landlord and the heirs, personal representatives, successors and assigns of the Landlord, and the Tenant and its successors and assigns.

30.    DELIVERIES AND EMPLOYEE PARKING:

30.01. The Tenant agrees that all deliveries to the Demised Premises shall be made at the rear of the Building.  All the Tenant's employees shall park in areas now or as may be later designated for such by the Landlord from time to time.

31.    MISCELLANEOUS:

31.01. The Tenant shall store all trash, debris and all other waste materials in a fireproof container outside the Building in an area designated by the Landlord.  the Tenant covenants and agrees, at its sole cost and expense, to comply with all present and future laws, orders, and regulations of all state, federal, municipal, and local governments, departments, commissions, and boards regarding collection, sorting, separation and recycling of waste products, garbage, refuse and trash into such categories as provided by law.  Each separately sorted category of waste products, garbage, refuge, and trash shall be placed in separate receptacles if required by law.  If separate receptacles are required by law, they shall be placed in an area designated by the Landlord. The Landlord reserves the right to refuse to collect or accept from the Tenant any waste products, garbage, refuse, or trash that is not separated and sorted as required by law, and to require the Tenant to arrange for such collection at the Tenant's sole cost and expense. The Tenant shall indemnify, defend, and hold the Landlord harmless (including legal fees and

Exhibit "A"

expenses) from and against any actions, claims, and suits arising from such noncompliance, employing counsel reasonably satisfactory to the Landlord.

31.02. The Tenant shall not conduct any auction, distress, fire or bankruptcy sale (whether real or fictitious) or going out of business sale.

31.03. The Tenant covenants and agrees that no merchandise shall be displayed for sale or for any other purpose on the sidewalk or anywhere outside of the Building in the Demised Premises is located.

31.04. The covenants of the Landlord contained in this lease shall be binding upon the Landlord and the Landlord's successors in title only with respect to breaches occurring during a party's ownership of the Demised Premises. The Tenant specifically agrees to look solely to the Landlord's equity interest in the property of which the Demised Premises are a part for the recovery of any judgment against the Landlord.

31.05. The Tenant shall look only and solely to the Landlord's estate and interest in and to the Shopping Center for the satisfaction of any right of the Tenant arising out of this lease or for the collection of judgment or other judicial process requiring the payment of money by the Landlord, and to no other property or assets of the Landlord, the Landlord's agents, incorporators, shareholders, employees, officers, directors, partners, agents, principals (disclosed or undisclosed), joint venturers, or affiliates shall be subject to levy, lien, execution, attachment, or other enforcement procedure for the satisfaction of the Tenant's rights and remedies under or with respect to this lease, the Tenant's use and occupancy of the Demised Premises, or any liability of the Landlord to the Tenant.

31.06. If any term or provision of this lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable the remainder of this lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this lease shall be valid and be enforced to the fullest extent permitted by law.

31.07. This lease and the obligation of the Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of the Tenant to be performed shall in no way be affected, impaired or excused because the Landlord is unable to perform any of the

Exhibit "A"

obligations of the Landlord in this lease where the inability to so perform is due to causes beyond the Landlord's reasonable control.

31.08. The Landlord and the Tenant understand, agree, and acknowledge that:

(a)     This lease has been freely negotiated by both parties; and

(b)     That, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this lease or any of its terms or conditions, there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this lease or any portion thereof.

32.     SECURITY DEPOSIT:

32.01. Upon the execution of this lease, the Tenant shall deposit with the Landlord the sum of $3,000.00 as security for the full and faithful performance by the Tenant of all of the terms, covenants and conditions of this lease upon the Tenant's part to be performed, which said sum shall be returned to the Tenant after the time fixed as the expiration of the term herein, provided the Tenant has fully and faithfully carried out all of said terms, covenants and conditions on the Tenant's part to be performed.  In the event of a bona fide sale, subject to this lease, the Landlord shall have the right to transfer the security to the vendee for the benefit of the Tenant and the Landlord shall be considered released by the Tenant from all liability for the return of such security; and the Tenant agrees to look to the new landlord solely for the return of the said security, and it is agreed that this shall apply to every transfer or assignment made of the security to a new landlord.

33.     HAZARDOUS WASTE:

33.01. The Tenant hereby covenants to the Landlord, which covenants shall survive the termination of this lease, that (a) the Tenant shall during the term of this lease be in compliance in all respects with all applicable federal, state and local laws with respect to the Tenant's use and occupancy of the Demised Premises, including, without limitation, those relating to toxic and hazardous substances and other environmental matters; (b) if any environmental contamination (including the storage or disposal of petroleum based products) is found on the Demised Premises (as result of the Tenant's use and occupancy thereof) on the termination of this lease for any reason or the expiration of the term hereof for which any removal or remedial action is required pursuant to law, ordinance, order, rule, regulation or governmental action, the Tenant

Exhibit "A"

shall, at its sole cost and expense, take such removal or remedial action promptly to the satisfaction of the appropriate governmental agency; and (c) the Tenant agrees to defend, indemnify and hold harmless the Landlord from and against any claims, actions, demands, penalties, fines, liabilities, settlements, damages, costs or expenses (including, without limitation, attorney and consultant fees) and make any repairs and/or ameliorations arising out of or in any way related to (i) the present or future disposal, release or presence on the Demised Premises (as a result of the Tenant's use and occupancy thereof) of any hazardous or toxic substances (including, without limitation, any petroleum based products) caused by the Tenant's occupation of the Demised Premises, (ii) any personal injury or property damage arising out of or related to such hazardous or toxic substances, (iii) any lawsuit brought or threatened, settlement reached or government order given or related to such hazardous or toxic substances, and/or (iv) any violation of any law, order, regulation, requirement or demand of any governmental authority which is based upon or related to such hazardous or toxic substances. For purposes of this article, "hazardous and toxic substances" shall include, without limitation, any flammable explosives, radioactive materials, hazardous materials, hazardous wastes, petroleum based products, hazardous or toxic substances or related materials described in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, the Hazardous Materials Transportation Act, as amended, the New York Environmental Conservation Law, the Resource Conservation and Recovery Act, as amended, and the regulations adopted and publications promulgated pursuant thereto.

34. <u>EXECUTION OF LEASE BY THE PARTIES</u>:

34.01. The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Demised Premises and this document becomes effective and binding only upon the execution and delivery hereof by the Landlord and by the Tenant. All negotiations, considerations, representations and understandings between the Landlord and the Tenant are incorporated herein and may be modified or altered only by agreement in writing between the Landlord and the Tenant, and no act or omission of any employee or other agent of the Landlord shall alter, change or modify any of the provisions hereof.

Exhibit "A"

## 35. WAIVER OF SUBROGATION:

35.01 The Landlord and the Tenant hereby waive as against the other any and all claims and demands of whatsoever nature for damages, loss or injury to the other's property in, upon or about the Demised Premises or the Shopping Center, to the extent this waiver of liability is permitted by any applicable policies of insurance maintained by the Landlord with respect to the Landlord's waiver of liability, and maintained by the Tenant with respect to the Tenant's waiver of liability and to the extent insurance fully reimburses the damaged party.

## 36. BROKER:

36.01. The Tenant represents that it has had no dealings with any broker or agent in connection with this lease and covenants to hold harmless and indemnify the Landlord from and against any and all losses, damages, expenses, including without limitation, court cost and attorneys' fees and disbursements, arising out of any claims by any other broker or agent with respect to dealing with the Tenant in connection with this lease or the negotiation thereof.

## 37. EXTENDED TERM:

37.01. Provided this lease has not been terminated pursuant to any of the provisions contained herein and provided the Tenant is in compliance with all its obligations under this lease, the Tenant shall have the right, to elect to extend the term of this lease for a five (5) year term; such extended term to be upon the same terms, covenants and agreements as in this lease with the exception that the annual rent shall increase to Thirty-Five Thousand and no/100 ($35,000.00) Dollars per year , payable in equal monthly installments of Two Thousand Nine Hundred Sixteen and 17/100 ($2,916.17) Dollars on the first day of each and every month of said extended term, in advance. If the Tenant so elects to extend the term of this lease, the Tenant shall give notice thereof to the Landlord at least One Hundred Eighty (180) days prior to the expiration date of the original term thereof, time being of the essence.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals and have caused these presents to be signed by its duly authorized officers and its corporate seals to be affixed the day and year first above written.

Exhibit "A"

KEM PLAZA, INC., by

_____
David M. Siegal, President


_____
James Partyka


_____
Barbara Partyka

STATE OF NEW YORK    )
COUNTY OF MONTGOMERY)   ss.:

      On the _____ day of _____, 2009, before me, the undersigned, a notary public in and for said State, personally appeared JAMES PARTYKA, personally known to me or proved to me on the basis of satisfactory evidence consisting of a driver's license to be the individual whose name is subscribed to the within instrument and acknowledged to be that he executed the same.

                             _____
                             Notary Public, State of New York
                             Qualified in the County of
                             My Commission Expires on

STATE OF NEW YORK    )
COUNTY OF MONTGOMERY)   ss.:

      On the _____ day of _____, 2009, before me, the undersigned, a notary public in and for said State, personally appeared BARBARA PARTYKA, personally known to me or proved to me on the basis of satisfactory evidence consisting of a driver's license to be the individual whose name is subscribed to the within instrument and acknowledged to be that she executed the same.

                             _____
                             Notary Public, State of New York
                             Qualified in the County of
                             My Commission Expires on

Exhibit "A"



Exhibit "A"