**Christian H. Dribusch (507021)**
The Patroon Building
Five Clinton Square
Albany, NY 12207
(518) 436-1662

Attorney for Debtor

| | |
|---|---|
| **Hearing Date:** | **July 7, 2010** |
| **Hearing Time:** | **10:30 a.m.** |
| **Hearing Location:** | **James T. Foley Courthouse** |
| | **445 Broadway** |
| | **Albany, NY 12207** |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

**GREENER CLEANERS, LTD.,**

        Debtor.

Chapter 11
Case No.: 08-14239

## MOTION AUTHORIZING DEBTOR'S SALE OF ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS PURSUANT TO 11 U.S.C. §363 AND §365 AND APPROVAL OF SETTLEMENT AGREEMENT WITH NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION UNDER 11 U.S.C. §503(b) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019

Greener Cleaners, Ltd,, a New York corporation, debtor and debtor-in-possession herein (the "Debtor"), by and through its undersigned counsel, hereby moves this Court for entry of an order authorizing the Debtor to sell certain assets outside the ordinary course of business and enter into a sale agreement, assign certain lease agreements, and approve a settlement agreement with New York State Department of Environmental Conservations which includes an administrative claim (the "Motion"). The proposed sale agreement is attached hereto as Exhibit A and the proposed settlement agreement is attached hereto as Exhibit B. In further support of this Motion, the Debtor alleges:

### BACKGROUND

1. On December 18, 2008 (the "Petition Date"), the Debtor filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.    The Debtor has continued in possession of its property and has continued to operate and manage its business as debtor-in-possession pursuant to Bankruptcy Code §1107(a) and §1108.

3.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §157 and §1334.

4.    Venue is proper in this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §1408 and §1409.

5.    The statutory predicate for the relief sought is Bankruptcy Code §363(b), §365, §105, §503 and Federal Rule of Bankruptcy Procedure Rule 9019(a).

## **RELIEF REQUESTED**

6.     Prior to the Petition Date, the Debtor operated as a dry cleaner with thirteen (13) retail stores and a main plant in Schenectady, New York.   The Debtor has since consolidated a number of locations and now operates approximately 8 retail stores and a main plant.

7.    The Debtor has negotiated a proposed sale Agreement ("Asset Purchase Agreement") a copy of which is attached hereto as Exhibit A and incorporated herein by reference.

8.    The Debtor has a pre-petition line of credit facility with KeyBank National Association secured by most of the personal property of the Debtor.   The KeyBank line of credit facility has approximately $200,000.00 outstanding.   The Debtor is currently making interest only payments on the facility.

9.     It is essential that the sale of the Debtor's assets and business be consummated as soon as possible. The Debtor is experiencing losses. Given the loss of sales, potential customer defections and insufficient working capital, the Debtor has determined that the only way to preserve

the Debtor's business as a going concern is to sell its assets. If the business is not sold pursuant to the Agreement or such higher or better offer that is made at the hearing on the sale, the Debtor's continued viability will be severely impaired, the Debtor will have to shut down its operations, and approximately 50 jobs will be lost. As one of the mid-size employers in the area, a closing of the Debtor's facility would cause tremendous hardship to the Debtor's employees and their families as well as the community. Consummation of the Agreement or an alternative transaction will alleviate such hardship, preserve jobs, and maintain the viability of the Debtor's business as a going concern, albeit under new ownership.

10.     Because of the Debtor's financial situation and substantial secured debt, the Debtor's new interim management has determined that a stand-alone reorganization is not possible.

11.     If the Debtor's operations are to be preserved as a going concern, the sale process must be concluded rapidly. The business has no proprietary products and totally depends on the continued good will, loyalty and order flow of its customers.  While the Debtor has been able to persuade its customers to continue with the Debtor during the sale process, it is a virtual certainty that the Debtor's customers will cease doing business with the Debtor if the sale or an alternative transaction is not approved. Any decision by the Debtor's customers to withdraw their business from the Debtor could result in an almost immediate shutdown of the business and its liquidation.

12.     Accordingly, it is the Debtor's business judgment that the Debtor's operation must be sold immediately to avoid an erosion in the business's value and a shutdown resulting in the loss of approximately 50 jobs.

13.     By this Motion, the Debtor requests an Order pursuant to Bankruptcy Code §363(b)(1) and §365 authorizing the sale of the Assets and assignment of leases, free and clear of all liens and other interests, to the successful bidder ("Purchaser"), according to terms set forth in

the asset sale Agreement, subject to higher and better offers made on the return date of the Motion.

14.     Under the Agreement, a copy of which is annexed as <u>Exhibit A,</u> Purchaser has agreed to acquire substantially all of the Debtor's assets (excepting its Rotterdam site) for $275,000.00 payable to the Debtor through a promissory note payable over 7 years with interest at 5% over, including:

(a)     An assignment of the leases of the stores reflected on <u>Exhibit A</u> to the Agreement (collectively, the "Real Property");

(b)     All trade accounts receivable, trade notes receivable and other rights to receive payment from customers of the business, including accrued accounts receivable representing amounts payable for products sold and/or services rendered, but not yet invoiced or billed as of the Closing Date (collectively, the "Receivables");

(c)     All inventories of raw materials, work-in-process, finished goods, parts, factory and maintenance supplies and other inventory items of the business (collectively, the "Inventory");

(d)     All machinery, equipment and vehicles owned by the Debtor and located at the Real Property (the "Fixed Assets");

(e)     All furniture and fixtures of the Debtor located on the Real Property;

(f)     To the extent permitted by law and any subject warranty agreement, all manufacturers' warranties and/or vendors' warranties in effect with respect to any of the Fixed Assets and/or the Inventory (except the Solveair cleaning machine claim);

(g)     All patents, trademarks, trade names, copyrights and other intellectual property, and all pending applications and registrants therefore, and all goodwill related thereto, which are used in the business and in which the Debtor has any rights;

(h)     All customer lists, supplier lists, operating manuals, trade secrets, confidential information, technical information, and other such knowledge and information constituting the "know-how" of the business, as well as all operational books and records used in the business; and

(i)     To the extent assignable, all right, title and interest in all governmental licenses and permits utilized by the Debtor in the business.

15.     The Debtor makes no warranty, express or implied, with respect to the conformity, adequacy, condition or fitness for any particular purpose of any of the assets being sold, and all of the assets are being transferred to the Buyer "AS IS" and "WHERE IS."

16.     The Purchaser is responsible for the payment of all sales and use taxes, if any, which may arise out of or be assessable in respect of the transactions contemplated by the Agreement.

17.     The sale is contingent on the Purchaser entering into an acceptable lease with Kem Plant, LLC a copy of the proposed lease agreement is attached hereto as Exhibit C.

18.     The sale is also contingent upon the Purchaser entering into the proposed settlement stipulation annexed hereto as Exhibit B with the New York State Department of Environmental Conservation.  The Debtor is seeking Bankruptcy Court approval to enter the proposed settlement as part of the Motion.

19.     Prior to closing, the Debtor shall permit the Purchaser and its counsel, accountants and other representatives to have reasonable access to all records and information relating to the Debtor's business. After the closing, the Purchaser is required to give the Debtor reasonable access to the books and records turned over to the Purchaser so that the Debtor can continue to administer its chapter 11 case.

20.     Subject to any requirements imposed by the Court, the Debtor will continue to carry on its business in substantially the same manner as it has during the chapter 11 case.

21.     The Agreement is subject to Court approval and such higher and better offers that may be made at the hearing on the sale (the "Sale Hearing") in an amount at least $2,500.00 greater (the "Overbid Amount") than the amount payable under the Agreement.[1]  The Agreement also provides that the sale is to be free and clear of all liens, claims, security interests and encumbrances of every kind and nature and other interests, with all such liens, claims, pledges, security interests, encumbrances and interests attaching to the proceeds of sale to the same extent and in the same order of priority of any existing liens, claims, security interests, encumbrances and interests of record, or as may be determined by the Court.

22.     The Agreement also contemplates that Purchaser's offer is subject to higher and better offers. To maximize the sale proceeds, the Debtor requests that the Court conduct an open auction at the Sale Hearing on the following terms and conditions:

        (a)     All initial competing bids must equal or exceed $277,500.00;

        (b)     All subsequent bids shall be in increments of $2,500.00;

---

[1]  Unless such bid is for cash or provides for third party financing in which event the Debtor reserves the right to accept an offer less than the current $275,000.00 bid which is subject to Debtor financing.

(c)     All competing bids must be accompanied by a good faith deposit in the amount of 10% of the competing bid by certified or cashier''s check payable to counsel for the Debtor which shall be forfeited if the buyer fails to close or to execute the Agreement, modified *only* as to the identity of the buyer and price, or such other terms that are more favorable to the Debtor than the terms set forth in the Agreement. If requested by the Debtor, the buyer must demonstrate satisfactory proof of its ability to consummate the sale before being permitted to either bid or purchase the assets;

(d)     All counterbids cannot be subject to any conditions including, but not limited to, any condition based upon the competing bidder''s ability to obtain financing, except for those conditions set forth in the Agreement; and

(e)     The assets shall be sold "AS IS," "WHERE IS," without any representation or warranty of any type whatsoever, except that the Debtor has and owns good and marketable title to the assets being offered for sale.

23.     The Debtor seeks an order authorizing it to enter into the asset purchase Agreement pursuant to Bankruptcy Code §363(b) and (f), §365, and §105, and approval of the New York State Department of Environmental Conservation settlement pursuant to Bankruptcy Code §503 and Federal Rule of Bankruptcy Procedure Rule 9019.

## **AUTHORITY FOR MOTION**

*Bankruptcy 363(b) and (f) Sale.*

24.     Bankruptcy Code § 363(b)(1) authorizes the trustee (or a debtor in possession, who has the rights and powers of a trustee) to use, sell or lease property of the estate other than in the ordinary course of business.

25.     The Debtor may sell free and clear of an interest (including a lien) of an entity

other than the estate only if:

>   (1) Applicable nonbankruptcy law would permit a sale of such property free of
>   the interest;
>
>   (2) The other entity consents;
>
>   (3) The interest is a lien and the sale price is greater than the aggregate value of
>   all liens on such property;
>
>   (4) The interest is in bona fide dispute; or
>
>   (5) The entity could be compelled in a legal or equitable proceeding to accept a
>   money satisfaction of such interest.

26.     Bankruptcy courts have substantial discretion when deciding whether to approve the

sale of substantially all of the Debtor's assets outside of a plan of reorganization, especially when

there is an articulated business justification. See *Official Committee of Unsecured Creditors of the*

*LTV Aerospace and Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 975 F.2d 141, 144 (2d

Cir. 1992); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

1063 (2d Cir. 1983)

27.     In determining whether to approve a proposed sale under Bankruptcy Code § 363,

courts generally apply standards that, although stated variously ways, represent essentially a

business judgment test. See, *Committee of Security Holders v. Lionel Corp*, 722 F.2d 1063, 1071

(2nd Cir. 1983).

28.     Once the Debtor has articulated a rational business justification, a presumption

attaches that the decision was made on an informed basis, in good faith and in the honest belief

that the action is in the best interest of the Debtor.  See, *Official Committee of Subordinated*

*Bondholders v. Integrated Resources, Inc.,* 147 B.R. 650, 656 (SDNY 1992).

29.     In addition, when there are exigent circumstances and the assets are subject to rapid deterioration, the courts have approved significant asset sales prior to the confirmation of a plan. *See In re Chateaugay Corp.*, 973 F.2d 141 (delay in sale risked a lower price in the future); *In re Pure Penn Petroleum Co.*, 188 F.2d 851 (2d Cir. 1951); *In re Solar Mfg. Corp.*, 176 F.2d 493 (3d Cir. 1949); *In re V. Loewer's Gambrinus Brewery Co.*, 141 F.2d 747 (2d Cir. 1944); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480 (Bankr. N.D. Ohio 1992) (sale approved because debtor did not have funds to repair or maintain manufacturing equipment to meet inspections).

30.     In this case, ample justification exists for the approval of the sale.  The Debtor's assets are subject to decline in value unless the Debtor can consummate a sale with a third party to preserve the business as a going concern. Unless a sale is approved, it is highly unlikely that the Debtor will be able to maintain the loyalty of its customers; the business will have to be shut down and liquidated. In addition, the Debtor currently has sufficient funding pursuant to its post-petition financing arrangement to operate, manufacture and complete orders. However, if a sale to a third party is not consummated in a timely fashion, it is unclear whether the Debtor will be able to extend its financing arrangement. Thus, a prompt sale advances the interests of the estate and maximizes the value of the assets. Accordingly, the Debtor respectfully submits that the sale should be approved.

*Bankruptcy Code §365 Assignment.*

31.     Bankruptcy Code Section 365(a) authorizes a debtor to assume and assign or to reject an unexpired lease, subject to the Court's approval.

32.     The Debtor has previously assumed many of the leases proposed to be assumed and assigned  on Exhibit A of the Agreement ("Targeted Leases").

33.     The standard that is applied in determining whether an unexpired lease should be assumed and assigned or rejected is the debtor's "business judgment" that the assumption or rejection is in the debtors' economic best interest. *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v Bildisco & Bildisco*, 465 U.S. 513, 523 (1984). The Debtors' assumption and assignment of the Targeted Leases (subject to a successful bid) is an integral part of the Debtors' liquidation efforts as the equipment is located within the real property represented by the Targeted Leases and would bring substantially less value if sold through a liquidation sale.  Additionally, the Targeted Leases represent locations which have value to a Purchaser acquiring the Debtor's assets as a going concern.  Therefore, the assignment of the Targeted Leases to the Purchasers is within the Debtors' sound business judgment.

34.     Bankruptcy Code Section 365(b)(1) codifies the requirements for assuming an unexpired lease of a debtor:

> If there has been a default in an executory contract of unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

35.     The Debtor agrees to comply with Bankruptcy Code §365(b)(1)(A) and (B) by curing any defaults under any Targeted Leases to be assumed and assigned.

36.     If requested at the Hearing, the Debtors will satisfy Bankruptcy Code §365(b)(1)(C) for any Targeted Leases to be assumed and assigned, by demonstrating adequate assurance of future performance by the proposed assignee.

37.     The meaning of "adequate assurance" depends on the facts and circumstances of each case, but should "be given a practical pragmatic construction." *EBG Midtown S. Corp. v McLaren/Hart Envtl. Eng'g. Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citation omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993). The assurance that rent will be paid is a chief determinant in assessing adequate assurance of future performance.

38.     Adequate assurance includes demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance was present when prospective assignee of lease from debtor had the financial resources, and an expressed willingness, to devote sufficient funding to business in order to give it strong likelihood of succeeding).

39.     If a landlord of any affected Targeted Lease objects to an assumption and assignment, the Debtor will offer evidence at a Hearing to demonstrate the financial wherewithal of the relevant assignee. At a Hearing, the Court and interested parties will have the opportunity to evaluate and, if necessary, challenge the ability of the assignee to provide adequate assurance of future performance under the particular lease to be assumed and assigned. The Court will therefore have sufficient bases to find that adequate assurance of future performance exists.

*Federal Rule of Bankruptcy Procedure Rule 9019 Settlement with New York State.*

40.     FRBP 9019(a) provides that the Bankruptcy Court is to "canvas the issues to see whether the proposed settlement with New York State 'falls below the lowest point on the

range of reasonableness.'" If the proposed settlement agreement falls within the range of reasonableness it should be approved by the Bankruptcy Court.

41.    The Bankruptcy Court should consider the following factors in determining whether the proposed Settlement Agreement falls within the range of reasonableness:

>    (a) The probability of success in the litigation;
>
>    (b) the difficulties, if any, to be encountered in the matter of collection;
>
>    (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;
>
>    (d) the paramount interest of the creditors and a proper deference to their reasonable views on the litigation

42.    The Debtor has participated in extensive negotiations with the State of New York resulting in the proposed settlement annexed hereto as <u>Exhibit B.</u>  The Debtor has retained and consulted with environmental counsel who has assisted the Debtor in negotiating a proposed resolution which provides, among other things that the Debtor commits to pay $65,000 to fund further investigation and remediation at the Site.  A portion of this sum ($10,000) shall be used to pay for the installation of a soil vapor extraction system at the site by no later than December 1, 2010.  The remainder of the money, $55,000, shall be **treated as an administrative claim** and paid to the New York State.  These payments shall satisfy Debtor's obligations with respect to investigation and remediation of the site.

43.    The Debtor has determined in it sound business judgment that that the costs and probability of success in resolving the environmental issues far outweigh any potential benefits of pursuing a course of litigation.  In addition, resolution of the environmental claim is a condition precedent to any proposed sale.  Based upon the forgoing, the Debtor has established

an adequate business justification for the proposed settlement and, therefore, requests authority to enter into the settlement proposal.

44.     When property is to be sold free and clear of adverse interests, a motion must be made in accordance with Federal Rules of Bankruptcy Procedure Rules 6004(c) and 9014. Thus, when there is intent to sell an asset free and clear of liens, both notice to creditors and the commencement of a contested matter are required.

45.     The Purchaser is not an "insider" or "affiliate" of the Debtor.

46.     Upon information and belief, the Debtor's administrative claims exceed the purchase price and, therefore, there is not likely to be a distribution to the unsecured creditors.

47.     Notice of the Motion and Motion has been given to the mailing matrix.   In light of the nature of the relief requested herein, the Debtor submits that no further notice need be given.

48.     No previous application for the relief requested herein has been made by the Debtor to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order pursuant to 11 U.S.C. § 363(b) and (5), §365, §105, §503, and Federal Rule of Bankruptcy Procedure 9019 authorizing the sale of the assets free and clear of all liens and other interests, such liens and other interests to attach to the proceeds of sale, pursuant to the terms and conditions set forth in this Motion and the annexed asset sale Agreement, approval of the New York State settlement, together with such other and further relief as to this Court may seem just and proper.

Dated this 9th day of June, 2010

By: */s/ Christian H. Dribusch*
Christian H. Dribusch
The Patroon Building
Five Clinton Square
Albany, NY 12207
(518) 436-1662

**OFFER OF PURCHASE OF ASSETS**
**OF GREENER CLEANERS, LTD.**
**(formerly KEM CLEANERS, INC.)**
**by**
**_____, INC. (a corporation to**
**be formed)**
**(hereafter XYZ Corp.)**

XYZ Corp. offers to purchase the assets of Greener Cleaners Ltd. upon the following terms and conditions:

1.      **Assets Purchased.**

All assets of Greener Cleaners, tangible and intangible, goodwill and all intellectual property, including trade name, trade and service marks and copyrights and corporate name, including all accounts receivable and inventory together with assignment of leases of the stores and plant located as shown on Exhibit A attached hereto together with all trade fixtures and inventory situate at said locations

but excluding, cash on hand at date of closing, the Solvair cleaning machine and any claims or causes of action relating to the Solvair cleaning machine as against R.R. Streets Co., Inc.

2.      **Price.**

The purchase price shall be $275,000.00 payable by a note in the said amount of $275,000.00.  The note shall bear interest at the rate of 5.00% per annum and shall be paid in equal monthly payments over a seven year term.

The note shall be secured only by the assets purchased and shall not be otherwise secured or guaranteed.

To the extent that the assets purchased are subject to any security interest (except the security interest hereby granted Greener Cleaners), all monthly payments on the note shall be paid directly to the secured party until its or their liens are fully paid.

3.      **Conditions Precedent.**

a.   DEC Settlement with Greener Cleaners and XYZ Corp to contain the following language as acceptable to XYZ Corp.:.

In consideration of the payment of up to $20,000.00, to NY DEC by XYZ Corp.. with the objective and intention of the parties to provide for the elimination of any significant threats to the environment and public health, if any are present, arising

Exhibit "A"

from conditions at 801-815 State Street, Schenectady and XYZ Corp.. seeks to have a Certificate of Completion ("COC") or No Further Action ("NFA") determination or equivalent promptly issued upon the elimination of any such significant threats, as described in a Stipulation to be approved by the Bankruptcy Court, and in reliance upon the representation of XYZ Corp. that it has no prior affiliation with the Seller, the State of New York hereby covenants not to sue and herein releases XYZ Corp. and its officers, directors, successors and assigns [unless any such successor or assigned entity is associated in any way with the Seller other than with regard to the sale of the property and business] that hold title to the real property, and lenders, from any and all claims, liabilities and manner of action, whether statutory or common law, involving the investigation or cleanup of subsurface PCE contamination at, on, under or migrating from the bankrupt property, including groundwater contamination, by reason of, relating to, or associated with the discharge, release or migration of PCE contamination at, on or under the property as of the date of this Settlement Agreement. Nothing herein is to be construed to provide a covenant not to sue or a release from liability for any discharges, releases or spills of contaminants at the property after the signing of this Settlement Agreement.

b.      Subject to Bankruptcy Court Approval.

This offer is subject to and made expressly contingent upon the approval of the United States Bankruptcy Court for the Northern District of New York in Case No. 08-14239 of the sale of Greener Cleaners' assets to XYZ Corp. upon the terms of this officer.

c.      Subject to Due Diligence.

This officer is subject to and made expressly contingent upon completion of due diligence by XYZ Corp. satisfactory to XYZ Corp. XYZ Corp. shall have 30 days after execution of a Contract of Purchase and Sale to complete its due diligence and said Contract of Purchase and Sale shall be conditioned upon such due diligence.

4.      **No Assumption of Liabilities.**

XYZ Corp. is not assuming any liabilities of Greener Cleaners and Greener Cleaners shall hold XYZ Corp. harmless from any claims based upon any of Greener Cleaners liabilities.

/s/ Michael M. Babat
Michael M. Babat, Esq.
on behalf of Arthur Fuerst

Exhibit "A"

**Exhibit A**

Latham Store – Peter Harris Plaza
952 Troy-Schenectady Road, Latham, NY

Madison Store
1078 Madison Avenue, Albany, NY

Guilderland Store
5 New Karner Road, Guilderland, NY

Loudonville Store – Loudonville Plaza
350 Northern Blvd., Albany, NY

Shaker Store – Shaker Pine Mall
154 Vly Road, Niskayuna, NY

Glenmont Store – Town Squire Plaza
326 Glenmont Road, #5, Glenmont, NY

Slingerlands Store – Price Chopper Plaza
1365 New Scotland Ave., Suite # Slingerlands, NY

Glenville Store
26 Saratoga Road, Scotia, NY

State Street Store and Plant
801-815 State Street, Schenectady NY

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

In Re:

**GREENER CLEANERS, LTD.,**
**d/b/a Kem Cleaners**                                          **Chapter 11**
                                                               **Case No. 08-14239**
                                        **Debtor.**
_____                        **Hon. Robert E. Littlefield**

### STIPULATION AND ORDER

**WHEREAS** Debtor commenced dry-cleaning operations at the property located at 809

State Street in Schenectady (the "Site") in 1999, and

**WHEREAS** the Site had served as an automobile sales, service and/or gasoline filling

station from the 1930s to the 1980s, and

**WHEREAS** based on an inspection of the Site in October 2007, the New York State

Department of Environmental Conservation ("Department") alleged that there were certain

violations of the Environmental Conservation Law ("ECL") relating to the operation and

maintenance of Debtor's dry cleaning machines, which at the time used the solvent

perchloroethylene ("perc") in the dry cleaning process, and

**WHEREAS** in December 2008 the Debtor filed a bankruptcy petition in the instant case,

and

**WHEREAS** in February 2009 the Department retained Precision Environmental Services

("Precision") to conduct a subsurface investigation to determine the extent and magnitude of

solvent contamination in groundwater and soil at the Site and also filed an administrative

Exhibit "B"

enforcement action against the Debtor, and

**WHEREAS** in October 2009 the Department received a copy of the investigation results from Precision, which showed the presence of perc in groundwater in concentrations exceeding state standards adjacent to the main building on the Site and perc and acetone in soil vapor underneath the main building, and

**WHEREAS** all dry cleaning products containing compounds of the type detected in the subsurface have been removed from the property and are no longer used at the Site, and

**WHEREAS** the Debtor and the Department desire to have remedial measures taken to eliminate exposures to the dry cleaning compounds detected in the groundwater and in vapor, and

**WHEREAS** the Department filed a proof of claim in the amount of $36,500 reflecting its claim for penalties in the administrative enforcement action and filed an amended proof of claim in the amount of $56,500 to reflect the $20,000 paid to Precision for the Site investigation, and

**WHEREAS** on November 3, 2009 the Department filed a motion for administrative expense priority in the amount of $20,000, and the Court granted this motion on April 14, 2010, and

**WHEREAS** Debtor intends to sell all of its dry cleaning facilities except one to a company that is not in any way affiliated with Debtor (the "Purchaser"), and

**WHEREAS** the Purchaser affirms by its signature below that it is not in any way affiliated with Debtor and that it will not use perc in any dry cleaning operations at the Site, and

**WHEREAS** the signatories to this Stipulation and Order intend to address the outstanding issues related to the investigation and remediation of environmental conditions

2

detected during the 2009 investigation and in so doing resolve the pending administrative enforcement action against Debtor, the Department's proof of claim in the instant case, and clarify the obligations of Purchaser for existing contamination at the Site, and

      **WHEREAS** the resolution of these issues will be protective of the environment while also providing reasonable certainty as to the scope of Debtor's and Purchaser's financial obligations concerning the investigation and remediation of the property so that the Debtor may proceed with a 11 U.S.C. § 363(b) sale and wind down its affairs and so that the Purchaser may do the necessary financial planning to take over Debtor's business, and,

      **WHEREAS** the Department acknowledges the limited financial resources of the Debtor based on its filings in the instant case and projection of proceeds anticipated by the sale of the Site and Debtor's business, and,

      **WHEREAS** it is the objective and intention of the signatories to provide for the elimination of any significant threats to the environment and public health, if any are present, arising from conditions at the Site,

      **NOW**, i**t is therefore Stipulated and Agreed by and between the parties, to be So Ordered by the Court that:**

      1.     Debtor's Obligations.  The Debtor commits to pay $65,000 to fund further investigation and remediation at the Site.  A portion of this sum ($10,000) shall be used to pay for the installation of a soil vapor extraction system at the Site by no later than December 1, 2010.  The remainder of the money, $55,000, shall be treated as an administrative claim and paid to the Department pursuant to the terms set forth in the attached motion.  These payments shall satisfy Debtor's obligations with respect to

Exhibit "B"

investigation and remediation of the Site.

2.        Purchaser's Obligations.  The Purchaser shall pay the Department $20,000 pursuant to the following payment schedule: $10,000 at the closing of the 363(b) sale; an additional $5,000 by January 31, 2012 provided that the Department determines that there are off-Site exposure pathway(s) that threaten public health or the environment and notify Purchaser of same by January 15, 2012; an additional $5,000 by January 31, 2013 provided that the Department determines that there are off-Site exposure pathway(s) that threaten public health or the environment and notifies Purchaser of same by January 15, 2013.  These payments shall satisfy the Purchaser's obligations with respect to investigation and remediation of the Site, provided that (i) Purchaser does not use perc in any dry cleaning operations at the Site, and (ii) continues to operate any soil vapor extraction system installed at the Site prior to or after the closing.

3.        Department's Obligations.  With respect to Debtor, the Department agrees not to oppose Debtor's 363(b) sale or plan for liquidation of assets and further to dismiss the administrative enforcement action against Debtor upon the Court's closing of the bankruptcy case.  Regarding the Purchaser, the Department hereby releases and covenants not to sue the Purchaser, its directors, officers, shareholders, and successors-in-interest (provided that any such successors are not affiliated with Debtor) for any contamination existing at the Site at the date of closing subject to the Purchaser satisfying its obligations set forth in ¶ 2, supra.

4.        This Stipulation and Order becomes effective when approved by the Court.

5.        The Court shall retain jurisdiction over this matter for purposes of enforcing or

Exhibit "B"

modifying this Stipulation and Order.

6.      This Stipulation and Order shall constitute the full and complete agreement among the signatories and shall not be modified except upon written consent of all signatories.


**Dated: \_\_\_, 2010**                    **Andrew Cuomo**
**Attorney General of the**
**State of New York**
**The Capitol**
**Albany, New York 12224**

                                   **By:**   _____
**Michael Myers**
**Assistant Attorney General**
**(518) 474-8096**
**Attorney for the New York State**
**Department of Environmental Conservation**


                                       _____
**Dated: \_\_\_, 2010**                    **By:**   **Greener Cleaners, Ltd.**
**Debtor In Possession**
**809 State Street**
**Schenectady, New York**


                                       _____
**[Purchaser]**

**THE FOREGOING STIPULATION AND AGREEMENT IS SO ORDERED**.

**Dated:**                                 _____
**Honorable Robert E. Littlefield**
**United State Bankruptcy Judge**

5

AGREEMENT OF LEASE

Agreement of lease, made as of the ____day of June, 2010 between **Kem Properties, LLC,** a New York limited liability company having offices at 10 New Karner Road, Guilderland, New York 12084 (hereinafter called Αthe Landlord@), and **Arthur Fuerst**, having an office at _____, (hereinafter called ΑTenant@).

W I T N E S S E T H :

1. <u>DEMISED PREMISES</u>:

1.01    The Landlord hereby leases to the Tenant and the Tenant hereby hires from the Landlord, the premises (hereinafter referred to as Αthe Premises@) containing approximately one and three tenths (1.3) acres, known as 801-815 State Street, 5 Mynderse Street, and 5 Chestnut Street, all located in the City and County of Schenectady, New York and further described on the tax map of the Assessor of the City of Schenectady as <u>Parcel I.D.</u>  49.25-4-24, 49.25-4-25, 49.25-4-30, 49.25-4-38, including (3) buildings situate thereon (Αthe Buildings@), located at 801-815 State Street, City and County of Schenectady, New York.

2. <u>TERM</u>:

2.01.   The term of this lease shall be for seven (7) years, commencing on the 1st day of _____, 2010 ("Commencement Date") and terminating on the 30th day of _____, 2017.

3. <u>RENT</u>:

3.01.   The Tenant shall pay an annual rent of Thirty Three Thousand Two Hundred Seventy-Six and 00/100ths Dollars ($33,276.00), payable in monthly installments of Two Thousand Seven Hundred Seventy-Three and 00/100ths Dollars ($2,773.00) on the first day of each month of said term, in advance. Monthly rent shall be paid by paying Two Thousand One Hundred Twenty and 00/100 Dollars ($2,120.00) to the Landlord and Six Hundred Fifty Three and 00/100 Dollars ($653.00) to the trust account of Siegal Law Offices, LLC, Albany, New York or the trust account of such other attorney in good standing with offices in Albany New York as Landlord may designate in writing. In the event of the designation of a different attorney to whom to send the $653.00 month Landlord shall have the previous attorney forward the funds in the trust account to the new attorney so all funds held in escrow hereunder are held in one attorney's trust account.

3.02    Upon the Tenant's timely exercise of its option to purchase set forth in article ___ herein, half the funds held in the attorney trust account from the $653.00 monthly payments shall be paid to the Landlord at the Closing (as defined in article 30) and shall be credited against the purchase price. In the event that the tenant

Draft – for discussion purposes only – May 11, 2010

Exhibit "C"

does not timely exercise his purchase option then at the end of the term of this lease the said funds in the attorney trust account shall be paid 50% to each of the Landlord and the Tenant herein.

4.   <u>USE OF PREMISES</u>:

4.01.   The Tenant may use and occupy the Demised Premises thereon for any lawful purpose(s).

5.   <u>TAXES</u>:

5.01.   In addition to the annual rental provided for in article 3 hereof, the Tenant agrees shall pay the Landlord as additional rent all real property taxes, payments in lieu of taxes, if any, water and sewer rents, rates and charges, and assessments, which may be levied or assessed against the Demised Premises by any lawful authority for the period of the term of this Lease.   Currently the taxes on the Demised Premises are under judicial challenge in the Supreme Court of the State of New York, in and for the County of Schenectady, having index number Index No.: 2009-1355. Siegal Law Offices LLC is the attorney for the Landlord in this proceeding. The taxes for 2010 are under grievance, said grievance having been timely filed by Siegal Law Offices LLC with the Board of Assessment Review for the City of Schenectady on May 11, 2010. Taxes have not been paid by the Landlord for 2009 and 2010. In consideration of the Tenant's paying the taxes determined to be due upon the resolution of the proceedings, the Landlord will bear the expense of the services of Siegal Law Offices LLC through trial or settlement. The Tenant shall pay each tax bill within ten (10) days of receipt of a tax bill from the Landlord.   Should the State of New York or any political subdivision thereof or any governmental authority having jurisdiction thereover, impose a tax and/or assessment (other than a net income or franchise tax) upon or against the rental payable by a tenant in the Building to the Landlord, or any other such tax which is intended in whole or in part as a substitute for the current method of real estate taxation, such tax and/or assessment shall be deemed to constitute a tax and/or assessment against the Building for the purpose of this article.

5.02.   Nothing herein contained is intended to make the Tenant responsible for franchise, corporate or partnership taxes which are levied to the Landlord, including excise, inheritance, capital levy, transfer or income, profits or revenue, upon income of the Landlord, except that, in the event of the passage of any statute, act or law as the result of which the Landlord becomes obligated to pay any income tax or any other tax, charge, levy assessment or imposition, in lieu or place of any general tax, school tax, or other real estate tax or assessment, which would otherwise be levied against and/or become a lien upon the Demised Premises such tax, charge, levy, assessment or imposition shall be payable by the Tenant as provided for by this article 5.

5.03   The Tenant may challenge any tax and/or assessment upon the Demised Premises at its own cost and expense. The Landlord shall cooperate with any such application or proceeding.

Draft – for discussion purposes only – May 11, 2010

Exhibit "C"

6. <u>INSURANCE</u>:

6.01.   The Tenant shall carry during the term hereof insurance for fire, extended coverage, vandalism and malicious mischief, insuring the improvements located on the Demised Premises and all appurtenances thereto (including the Tenant's trade fixtures, furnishings, equipment, personal property and the Tenant's work) for not less than the full insurable value thereof.  Throughout the term of this lease the Tenant shall provide the Landlord with copies of insurance certificates evidencing that all insurance coverage provided for herein is in full force and effect and stating the terms thereof. All policies shall name the Landlord as an additional insured and shall provide that the Landlord and the Tenant shall be given a minimum of thirty (30) days written notice by the insurance company prior to cancellation, termination or change in such insurance.

6.02.   The Tenant shall carry comprehensive commercial general liability insurance on an occurrence basis on the Demised Premises during the term hereof, for limits of not less than One Million ($1,000,000.00) Dollars per occurrence and Two Million ($2,000,000.00) Dollars aggregate limit; a policy of Marina Operator=s Legal Liability for not less than One Million ($1,000,000.00) Dollars; a policy of Protection and Indemnity Liability for not less than One Million ($1,000,000.00) Dollars per occurrence; and a Commercial Umbrella Liability of Five Million ($5,000,000.00) Dollars per occurrence and aggregate limits.  The umbrella policy should provide that it is in excess and addition to each of the policies hereinbefore mentioned.  All policies shall name the Landlord as an additional insured and shall provide that the  Landlord and the Tenant shall be given a minimum of thirty (30) days written notice by the insurance company prior to cancellation, termination or change in such insurance. The Tenant shall provide the Landlord with copies of the certificates evidencing that all insurance coverage provided for herein is in full force and effect and stating the terms thereof.

6.03.   The Tenant shall be responsible for the maintenance of the plate glass and doors in or on the Demised Premises but shall have the option either to insure the risk or to self insure.

7.   <u>ALTERATIONS</u>:

7.01.   The Tenant may not make any installations, alterations or additions in or to the Demised Premises without the consent of the Landlord, which consent will not be unreasonably withheld.

8.   <u>REPAIRS</u>:

8.01.   The Tenant shall take good care of the Demised Premises, maintain same and shall, at the Tenant's own cost and expense, make all repairs of all types, structural and nonstructural, ordinary and extraordinary, and at the end or other expiration of the term, shall deliver up the Demised Premises in good order and condition, damage by the elements and normal wear and tear excepted.

Draft – for discussion purposes only – May 11, 2010

Exhibit "C"

9. <u>DESTRUCTION BY FIRE OR OTHER CASUALTY</u>:

9.01. In the event the Demised Premises are hereafter damaged or destroyed or rendered partially untenantable for their accustomed uses by fire or other casualty insured under the coverage which the Landlord is obligated to carry pursuant to article 6, then the Landlord to the extent of insurance proceeds received on account of such casualty shall promptly repair said premises and restore the same to substantially the condition in which they were immediately prior to the happening of such casualty, and from the date of such casualty until the Demised Premises are so repaired and restored, annual rental payments and all other charges and items of additional rental payable hereunder, except for any proportionate share of taxes and charges due under articles 5 and 6 hereof, shall abate in such proportion as the part of the Demised Premises thus destroyed or rendered untenantable bears to the total Demised Premises, provided, however, that in the event fifty percent (50%) or more of the Demised Premises be hereafter destroyed or rendered untenantable by fire or other casualty during the term of this lease (based upon the cost to replace the premises damaged or destroyed as compared with the physical value of the improvements on the Demised Premises or said Building, as the case may be, immediately prior to such fire or other casualty as shown by certificate of the Landlord's architect), then either party hereto shall have the right to terminate this lease effective as of the date of such casualty, by giving to the other party hereto, within thirty (30) days after the happening of such casualty, written notice of such termination. If said notice be given within said thirty (30) day period, this lease shall terminate and annual rental and all other charges and items of additional rental shall abate as aforesaid from the happening of such casualty, and the Landlord shall promptly repay to the Tenant any rental theretofore paid in advance which has not been earned at the date of such casualty. If said notice be not given and the Landlord is required or elects to repair or rebuild the Demised Premises as herein provided, then the Tenant shall repair and replace its trade fixtures, furnishings and equipment in a manner and to at least a condition equal to that prior to their damage or destruction. Except as herein expressly provided to the contrary, this lease shall not terminate nor shall there be any abatement of rent or other charges or items of additional rent as the result of a fire or other casualty. In determining what constitutes prompt repair of the Demised Premises consideration shall be given to the delays caused by strikes, adjustment of insurance and other causes beyond the Landlord's control.

10. <u>SIGNS</u>:

10.01. The Tenant shall neither place, nor cause or allow to be placed, any sign or signs of any kind whatsoever at, in, on or about the Demised Premises, or any windows or glass therein, without approval of the Landlord and necessary municipal authorities. The size, design, character and location of any of the Tenant's signs shall be in conformity with the specifications and drawings applicable to the construction of the Demised

Draft – for discussion purposes only – May 11, 2010

Premises, as prepared or approved by the Landlord.  Approval of all signs shall be in writing by the Landlord, and will not be unreasonably withheld.  In the case that the Landlord shall deem it necessary to remove any such sign or signs in order to make any other repairs or alterations or improvements in or upon the Demised Premises or the Buildings or any part thereof, the Landlord shall have the right to do so, providing the same be removed and replaced at the Landlord's expense, whenever the said repairs, alterations or improvements shall be completed.

10.02.  Upon termination of this lease by expiration or otherwise, the Tenant shall remove all of its signs, interior and exterior, within five (5) days after such termination and shall repair to the Landlord's reasonable satisfaction any damage caused by such removal.

11.     UTILITIES:

11.01.  The Tenant shall be responsible for payment of all utilities servicing the Demised Premises, including electric, gas, telephone, sewer, and water.

12.     ASSIGNMENT OF LEASE:

12.01.  The Tenant may sublet or assign this lease. No assignment or sublease shall be effective unless the assignee or sublessee agrees directly with the Landlord to perform the Tenant's obligations under this lease. Notwithstanding any permitted assignment or subletting, no further assignment or subletting may be made without the Landlord's consent and, in all events, the Tenant shall remain fully and primarily liable for the payment of all rent, additional rent and the performance of all the terms, covenants and conditions contained herein jointly and severally with such assignee or sublessee. The Landlord's dealing with an assignee or sublessee shall not affect the continued liability of the Tenant under this lease.

13.     COMPLIANCE WITH LAWS:

13.01.  The Tenant shall comply with all laws, order and regulations of federal, state, county and municipal authorities, and with any direction pursuant to laws of any public officer thereof, which shall impose any violation, order or duty upon the Landlord or the Tenant resulting from the use and occupancy of the Demised Premises by the Tenant.  The Tenant shall have the right, upon giving notice to the Landlord, to contest any obligation imposed upon the Tenant pursuant to the provisions of this article, and to defer compliance during the pendency of such contest, provided that the failure of the Tenant to so comply will not subject the Landlord to prosecution or criminal penalty. The Landlord represents to the best of his knowledge, information and belief that the Buildings, and the Demised Premises to be in compliance with all applicable laws, codes, regulations, and statue at the time of occupancy by the Tenant. The  Landlord shall comply with

Exhibit "C"

any such laws, orders, regulations, directions and rules in respect to the Demised Premises, other than those imposing an obligation upon the Tenant as aforesaid, subject, however, to the right of the Landlord similarly to contest as aforesaid and defer compliance during the pendency of such contest.

14.    SUBORDINATION:

14.01. This instrument shall not be a lien against said Demised Premises with respect to any first mortgage that is now on or that hereafter may be placed against the Demised Premises, and upon the recording of such mortgage or mortgages, the same shall have preference and precedence and be superior and prior in lien to this lease, irrespective of the date of recording of the same and the Tenant agrees to execute any such instrument, without cost, which may be deemed necessary or desirable to further effect the subordination of this lease to any such mortgage, and a refusal to execute such instrument shall entitle the Landlord, or the Landlord's assigns and legal representatives to the option of cancelling this lease without incurring any expense or damage and the term hereby granted is expressly limited accordingly, provided, however, that a non-disturbance agreement shall have first been entered into in respect to such mortgage.  The term "non-disturbance agreement" as used in this article shall mean an agreement in recordable form between the Tenant and the holder of any subsequent mortgage lien, which shall provide, in substance, that the Tenant shall attorn to any such mortgagee and that as long as the Tenant is not in default under this lease beyond any period given to the tenant to cure such default, such holder will not name or join the Tenant as a party defendant or otherwise in any suit, action or proceeding to enforce, nor will this lease be terminated or otherwise affected by enforcement of, any rights given to such holder pursuant to the terms, covenants or conditions contained in such mortgage or mortgages, or any other documents held by such holder or any rights given to such holder as a matter of law.  However, at the election of the holder of any first mortgage on the Building this lease shall be prior and superior to the lien of any such mortgage.  The Tenant agrees to make minor, reasonable changes to this lease as may be required by any such mortgagee, provided such mortgagee is a recognized lending institution and the said changes do not modify the substance of this agreement.

14.02. With reference to any assignment by the Landlord of the Landlord's interest in this lease, or the rents payable hereunder, conditional in nature or otherwise, which assignment is made to the holder of a mortgage on property which includes the Demised Premises, the Tenant agrees:

(a)    That the execution thereof by the Landlord and the acceptance thereof by the holder of such mortgage, shall never be treated as an assumption by such holder of the obligations of the Landlord hereunder, unless and until such holder shall, by notice to the Tenant, specifically otherwise elect; and

(b)     Except as aforesaid, such holder shall be treated as having assumed the Landlord's obligations hereunder only upon foreclosure of such holder's mortgage, the taking of possession of the Demised Premises, and such holder's acceptance of the Tenant's attornment.

15.     <u>WAIVER OF REDEMPTION</u>:

15.01.  The Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event of the Tenant being dispossessed or removed from the Demised Premises because of default by the Tenant pursuant to the covenants or agreements contained in this lease.

16.     <u>DEFAULT</u>

16.01.  (a)     It is expressly understood and agreed that in case the Demised Premises shall be deserted or vacated, or if default be made in the payment of the rent or additional rent or any part thereof as herein specified, or if, without the consent of the Landlord, the Tenant shall sell, assign, or mortgage this lease, or if default be made in the performance of any of the covenants and agreements in this lease contained on the part of the Tenant to be kept and performed, or if the Tenant shall fail to comply with any of the statutes, ordinances, rules, orders, regulations and requirements of the federal, state and local governments or of any and all their departments or bureaus, applicable to the Demised Premises, or if the Tenant shall file or there shall be filed against the Tenant a petition in bankruptcy or arrangement, or under any insolvency laws now or hereinafter enacted, or the Tenant be adjudicated a bankrupt or make an assignment for the benefit of creditors to take advantage of any insolvency act, the Landlord may, if the Landlord so elects, and may at any time thereafter terminate this lease and the term hereof, on giving to the Tenant thirty (30) days notice in writing to cure such default, except in the case of non-payment of rent or additional rent said notice shall require a cure within ten (10) days, and if such default is not so cured, this lease and the term hereof shall expire and come to an end on the date fixed in such notice as if the said date were the date originally fixed in this lease for the expiration hereof, and the Landlord may re-enter the Demised Premises and dispossess or remove the Tenant or any other occupant of the Demised Premises by summary proceedings or otherwise, and remove their effects and hold the Demised Premises as if this lease had not been made, but without prejudice to the Landlord's remedies, on account thereof as set forth in paragraph (b) below.  The Tenant acknowledges that the Tenant has read and is fully familiar with this article "16" of the lease and that in the event of any default with respect to payment of rent or additional rent by the Tenant after notice is given as required herein, the Landlord may forthwith enter, take possession and operate the Demised Premises.

Exhibit "C"

(b)     In the event of such dispossession or removal and notwithstanding such action or the termination of this lease,  (i) the Tenant shall be liable forthwith to pay the rent and additional rent payable under this lease up to the date of such dispossession, removal or termination, (ii) the  Landlord may re-let the Demised Premises, or any part or parts thereof, either in the name of the Landlord or otherwise, for a term or terms which may, at the option of the Landlord, be less than or exceed the period which would otherwise have constituted the balance of the term of this  lease and may grant concessions or free rent for a reasonable time, (iii) the Tenant shall pay to the Landlord as liquidated damages for the failure of the Tenant to observe and perform the covenants and agreements of the  Tenant under this lease, any deficiency between the rent and additional rent payable by the Tenant under this lease and the net amount, if any, of the rents collected on account of the lease or leases of the Demised Premises for each month of the period which would otherwise have constituted the balance of the term of this lease, (iv) amounts received by the Landlord after reletting shall first be applied against the Landlord's expenses incurred in any reletting, until the same are recovered, and until such recovery, the Tenant shall pay, as of each day when a payment would fall due under this lease, the amount which the Tenant is obligated to pay under the terms of this lease (the Tenant's liability prior to any such reletting and such recovery not in any way to be diminished as a result of the fact that such reletting might be for a rent higher than the rent provided for in this lease); when and if such expenses have been completely recovered, the amounts received from reletting by the  Landlord as have not previously been applied shall be credited against the Tenant's obligations as of each day when a payment would fall due under this lease, and only the net amount thereof shall be payable by the Tenant; further, amounts received by the Landlord from such reletting for any period shall be credited only against obligations of the Tenant allocable to such period, and shall not be credited against obligations of the Tenant hereunder accruing subsequent or prior to such period; nor shall any credit of any kind be due for any period after the date when the term of this lease is scheduled to expire according to its terms.  The Landlord may make such alterations, repairs, replacements and decorations in the Demised Premises as the  Landlord considers advisable and necessary for the purpose of reletting the Demised Premises, and the making of such alterations and decorations shall not operate or be construed to release the Tenant from liability under this lease.  The failure or refusal of the Landlord to re-let the Demised Premises or any part thereof shall not release or affect the liability of the tenant for damages under this lease. The  Landlord shall in no event be liable in any way whatsoever for inability to re-let the Demised Premises or, in the event that the Demised Premises are re-let, for inability to collect the rent under such reletting.

Draft – for discussion purposes only – May 11, 2010

Exhibit "C"

(c)  After default of payment of rent, or violation of any other provision of this lease, or expiration thereof, the Tenant moves out or is dispossessed and fails to remove any trade fixture or other property prior to such said removal, expiration of lease, or prior to the execution of the warrant, then in that event, the said fixtures and properties shall be deemed abandoned by the said Tenant and shall become the property of the Landlord.

17.  <u>CURING DEFAULTS</u>:

17.01.  If the Tenant shall default in the observance or performance of any covenant or agreement of this lease on the part of the Tenant to be observed or performed, beyond any period given to the Tenant to cure such default,  the  Landlord may perform the same for the account of the Tenant, and if the  Landlord makes any expenditures or incurs any obligation for the payment of money in connection therewith, including, but not limited to, reasonable attorneys' fees in instituting, prosecuting or defending any action or proceedings, such expenditures paid, or obligations incurred, with interest and costs, shall be deemed to be additional rent and shall be paid by the Tenant to the Landlord within ten (10) days of rendition to the Tenant of any bill or statement therefor.

18.  <u>EMINENT DOMAIN</u>:

18.01.  If the Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, then in that event, the term of this lease shall cease and terminate from the date of title vesting in such proceeding.  If a portion of the Demised Premises shall be so taken that continued operation of the marina would be uneconomical, then the Tenant shall have the right to terminate this lease by giving notice to the Landlord not later than thirty (30) days after the effective date of such taking.

18.02.  In the event of a taking of the Demised Premises or any part thereof, Landlord shall have and hereby reserves and excepts, and Tenant hereby grants and assigns to Landlord, all rights to recover for damages to the Demised Premises and the leasehold interest hereby created, and to compensation accrued or hereafter to accrue by reason of such taking, as aforesaid, and by way of confirming the foregoing, the Tenant hereby grants and assigns, and covenants with the Landlord to grant and assign, to the Landlord all rights to such damages or compensation.  Nothing contained herein shall be construed to prevent the Tenant from prosecuting in any condemnation proceedings any claims permitted by law to recover for relocation expenses, loss of business, or depreciation to, or cost of removable trade fixtures, furniture and other personal property belonging to the Tenant, provided that such action shall not affect the amount of compensation otherwise recoverable by the Landlord from the taking authority.

Draft – for discussion purposes only – May 11, 2010

Exhibit "C"

19. <u>INDEMNIFICATIONS</u>:

19.01. The Tenant does hereby covenant and agree with said the Landlord that it will indemnify and save harmless the Landlord from and against any and all liability, damage, penalties or judgments arising from injury to person or property sustained by anyone in and about the Demised Premises resulting from any act or acts of omission or commission of the Tenant, or the Tenant's officers, agents, servants, employees, contractors, or assignees. The Tenant shall, at its own cost and expense, defend any and all suits or actions (just or unjust) which may be brought against the Landlord or in which the Landlord may be impleaded with others upon any such abovementioned matter, claim or claims, except as may result from any act or acts of omission or commission of the Landlord, or the Landlord's officers, agents servants, employees, assignees or contractors. The Landlord shall not be responsible or liable for any damage or injury to any property, fixtures, buildings or other improvements, or to any person or persons, at any time on the Demised Premises, including any damage or injury to the Tenant or to any of the Tenant's officers, agents, servants, employees, contractors, customers or assignees; except as may result from any act or acts of omission or commission of the Landlord, which continue after notice from the Tenant to the Landlord of a condition for the cure or correction of which the Landlord is liable and the Landlord has failed, within a reasonable time after notice, to cure or correct such condition.

20. <u>END OF TERM</u>:

20.01. Upon expiration or other termination of the term of this lease, the Tenant shall quit and surrender to the Landlord the Demised Premises, broom clean, in good order and condition and with all heating, ventilating and airconditioning systems in good working order, reasonable wear and tear and damage by fire or other casualty excepted.

21. <u>QUIET ENJOYMENT</u>:

21.01. The Landlord covenants and agrees that the tenant may peaceably and quietly enjoy the Demised Premises, subject, however, to the covenants and agreements contained in this lease.

22. <u>NO WAIVER</u>:

22.01. The failure of the Landlord to seek redress for violation of, or to insist upon the strict performance of, any covenant or agreement contained in this lease shall not prevent a similar subsequent act from constituting a default under this lease. This lease contains the entire agreement between the parties, and cannot be changed, modified, or amended unless such change, modification or amendment is in writing and signed by the party against whom enforcement of such change, modification or amendment is sought.

Draft – for discussion purposes only – May 11, 2010

22.02.  No payment by the Tenant, or acceptance by the Landlord, of a lesser amount then shall be due from the Tenant to the Landlord shall be treated otherwise than as a payment on account.  The acceptance by the Landlord of a check for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such check, that such lesser amount is payment in full, shall be given no effect, and the Landlord may accept such check without prejudice to any other rights or remedies which the Landlord may have against the Tenant.

23.     MEMORANDUM OF LEASE:

23.01.  Upon request of either party to this lease, the Landlord and the Tenant agree to execute and deliver a memorandum of this lease and a memorandum of any modification of this lease, in recordable form, containing the information required by Section  291-c and 291-cc of the Real Property Law of the State of New York.

24.     INSPECTION OF PREMISES:

24.01.  The Tenant agrees that the Landlord and its agents and/or representatives shall have the right to enter into and upon Demised Premises, or any part thereof, at all reasonable hours for the purpose of examining the same, or making such repairs or alterations therein as may be necessary for the safety and preservation thereof.

24.02.  The Tenant also agrees to permit during the last six (6) months of the term of this lease, the Landlord or the Landlord's agents to show the Demised Premises to persons wishing to lease the same.

25.     NOTICES:

25.01.  Any notice or demand required to be given under this lease, or pursuant to any law or governmental regulations, by the Landlord to the Tenant or by the Tenant to the Landlord shall be in writing.  Unless otherwise required by law or governmental regulations, any such notice or demand shall be deemed given if sent by registered or certified mail, enclosed in a secure postage prepaid wrapper, addressed (i) to the Landlord, at the address of the Landlord first hereinabove set forth, or such other address as the Landlord may designate by notice to the Tenant, or (ii) to the Tenant, at the address of the Tenant first hereinabove set forth or such other address as the Tenant may designate by notice to the Landlord.

25.02.  After receiving notice from any person, firm or other entity that it holds a mortgage which includes the Demised Premises as part of the mortgaged premises, no notice from the Tenant to the Landlord shall be effective unless and until a copy of the same is given to such holder, and the curing of any of the Landlord's default by such holder shall be treated as performance by the Landlord.

Draft – for discussion purposes only – May 11, 2010

26. <u>CAPTIONS</u>:

26.01.  The captions preceding the articles of this lease are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this lease nor the intent of any provision of this lease.

27. <u>SUCCESSORS AND ASSIGNS</u>:

27.01.  The covenants and agreements contained in this lease shall bind and inure to the benefit of the Landlord and the heirs, personal representatives, successors and assigns of the Landlord, and the Tenant and its successors and assigns.

28. <u>MISCELLANEOUS</u>:

28.01.  The covenants of the Landlord contained in this lease shall be binding upon the Landlord and the Landlord's successors in title only with respect to breaches occurring during the Landlord's and the Landlord's successors' respective ownership of the Landlord's interest in the Demised Premises, and the Tenant specifically agrees to look solely to the Landlord's equity interest in the property of which the Demised Premises are a part for the recovery of any judgment against the Landlord.

28.02.  If any term or provision of this lease, or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this lease shall be valid and be enforced to the fullest extent permitted by law.

28.03.  The Landlord and the Tenant understand, agree, and acknowledge that:

(a)      This Lease has been freely negotiated by both parties; and

(b)     That, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this lease or any of its terms or conditions, there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this lease or any portion thereof.  The parties acknowledge that David Siegal, an officer of the Tenant and member of the Landlord is an attorney and the drafter of this lease, and has not represented either party *vis a vis* the other.

28.04.  The Tenant will not suffer or permit, during the term herein granted, or any extensions thereof, any mechanic's or other liens for work, labor, services or materials to attach to the Demised Premises or to any portion thereof; and that whenever and as often, if ever, as any such lien or liens shall be filed, or shall attach, the Tenant will, within sixty (60) days thereafter, either pay the same or procure the cancellation thereof by giving security, or in such a manner as is or may be prescribed by law.

29.     <u>HAZARDOUS SUBSTANCES</u>:

29.01. (1) The term "Hazardous Substances", as used in this Lease, shall include, without limitation, flammables, explosives, radioactive materials, asbestos, polychlorinated biphenyls (PCBs), chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, toxic substances or related materials, petroleum and petroleum products, and substances declared to be hazardous or toxic under any law or regulation now or hereafter enacted or promulgated by any governmental authority.

(2)  There is currently a proceeding with the New York Department of Environmental Conservation ("DEC") concerning alleged violations which occurred at the Demised Premises in or about June and October 2007, having  DEC Index No.: R4-2007-1119-160, assigned to Administrative Judge James McClymonds. The matter which is the subject of the administrative proceeding referred to in the proceeding sentence is referred to as the "DEC Matter". The tenant of the Demised Premises at the time of the DEC Matter was Greener Cleaners, Ltd ("Greener"). Landlord asserts it has no responsibility or liability in connection with the DEC Matter. Tenant represents that it has paid $10,000.00 to DEC in exchange for a covenant by DEC not to sue Tenant or tenant's landlord in connection with the DEC Matter. Tenant represents that it has a written asset purchase agreement with Greener in which Tenant is to deposit up to $5,000.00 in 2010 and $5,000.00 in 2013 toward whatever remediation program is in place for the DEC Matter. Tenant's covenant with Greener shall be enforceable by Landlord as an intended third party beneficiary. The balance of this article 29 shall not apply with respect to the DEC Matter. This lease is contingent upon the Closing occurring as set forth in and as defined in the asset purchase agreement the Tenant has with Greener.

(3)     Tenant's Restrictions.  The Tenant shall not cause or permit to occur:

(a)     Any violation of any federal, state, or local law, ordinance, or regulation now or hereafter enacted, related to environmental conditions on, under, or about the Demised Premises, arising from

the Tenant's use or occupancy of the Demised Premises, including, but not limited to, soil and ground water conditions; or

(b)     The use, generation, release, manufacture, refining, production, processing, storage, or disposal of any Hazardous Substance on, under, or about the Demised Premises, or the transportation to or from the Demised Premises of any Hazardous Substance, except in compliance with all environmental laws pertaining thereto.

(4)     Environmental Clean-up.

With respect to the Tenant's use and occupancy of the Demised Premises:

(a)     The Tenant shall, at the Tenant's own expense, comply with all laws regulating the use, generation, storage, transportation, or disposal of Hazardous Substances ("Laws").

(b)     The Tenant shall, at the Tenant's own expense, make all submissions to, provide all information required by, and comply with all requirements of all governmental authorities (the "Authorities") under the Laws.

(c)     Should any Authority or any third party demand that a cleanup plan be prepared and that a clean-up be undertaken because of any deposit, spill, discharge, or other release of Hazardous Substances that occurs during the term of this Lease, at or from the Demised Premises, from the Tenant's use or occupancy of the Demised Premises, then the Tenant shall, at the Tenant's own expense, prepare and submit the required plans and all related bonds and other financial assurances; and the Tenant shall carry out all such cleanup plans.

(d)     The Tenant shall promptly provide all information regarding the use, generation, storage, transportation, or disposal of Hazardous Substances that is requested by the Landlord.  If the Tenant fails to fulfill any duty imposed under this paragraph (3) within a reasonable time, the Landlord may do so; and in such case, the Tenant shall cooperate with the Landlord in order to prepare all documents the Landlord deems necessary or appropriate to determine the applicability of the Laws to the Demised Premises and the Tenant's use thereof, and for compliance therewith, and the Tenant shall execute all documents promptly upon the Landlord's request.  No such action by the Landlord and no attempt made by the Landlord to mitigate damages under any Law shall constitute a waiver of any of the Tenant's obligations under this paragraph (4).

(e)     Landlord and Tenant's obligations and liabilities under this Article A30" shall survive the expiration of this Lease.

(5)     Tenant's Indemnity.

(a)     The Tenant shall indemnify, defend, and hold harmless the Landlord, the manager of the property, and their respective officers, directors, beneficiaries, shareholders, partners, agents, and employees from all fines, suits, procedures, claims, and actions of every kind, and all costs associated therewith

(including reasonable attorneys' and consultants' fees) arising out of or in any way connected with any deposit, spill, discharge, or other release of Hazardous Substances that occurs during the term of this lease at or from the Demised Premises and which arises from the Tenant's use or occupancy of the Demised Premises, or from the Tenant's failure to provide all information, make all submissions, and take all steps required by all authorities under the Laws and all other environmental laws.

30.   OPTION TO PURCHASE:

30.01.   Provided this lease is in full force and effect and the Tenant is not in default hereunder, the Tenant has the option to purchase the Demised Premises upon the following terms and conditions:

A.      The Tenant may exercise this option at any time during the scheduled term of this lease but not later than six (6) months prior to the expiration of the term by written notice to the Landlord that the Tenant is exercising his option to purchase the Demised Premises pursuant to this lease. The transfer of title and payment of the purchase price shall occur within thirty days of the Tenant's exercise of his option.

B.      The Landlord shall convey the Demised Premises to the Tenant by bargain and sale deed with covenant against the grantor's acts  in proper form for recording, which deed shall include the covenants required by Subdivision "5" of Section 13 of the Lien law.  The deed shall include a permanent  nonexclusive easement over Grimm Lane for light, air, ingress and egress.  The said deed shall be prepared, duly signed by the Landlord, and signature(s) acknowledged and have any transfer tax paid in the proper amount, all at the Landlord's expense, so as to convey to the Tenant the fee simple of the Demised Premises free and clear of all liens and encumbrances, except as herein stated.

C.      The Landlord shall convey the Demised Premises subject to all covenants, conditions, restrictions and easements of record, to zoning and environmental protection laws, and to any state of facts which an inspection and/or accurate survey may show, provided that this does not render the title to the Demised Premises unmarketable and does not prevent the intended use of the property for all legal purposes as provided in the zoning ordinance of the City of Schenectady.

D.      The Landlord may pay and discharge any liens and encumbrances not provided for herein out of the moneys paid by the Tenant on the transfer of title.

E.      The Landlord shall pay the New York State Real Property Transfer Tax and Capital Gains Tax, if any, as set by law and further agrees to pay the expenses of preparing and recording satisfaction or release of any existing mortgage.

F.      The buildings on the Demised Premises herein will be sold "as is", without warranty as to condition, express or implied, and under the conveyance herein shall be made in their condition on the date of transfer of title, except that in the case of any destruction within the meaning of the provisions of Section 51311 of the General Obligations Law of the State of New York entitled "Uniform Vendor and Purchaser Risk Act",

said section shall not apply to this sale.

        G.      The purchase price is Two Hundred Ninety Thousand and no/100 ($290,000.00) dollars and shall be paid as follows:

        $ 25,000.00 deposit on exercise of the option.

        $192,500.00 to be paid at time of closing.

        $ 72,500.00 by giving the Landlord the note of the Tenant to pay said sum in equal consecutive monthly installments with interest at the annual rate of five percent (5%) commencing 30 days from the date of the closing for sixty (60) months. The note shall be secured by a first mortgage upon the Demised Premises, recorded at the Tenant's expense. The form of the note and mortgage shall be the form in general use by Key Bank, N.A. for commercial term loan mortgage transactions. The payment of the purchase price and the execution and delivery of the deed, note and mortgage with funds for recording are hereinbefore and referred to as the Closing.

        H.      This option is not assignable separate and apart from this lease, and is not severablefrom this lease. This option shall terminate if the lease terminates for any reason.

        IN WITNESS WHEREOF, the Landlord has signed these presents and Tenant has caused these presents to be signed by its duly authorized officer.

**Kem Plant, LLC**

_____

By: David M. Siegal, member

_____

Arthur Fuerst

STATE OF NEW YORK )
COUNTY OF ) ss.:

        On this ____ day of June, 2010, before me personally came **David M. Siegal,** to me personally known, who, being by me duly sworn, did depose and say that he resides at Longboat Key, Florida, that he is a member of Kem Plant, LLC, the limited liability company described  in, and which executed, the within Instrument;  and that he signed his name thereto with the authority of the articles of organization of the company and as the act and deed of the company.

                                       _____
                                       Notary Public, State of New York
                                       Qualified in the County of
                                       My Commission Expires

STATE OF NEW YORK )
COUNTY OF ALBANY ) ss.:

        On the _____ day of June, in the year 2010, before me, the undersigned, a notary public in and for said State, personally appeared  Arthur Fuerst, personally known to me or proved to me on the basis of satisfactory evidence consisting of a driver=s license to be the individual whose name is subscribed to the within instrument and acknowledged to be that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

                                       _____
                                       Notary Public, State of New York
                                       Qualified in _____ County
                                       My Commission Expires on

Exhibit "C"

# INDEX TO LEASE

## KEM PLANT, LLC with ARTHUR FUERST

| ARTICLE | CAPTION | PAGE |
|---|---|---|
| 1 | DEMISED PREMISES | 1 |
| 2 | TERM | 1 |
| 3 | RENT | 1 |
| 4 | USE OF PREMISES | 1 |
| 5 | TAXES | 1 |
| 6 | INSURANCE | 2 |
| 7 | ALTERATIONS | 3 |
| 8 | REPAIRS | 3 |
| 9 | DESTRUCTION BY FIRE OR OTHER CASUALTY | 3 |
| 10 | SIGNS | 4 |
| 11 | UTILITIES | 4 |
| 12 | ASSIGNMENT OF LEASE | 4 |
| 13 | COMPLIANCE WITH LAWS | 5 |
| 14 | SUBORDINATION | 5 |
| 15 | WAIVER OF REDEMPTION | 6 |
| 16 | DEFAULT | 6 |
| 17 | CURING DEFAULTS | 8 |
| 18 | EMINENT DOMAIN | 8 |
| 19 | INDEMNIFICATIONS | 9 |
| 20 | END OF TERM | 9 |
| 21 | QUIET ENJOYMENT | 10 |
| 22 | NO WAIVER | 10 |
| 23 | MEMORANDUM OF LEASE | 10 |
| 24 | INSPECTION OF PREMISES | 10 |
| 25 | NOTICES | 10 |
| 26 | CAPTIONS | 11 |
| 27 | SUCCESSORS AND ASSIGNS | 11 |
| 28 | MISCELLANEOUS | 11 |
| 29 | HAZARDOUS SUBSTANCES | 12 |
| 30 | OPTION TO PURCHASE | 14 |

Exhibit "C"